**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

HOLOGIC, INC., AND CYTYC SURGICAL
PRODUCTS, LLC,

            Plaintiffs,

v.

MINERVA SURGICAL, INC.,

            Defendant.

C.A. No. 15-1031-JFB-SRF

## [PROPOSED] FINAL JURY INSTRUCTIONS

**Young Conaway Stargatt & Taylor llp**

Karen L. Pascale (#2903)
Pilar G. Kraman (#5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
kpascale@ycst.com
pkraman@ycst.com

*Counsel for Plaintiffs, Hologic, Inc. and
Cytyc Surgical Products, LLC*

**Greenberg Traurig llp**

Benjamin J. Schladweiler (#4601)
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, DE 19801
(302) 661-7000
schladweilerb@gtlaw.com

*Counsel for Defendant, Minerva Surgical, Inc.*

June 11, 2018

## TABLE OF CONTENTS

I.  GENERAL INSTRUCTIONS ................................................................... 1

    A.  INTRODUCTION [STIPULATED] ................................................ 1

    B.  DUTIES OF THE JURY [STIPULATED]........................................ 2

    C.  BURDENS OF PROOF [DISPUTED] ............................................ 3

    D.  EVIDENCE DEFINED [DISPUTED] ............................................ 6

    E.  DIRECT AND CIRCUMSTANTIAL EVIDENCE [STIPULATED] ................. 8

    F.  CREDIBILITY OF WITNESSES / WEIGHING CONFLICTING
       TESTIMONY [STIPULATED]........................................................ 9

    G.  NUMBER OF WITNESSES [STIPULATED] .................................. 10

    H.  EXPERT WITNESSES [STIPULATED]........................................ 11

    I.  DEPOSITION TESTIMONY [STIPULATED] ................................ 12

    J.  ADMITTED FACTS [STIPULATED] .......................................... 13

    K.  USE OF NOTES [STIPULATED] ............................................... 14

II. THE PARTIES AND THEIR CONTENTIONS [DISPUTED] ................. 15

III. GENERAL GUIDANCE REGARDING PATENTS ......................... 21

    A.  PATENT CLAIMS AND CLAIM LIMITATIONS OR
       REQUIREMENTS [STIPULATED].......................................... 21

    B.  DEPENDENT AND INDEPENDENT CLAIMS [STIPULATED].................... 22

    C.  CLAIM CONSTRUCTION [STIPULATED] .................................. 23

IV. PATENT INFRINGEMENT ............................................................. 25

    A.  OVERVIEW [DISPUTED] ........................................................ 25

    B.  DIRECT INFRINGEMENT [DISPUTED] .................................... 27

        1.  LITERAL INFRINGEMENT [DISPUTED] .......................... 27

        2.  INFRINGEMENT UNDER THE DOCTRINE OF
           EQUIVALENTS [DISPUTED]................................................ 31

       3.     INFRINGEMENT DESPITE ACCUSED INFRINGER'S IMPROVEMENT [DISPUTED] ............................................. 34

    C.     INDIRECT INFRINGEMENT [DISPUTED] ...................................... 35

        1.     INDUCING INFRINGEMENT [DISPUTED] ........................................ 35

        2.     CONTRIBUTORY INFRINGEMENT [DISPUTED] ............................ 38

    D.     WILLFUL INFRINGEMENT [DISPUTED] ...................................... 40

V.     ASSIGNOR ESTOPPEL [DISPUTED] ..................................................... 43

VI.    INVALIDITY ................................................................................................ 45

    A.     BURDEN OF PROOF [DISPUTED] .................................................... 45

    B.     LEVEL OF ORDINARY SKILL [DISPUTED] .................................... 46

    C.     WRITTEN DESCRIPTION REQUIREMENT [DISPUTED] ............................ 48

    D.     ENABLEMENT [DISPUTED] ............................................................ 52

VII.   PATENT DAMAGES [DISPUTED] .............................................................. 56

    A.     INTRODUCTION [DISPUTED] ........................................................ 56

    B.     LOST PROFITS [DISPUTED] ............................................................ 59

        1.     "BUT FOR" TEST [DISPUTED] ...................................................... 59

        2.     AMOUNT OF PROFIT [STIPULATED] .................................................. 61

        3.     LOST PROFITS—DEMAND [STIPULATED] ...................................... 62

        4.     MARKET SHARE [STIPULATED] ........................................................ 63

        5.     LOST-PROFITS—ACCEPTABILITY OF NON-INFRINGING SUBSTITUTES [STIPULATED] .............................................. 64

        6.     LOST-PROFITS—AVAILABILITY OF NON-INFRINGING SUBSTITUTES [DISPUTED] ................................................ 65

        7.     LOST PROFITS—CAPACITY [STIPULATED] .................................. 67

    C.     REASONABLE ROYALTY [DISPUTED] .......................................... 68

        1.     FACTORS FOR DETERMINING A REASONABLE ROYALTY [DISPUTED] ................................................................ 71

2.      AVAILABILITY OF NON-INFRINGING SUBSTITUTES [DISPUTED]...................................................................... 76

D.      DAMAGES APPORTIONMENT [DISPUTED] ................................. 77

E.      DATE OF COMMENCEMENT OF DAMAGES [STIPULATED]................... 78

VIII.   UNFAIR COMPETITION UNDER THE LANHAM ACT (15 U.S.C. § 1125) [DISPUTED]................................................................................................. 79

A.      DEFINITION OF A TRADEMARK [DISPUTED]............................................ 79

B.      UNFAIR COMPETITION [DISPUTED]............................................................ 81

C.      LIKELIHOOD OF CONFUSION – LAPP FACTOR TEST [DISPUTED]........ 83

D.      DAMAGES [DISPUTED]..................................................................................... 87

IX.    DECEPTIVE TRADE PRACTICES UNDER 6 DEL. C. § 2532 [DISPUTED]............ 89

X.     UNFAIR COMPETITION UNDER DELAWARE COMMON LAW [DISPUTED]................................................................................................. 91

XI.    TORTIOUS INTERFERENCE UNDER DELAWARE COMMON LAW [DISPUTED]................................................................................................. 93

XII.   DAMAGES FOR DELAWARE COMMON LAW CLAIMS [DISPUTED]................. 95

A.      COMPENSATORY DAMAGES [DISPUTED] .................................................. 95

B.      PUNITIVE DAMAGES [DISPUTED] ................................................................ 97

XIII.  MINERVA'S COUNTERCLAIMS [DISPUTED] ........................................................ 99

A.      LANHAM ACT [DISPUTED] ............................................................................ 99

B.      DELAWARE STATE LAW CLAIMS [DISPUTED] ...................................... 107

1.      DECEPTIVE TRADE PRACTICES UNDER 6 DEL. C. § 2532 [DISPUTED]..................................................................... 107

2.      UNFAIR COMPETITION UNDER DELAWARE LAW [DISPUTED]................................................................................. 109

3.      TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS [DISPUTED]............................................. 111

4.      DAMAGES FOR DELAWARE COMMON LAW CLAIMS [DISPUTED]................................................................................. 113

5. TRADE LIBEL CLAIMS [DISPUTED].................................................. 118

6. BREACH OF CONTRACT [DISPUTED]............................................. 120

XIV. DELIBERATION AND VERDICT ......................................................... 122

A. INTRODUCTION [STIPULATED] .................................................. 122

B. UNANIMOUS VERDICT [STIPULATED]........................................ 123

C. DUTY TO DELIBERATE [STIPULATED].......................................... 124

D. COURT HAS NO OPINION [STIPULATED]..................................... 126

I.      **GENERAL INSTRUCTIONS**

A.      **INTRODUCTION [STIPULATED]**

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

I will start by revisiting your duties as a jury and the general rules that apply in every civil case.  I will explain some rules that you must use in evaluating particular testimony and evidence.

I will then explain the positions of the parties and the law you will apply in this case.

Lastly, I will explain the rules that you must follow during your deliberations in the jury room.

Please listen very carefully to everything I say.  You will have a written copy of these instructions with you in the jury room for your reference during your deliberations.  You will also have a verdict form, which will list the questions that you must answer to decide this case.

**B.**     **DUTIES OF THE JURY [STIPULATED]**

You have two main duties as jurors.

Your first duty is to decide what the facts are from the evidence that you saw and heard during this trial.  You will have to decide what happened because deciding what the facts are is your job.

Your second duty is to take the law that I give you, apply it to the facts, and decide which party should prevail on the issues presented.  I decide which rules of law apply to this case.  In addition, because this is a patent case, I have also provided you with definitions of what certain terms in the claims mean.  These are called the Court's claim constructions.  You are bound by your oath as jurors to follow the Court's instructions and its claim constructions, even if you personally disagree with them.  All the instructions are important and you should consider them together as a whole.

Perform these duties fairly. Nothing that I may say or do is intended to indicate what your verdict should be.

### C.      BURDENS OF PROOF [DISPUTED]

**Hologic's Proposal:** In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof."

As I have already told you, in this case, Hologic is the owner of two patents and it contends Minerva infringes them.  Hologic has the burden of proving that it is more likely than not that Minerva infringes.  This standard is called a preponderance of the evidence.  To put it differently, if you were to put Hologic's and Minerva's evidence on opposite sides of a scale, the evidence supporting Hologic's allegations would have to make the scale tip somewhat on its side.  Hologic also asserts that Minerva willfully infringes the Patents-in-Suit.  Hologic must prove Minerva willfully infringed the Patents-in-Suit by the same preponderance of the evidence standard.

Minerva asserts that the Asserted Claims of the Patents-in-Suit are invalid.  Minerva must prove invalidity by clear and convincing evidence.  Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable.  Proof by clear and convincing evidence is, thus, a higher burden than proof by a preponderance of the evidence.

Hologic also asserts that Minerva is liable for unfair competition under 15 U.S.C. § 1125, deceptive trade practices under 6 Del. C. § 2532; unfair competition under Delaware common law; and  tortious interference with Hologic's business relationships.  Each of these claims must be proven by the same preponderance of the evidence standard.

Hologic must prove it is entitled to any damages by a preponderance of the evidence.

Those of you who are familiar with criminal cases will have heard the term "proof beyond a reasonable doubt."  That burden does **not** apply in a civil case like this and you,

therefore, should put it out of your mind in considering whether or not Hologic or Minerva have

met their "more likely than not" burdens of proof.

> ***Hologic's Sources****: See GlaxoSmithKline LLC v. Teva Pharms.USA, Inc.*, No. 14-cv-
> 00878-LPS, D.I. 440 at 14-15 (D. Del. June 19, 2017) (final instructions); *W.L. Gore &
> Assoc., Inc. v. C.R. Bard, Inc.*, No. 11-cv-00515-LPS-CJB, D.I. 777 at 3 (D. Del. Mar. 7,
> 2017) (final instructions); *MobileMedia Ideas, LLC v. Apple, Inc.*, No. 10-cv-00258, D.I.
> 703 at 14-15 (D. Del. Sept. 20, 2016) (final instructions).

**Minerva's Proposal:** In any legal action, facts must be proven by a required standard of

evidence, known as the "burden of proof."

As I have already told you, in this case, Hologic is the owner of two patents and it

contends Minerva infringes them.  Hologic has the burden of proving patent infringement by

what is called a preponderance of the evidence.  That means that Hologic has to produce

evidence which, when considered in the light of all the facts, leads you to believe that what

Hologic claims is more likely true than not.  To put it differently, if you were to put the evidence

of Hologic and Minerva concerning infringement on opposite sides of a scale, the evidence

supporting Hologic's claims would have to make the scales tip somewhat on its side in each

instance.  Hologic must also prove it is entitled to any damages by a preponderance of the

evidence.  In addition, Hologic must prove Minerva willfully infringed the Patents-in-Suit by the

same preponderance of the evidence standard.

Minerva contends that Hologic's patents are invalid.  Minerva has the burden of proving

that the asserted claims of the '183 patent and '348 patent are invalid by clear and convincing

evidence.  Clear and convincing evidence is evidence that produces an abiding conviction that

the truth of a factual contention is highly probable.

Hologic also asserts that Minerva is liable for unfair competition under 15 U.S.C. § 1125,

deceptive trade practices under 6 Del. C. § 2532; unfair competition under Delaware common

law; and tortious interference with Hologic's business relationships.  Each of these claims must be proven by the same preponderance of the evidence standard.

Minerva also asserts that Hologic is liable for unfair competition under 15 U.S.C. § 1125, deceptive trade practices under 6 Del. C. § 2532; unfair competition under Delaware common law; tortious interference with Minerva's contracts and business relationships; trade libel; and breach of contract.  Each of these claims must be proven by the same preponderance of the evidence standard.

Those of you who are familiar with criminal cases will have heard the term "proof beyond a reasonable doubt."  That burden does **<u>not</u>** apply in a civil case like this and you, therefore, should put it out of your mind in considering whether or not Hologic or Minerva have met their "more likely than not" burdens of proof.

*Minerva's Sources: See* Judge Robinson's Model Preliminary Jury Instructions.

### D.      EVIDENCE DEFINED [DISPUTED]

**Agreed**:  You must make your decision based only on the evidence that you have seen and heard in court.  The evidence in this case includes what the witnesses said while they were testifying under oath (including deposition testimony that has been played or read to you), the documents and things received as exhibits, and any facts to which the parties have stipulated.

The following things are not evidence: statements, arguments, and questions of the lawyers; objections by lawyers; any testimony I told you to disregard; and anything you may have seen or heard about this case outside the courtroom.  If an objection was sustained, ignore the question. If the objection was overruled, treat the answer to the question like any other.

If you were instructed that an item of evidence was received for a limited purpose, you must follow that instruction.  Do not consider any testimony or other evidence that was struck or excluded.  Do not speculate about what a witness might have said or what an exhibit might have shown.

**Hologic's Position**:  The attorneys prepared certain slides, charts and graphics to illustrate testimony from witnesses. These are called demonstratives.  These are not evidence even if they refer to, identify, or summarize evidence unless the parties agree and the Court admits them into evidence.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

**Minerva's Position**:  The attorneys prepared certain slides, charts and graphics to illustrate testimony from witnesses. These are called demonstratives.  These are not evidence even if they refer to, identify, or summarize evidence unless the Court admits them into evidence.

Make your decision based only on the evidence, as I have defined it here, and nothing

else.

**E.     DIRECT AND CIRCUMSTANTIAL EVIDENCE [STIPULATED]**

Some of you may have heard the terms "direct evidence" and "circumstantial evidence."

Direct evidence is simply evidence like the testimony of any eyewitness which, if you believe it, directly proves a fact.  If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weights that you should give to either one, nor does it say that one is any better evidence than the other.  You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

### F.     CREDIBILITY OF WITNESSES / WEIGHING CONFLICTING TESTIMONY [STIPULATED]

You are the sole judges of each witness's credibility.  You should consider each witness's knowledge, strength of memory, motive, opportunity to observe, how reasonable or unreasonable the testimony is, whether it is consistent or inconsistent, whether it has been contradicted, the witness's biases, prejudices, or interests, the witness's manner or demeanor on the witness stand, and all circumstances that, according to the evidence, could affect the credibility of the testimony.  Consider also any relation each witness may bear to each side of the case, the manner in which each witness might be affected by the verdict, the interest any witness may have in the verdict.  You may determine how much of any witness's testimony to accept or reject and choose to reject some parts of a witness's testimony while accepting other parts.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But if you cannot do this, then it is your duty and privilege to believe the testimony that, in your judgment, is most believable and disregard any testimony that, in your judgment, is not believable.

This instruction applies to the testimony of all witnesses, including expert witnesses.

## G.    NUMBER OF WITNESSES [STIPULATED]

Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based solely on the number of witnesses who testified.  What is more important is how believe the witnesses were, and how much weight you think their testimony deserves.  Concentrate on that, not the numbers of witnesses.

**H.      EXPERT WITNESSES [STIPULATED]**

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field, who we call an expert witness, is permitted to state his or her opinion on those technical matters.  You have heard testimony in this case from expert witnesses.

Expert testimony should receive whatever weight and credit you think appropriate given all the other evidence in the case. You are free to accept or reject the testimony of experts just as with any other witness.  In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I've previously mentioned for weighing testimony of all witnesses.  If you decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you conclude that the reasons given in support of the opinion are not sound, or if you feel that the opinion is outweighed by other evidence, you may disregard the opinion in whole or in part.

## I.      DEPOSITION TESTIMONY [STIPULATED]

You have heard witnesses testify through deposition testimony. A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath and swears to tell the truth, and lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

Deposition testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness had been present to testify.

In this trial, you have also heard from certain "Rule 30(b)(6)" corporate witnesses for the parties via deposition.  A Rule 30(b)(6) corporate witness is a person that a corporation has chosen to designate to speak on behalf of itself. This type of witness must be knowledgeable to speak on the specific identified topics and is required to give complete and knowledgeable answers on the corporation's behalf. The testimony of a Rule 30(b)(6) witness at his or her deposition is binding on the corporate party on those topics and, at trial, the party cannot contradict this earlier deposition testimony.  Before any Rule 30(b)(6) corporate witnesses testify, you will be told that the witness is a Rule 30(b)(6) witness.

**J.      ADMITTED FACTS [STIPULATED]**

The parties have stipulated that certain facts are true, and those admitted facts may be read to you during trial. You must treat any admitted facts as having been proved for the purposes of this case.

### K.    USE OF NOTES [STIPULATED]

You may any notes you took during the trial to refresh your memory.  Remember that your notes are for your personal use.  They may not be given or read to anyone else.  Your notes are not evidence.  Do not use your notes, or any other juror's notes, as authority to persuade fellow jurors.  Some testimony that is considered unimportant may take on greater importance later on in the trial in light of all the evidence presented.  Do not consider your notes that you or your fellow jurors may take as a kind of written transcript.  You should not be overly influenced by your notes or those of your fellow jurors.  Above all, your memory should be the greatest asset when it comes to deliberate and render a decision in this case.

## II.      THE PARTIES AND THEIR CONTENTIONS [DISPUTED]

**Hologic's Proposal:** Let me give you an overview of who the parties are and what each contends. The plaintiffs are Hologic, Inc. and Cytyc Surgical Products, LLC (who I will refer to as the "Plaintiffs" or "Hologic").  The defendant is Minerva Surgical, Inc. (who I will refer to as "Defendant" or "Minerva.").  Hologic is the owner of two United States patents.  The first is U.S. Patent No. 6,872,183, which I will refer to as "the '183 patent."  The second is U.S. Patent No. 9,095,348, which I will refer to as "the '348 patent."  I may also refer to these patents collectively as "the Patents-in-Suit," or the "Asserted Patents."  Copies of these patents were given to you in your binders.

Each patent includes numbered claims that define the legal scope of the patented invention. Hologic contends that Minerva infringes claims 7, 9, 11, 13 and 14 of the '183 Patent and claim 1 of the '348 Patent.  These claims are called the Asserted Claims.

The Patents-in-Suit in this case relate to endometrial ablation.  During the trial, the parties offered testimony to familiarize you with this technology.  The product Hologic is accusing of infringing its patents is called the Minerva's Endometrial Ablation System, which I may refer to as the "accused product" or the "Minerva EAS."  Hologic contends that Minerva has practiced the claims of the '183 Patent when using the Minerva Endometrial Ablation System.  Hologic also asserts that Minerva contributes to and induces its customers to also infringe the claims of the '183 Patent the when they use the Minerva EAS consistent with its instructions for use.  Hologic also contends that Minerva directly infringes the claims of the '348 Patent by making, selling and/or offering to sell the Minerva EAS in the United States.  Hologic further contends that Minerva's infringement of the Patents-in-Suit was and continues to be willful.

During the course of this case you heard references to certain terms and phrases from the asserted claims. I provided you a list of these terms and phrases for which I have provided a

definition that you are to use in deciding the issues presented to you.  Any other terms and
phrases that are not included on the list should be given their plain and ordinary meaning.

Hologic also contends that Minerva is subject to an equitable doctrine called assignor
estoppel, which bars Minerva from challenging the validity of any of the Patents-in-Suit.
Hologic contends that after one of the named inventors of each of the Patents-in-Suit, Mr. Csaba
Truckai, sold his company and assigned his patents and patent applications to Hologic for $325
million, he later founded Minerva to create the accused product.

Minerva denies all of Hologic's allegations of infringement and willful infringement.
Minerva affirmatively asserts that the asserted claims of the '183 patent and the '348 patent are
invalid.

In addition to the patent infringement claims, Hologic contends that Minerva has engaged
in unfair competition under 15 U.S.C. § 1125, deceptive trade practices under 6 Del. C. § 2532,
unfair competition under Delaware common law, and tortious interference with Hologic's
business relationships under Delaware common law by: (a) improperly using Hologic's
confidential sales information to target Hologic customers; and (b) by suggesting that the
Minerva EAS is a new version of Hologic's NovaSure product, thereby causing customers to be
likely confused as to the maker of the Minerva EAS.

Hologic also contends that Minerva has engaged in unfair competition under deceptive
trade practices under 6 Del. C. § 2532, unfair competition under Delaware common law, and
tortious interference with Hologic's business relationships under Delaware common law by: (a)
improperly using Hologic's confidential sales information to target Hologic customers; (b)
disparaging Hologic and its NovaSure brand to existing and prospective customers, including by
improperly claiming head-to-head comparisons of clinical results; and (c) inducing Hologic's

customers to break their contracts with Hologic.  Minerva denies all of Hologic's allegations on these claims.

Minerva has its own claims against Hologic.  Minerva contends that Hologic engaged in unfair competition and false advertising under 15 U.S.C. § 1125 as well as deceptive trade practices under 6 Del. C. § 2532, unfair competition under Delaware common law, tortious interference with Minerva's contracts and business relationships, and trade libel under Delaware common law.  Minerva contends that Hologic has engaged in false advertising by making false and misleading statements regarding the safety of Minerva's product; and that Hologic makes misleading claims about the efficacy of its NovaSure device.  Minerva also contends that Hologic breached a contract between Hologic and Minerva—a non-disclosure agreement or "NDA"—by broadly disseminating Minerva's confidential information.

You will be asked to decide whether Minerva infringed each of the Asserted Claims of the Patents-in-Suit, whether any such infringement was willful and to determine whether Minerva is in privity with any of the named inventors of the Patents-in-Suit.  You will also be asked to decide if Minerva engaged in unfair competition under 15 U.S.C. § 1125, unfair competition under Delaware common law, deceptive trade practices under 6 Del. C. § 2532, and tortious inference with Hologic's business relationships.  If you find liability, you will also decide the amount of money that Minerva should pay Hologic in damages.

You will also be asked to decide whether Hologic is liable for unfair competition under 15 U.S.C. § 1125; deceptive trade practices under 6 Del. C. § 2532; unfair competition under Delaware common law; tortious interference with Minerva's contracts and business relationships; trade libel; and breach of contract.  If you find liability, you will also decide the amount of money that Hologic should pay Minerva in damages.

**Minerva's Proposal:** Let me give you an overview of who the parties are and what each contends.

The plaintiffs in this case are Hologic, Inc. and Cytyc Surgical Products, LLC (who I will refer to as the "Plaintiffs" or "Hologic"). The defendant in this case is Minerva Surgical, Inc. (who I will refer to as "Defendant" or "Minerva.")

Hologic is the owner of two United States patents at issue in this case:  U.S. Patent No. 6,872,183, which I will refer to as "the '183 patent," and U.S. Patent No. 9,095,348, which I will refer to as "the '348 patent."  I may also refer to these patents collectively as "the Patents-in-Suit," or the "Asserted Patents."

Each patent includes numbered claims that define the legal scope of the patented invention. Hologic contends that claims 7, 9, 11, 13, and 14 of the '183 patent and claim 1 of the '348 patent.  These claims are called the Asserted Claims.

The Patents-in-Suit in this case relate to endometrial ablation.  During the trial, the parties offered testimony to familiarize you with this technology.   The product Hologic is accusing of infringing its patents is called the Minerva's Endometrial Ablation System, which I may refer to as "Minerva's EAS."

Hologic contends that Minerva has directly infringed the Asserted Claims of the '183 patent and the '348 patent by making, selling, and/or offering to sell Minerva's eAS in the United States.  Hologic also asserts that Minerva contributes to and induces its customers to also infringe the Asserted Claims of the '183 patent when they use Minerva's EAS consistent with its instructions for use.  Hologic further contends that Minerva's infringement of all two Patents-in-Suit was and continues to be willful.

Minerva denies all of Hologic's allegations of infringement and willful infringement. Minerva affirmatively asserts that the Asserted Claims of the '183 patent and the '348 patent are invalid for lack of adequate written description and for lack of enablement.

In addition to the patent infringement claims, Hologic contends that Minerva has engaged in unfair competition under 15 U.S.C. § 1125, deceptive trade practices under 6 Del. C. § 2532, unfair competition under Delaware common law, and tortious interference with Hologic's business relationships under Delaware common law by: (a) improperly using Hologic's confidential sales information to target Hologic customers; and (b) by suggesting that the Minerva EAS is a new version of Hologic's NovaSure product, thereby causing customers to be likely confused as to the maker of the Minerva EAS.  Hologic also contends that Minerva has engaged in unfair competition under deceptive trade practices under 6 Del. C. § 2532, unfair competition under Delaware common law, and tortious interference with Hologic's business relationships under Delaware common law by: (a) improperly using Hologic's confidential sales information to target Hologic customers; (b) disparaging Hologic and its NovaSure brand to existing and prospective customers, including by improperly claiming head-to-head comparisons of clinical results; and (c) inducing Hologic's customers to break their contracts with Hologic.

Minerva has its own claims against Hologic.  Minerva contends that Hologic engaged in unfair competition and false advertising under 15 U.S.C. § 1125 as well as deceptive trade practices under 6 Del. C. § 2532, unfair competition under Delaware common law, tortious interference with Minerva's contracts and business relationships, and trade libel under Delaware common law.  Minerva contends that: (a) Hologic has engaged in false advertising by making false and misleading statements regarding the safety of Minerva's product to create fear amongst current and prospective Minerva customers; and (b) Hologic makes improper and misleading

claims about the efficacy of its NovaSure device, including on the product packaging, because those advertised rates are higher than those approved by the United States Food & Drug Administration for NovaSure.  Minerva also contends that Hologic breached a contract between Hologic and Minerva—a non-disclosure agreement or "NDA"—by broadly disseminating Minerva's confidential and proprietary information throughout Hologic, including to Hologic's sales and marketing team, Hologic's research and development team, Hologic's in-house legal team, and others in violation of the terms of the NDA in order to gain an unfair competitive advantage against Minerva when it launched.

You will be asked to decide whether Minerva infringed each of the Asserted Claims of the Patents-in-Suit, whether any such infringement was willful, and if it engaged in unfair competition under federal law and state common law, deceptive trade practices, and tortious inference with Hologic's business relationships.  If you find liability, you will also decide the amount of money that Minerva should pay Hologic in damages for patent infringement.

You will also be asked to decide whether Hologic is liable for unfair competition under 15 U.S.C. § 1125; deceptive trade practices under 6 Del. C. § 2532; unfair competition under Delaware common law; tortious interference with Minerva's contracts and business relationships; trade libel; and breach of contract.  If you find liability, you will also decide the amount of money that Hologic should pay Minerva in damages.

III.     **GENERAL GUIDANCE REGARDING PATENTS**

A.     **PATENT CLAIMS AND CLAIM LIMITATIONS OR REQUIREMENTS [STIPULATED]**

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims."  The patent claims are the numbered sentences at the end of each patent. The claims are important because it is the words of the claims that define what inventions a patent covers.  The claims are intended to define, in words, the boundaries of the invention.

The words of a claim are often referred to as "claim elements" or "claim requirements" or "claim limitations."  For example, a claim that covers the invention of a table may recite the tabletop, four legs, and the glue that secures the legs to the tabletop.  The tabletop, legs and glue are each a separate requirement of the claim.  A claim covering the invention of a table is called an apparatus claim.  A claim describing the steps required to make a table is called a method claim.

## B.        DEPENDENT AND INDEPENDENT CLAIMS [STIPULATED]

There are two different types of claims in a patent.  The first type is called an "independent" claim.  An independent claim does not refer to any other claim of the patent.  An independent claim is read alone to determine its scope.  Accordingly, the words of these claims are read by themselves in order to determine what subject matter they cover.

The second type of claim is a "dependent" claim.  A dependent claim refers to at least one other claim in the patent and, thus, incorporates whatever that other claim says.  Accordingly, to determine what a dependent claim covers, you must read both the dependent claim and the claim or claims to which it refers.

### C.       CLAIM CONSTRUCTION [STIPULATED]

You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim.  The law says that it is my role to define the terms of the claims and it is your duty to apply my definitions. You must accept my definitions of these words in the claims as being correct.  It is your job to take these definitions and apply them to the issues that you are deciding, including the issue of infringement.  You must ignore any different interpretation that you may either believe is true or different interpretations referenced by the witnesses or by the attorneys.

In your notebooks, you will find a list of certain claim terms that the Court has construed and that you must follow.  It may be helpful for you to refer to this list as I discuss each claim construction.  I use the terms "construction" and "definition" interchangeably.

I instruct you that the following claim terms have the following definitions:

1.       The term "**pressure sensor**" as it appears in Claims 1 and 9 of the '183 patent means "a device whose input detects, directly or indirectly, a force per unit area and outputs a corresponding electrical signal."

2.       The term "**monitoring**" as it appears in Claims 1, 7, 9 and 11 of the'183 Patent means "monitoring."

3.       The term "**applicator head**" as it appears in Claims 1 and 12 of the '348 patent means "a distal end portion of an ablation device that applies energy to the uterine tissue."

4.       The term "**an indicator mechanism**" as it appears in Claim 1 of the '348 patent, means "a mechanism configured to indicate a dimension."

5.       The term "**one or more electrodes**" as it appears in Claim 1 of the '348 patent means "one or more electrical conductors."

In addition, the parties have agreed to the following definitions:

6.      The term "**pressure**" as it appears in Claims 1 and 9 of the '183 patent means "force per unit area."

7.      The term "**a perforation in the uterus**" as it appears in Claims 1, 6, 9 and 11 of the '183 patent means "an abnormal hole in the wall of the uterus."

8.      The term "**pivot point**" as it appears in Claim 1 of the '348 patent means "a point of attachment between two members about which the members hinge or rotate."


If I have not provided a specific definition for a term, you are to use the plain and ordinary meaning of that term.

IV.     **PATENT INFRINGEMENT**

A.      **OVERVIEW [DISPUTED]**

**Hologic's Proposal:** Hologic has the right to stop others from making, using, selling, or offering to sell the invention covered by its patent claims during the life of the patent. If any person makes or uses (within the United States) or sells or offers to sell (within the United States) what is covered by the patent claims without Hologic's permission, that person is said to infringe the patent. The patent owner may enforce its rights by filing a lawsuit for patent infringement.

In this case, Hologic alleges that Minerva directly infringes claims 7, 9, 11, 13, and 14 of the '183 Patent and claim 1 of the '348 Patent. Hologic also alleges that Minerva indirectly infringes claims 7, 9, 11, 13, and 14 of the '183 Patent by inducing and/or contributing to its customers' direct infringement.

Infringement is assessed on a claim-by-claim basis. Therefore, there may be infringement as to one claim but no infringement as to another. Infringement of one or more Asserted Claims by Minerva is sufficient for you to find Minerva liable for infringement.

In this case, there are three possible ways that a claim might be infringed: (1) directly infringing the patent either literally or under the doctrine of equivalents; (2) actively inducing infringement of the patent; or (3) contributing to infringement. Active inducement and contributory infringement are referred to as indirect infringement.

I will explain these different types of infringement, starting with direct infringement.

**Hologic's Sources**: *See IOENGINE LLC v. Imation, Corp.*, No. 14-1572-GMS, D.I. 199 at 23 (D. Del. Feb. 17, 2017) (final instructions); *IOENGINE, LLC v. Interactive Media Corp.*, No. 14-1571-GMS, D.I. 157 at 23 (D. Del. Jan. 17, 2017) (final instructions); *EMC Corp. v. Zerto, Inc.*, No. 12-956-GMS, D.I. 208 at 23 (D. Del. May 7, 2015) (final instructions).

**Minerva's Proposal:** A patent owner has the right to stop others from using the invention covered by its patent claims during the life of the patent.  If any person makes, uses, wells (within the United States), offers to sell (from within the United States), or imports what is covered by the patent claims without the patent owner's permission, that person is said to infringe the patent.

In this case, Hologic alleges that Minerva directly infringes claims 7, 9, 11, 13, and 14 of the '183 patent and claim 1 of the '348 patent.  Hologic also alleges that Minerva indirectly infringes claims 7, 9, 11, 13, and 14 of the '183 patent by inducing and/or contributing to its customers' direct infringement.

Infringement is assessed on a claim-by-claim basis.  Therefore, there may be infringement as to one claim but no infringement as to another. Infringement of one or more Asserted Claims by Minerva is sufficient for you to find Minerva liable for infringement.

I will explain these different types of infringement, starting with direct infringement.

***Minerva's Sources:*** *See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions.

**B.     DIRECT INFRINGEMENT [DISPUTED]**

**1.     LITERAL INFRINGEMENT [DISPUTED]**

**Hologic's Proposal:** There are two types of direct infringement: (1) literal infringement; and (2) infringement under the doctrine of equivalents.

Let me first address literal infringement.

The asserted claims of the '348 Patent are apparatus claims.  In order to prove direct, literal infringement of this type of claim, Hologic must prove by a preponderance of the evidence, i.e., that it is more likely than not, that Minerva made, used, sold, offered for sale within, or imported into the United States a product that meets all of the requirements of a claim without Hologic's permission.  The Minerva EAS is the accused product.

The asserted claims of the '183 Patent are method claims.  In order to prove direct, literal infringement of this type of claim, Hologic must prove by a preponderance of the evidence, i.e., that it is more likely than not, that Minerva has practiced each of the steps of the claimed methods in the United States without Hologic's permission.  A defendant cannot avoid liability for infringing a method patent by having another perform some of the steps of the process where some degree of connection and control between the two entities exist.  Minerva is liable for direct infringement if you find that Minerva conditioned participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance.

Minerva may directly infringe the Patents-in-Suit without knowing it was infringing or even if it in good faith believed what it was doing was not infringing.

In determining whether the Minerva EAS or any accused conduct by Minerva infringes any asserted claim, you should take the following steps:

First, you should read the claim language, limitation by limitation.  Apply any claim constructions by the court or any stipulations by the parties.  If the claim language was not construed, review it according to its ordinary meaning.

Second, you should compare the accused product or activity, element by element, to each of the limitations of the asserted claim.  The same features of an accused product may satisfy more than one element of a claim.

Third, if you find each and every limitation of the asserted claim in the accused product or method, you must return a verdict of infringement as to that claim.  If you do not find each and every limitation of the asserted claim in the accused product or method, you must return a verdict of no infringement as to that claim.  You must repeat the above analysis with every asserted claim.

There is one exception to this rule.  If you find that an independent claim is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim.  On the other hand, if you find that an independent claim has been infringed, you must still decide, separately, whether the product or method meets the additional requirements of any claims that depend from the independent claim, thus, whether those dependent claims have also been infringed.

*Hologic's Sources*: *See IOENGINE LLC v. Imation, Corp.*, No. 14-1572-GMS, D.I. 199 at 24-25 (D. Del. Feb. 17, 2017) (final instructions); *Intellectual Ventures I LLC v. Toshiba Corp.*, No. 13-453-SLR, D.I. 635 at 18 (D. Del. Feb. 10, 2017) (final instructions); *IOENGINE, LLC v. Interactive Media Corp.*, No. 14-1571-GMS, D.I. 157 at 24-25 (D. Del. Jan. 17, 2017) (final instructions); *MobileMedia Ideas, LLC v. Apple Inc.*, No. 10-258-SLR, D.I. 703 at 23-24 (D. Del. Sept. 20, 2016) (final instructions); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 13-1534-SLR, D.I. 336 at 23-24 (D. Del. May 11, 2016) (final instructions); *Cellectis S.A. v. Precision Biosciences, Inc.*, No. 11-173-SLR, D.I. 298 at 22-23 (D. Del. Apr. 30, 2013) (final instructions).

**Minerva's Proposal:** In order to prove direct infringement, plaintiff must prove that each requirement of the asserted claims is present in the accused product or method.  A claim requirement may be present in an accused product or method in one of two ways:  either literally or under the "doctrine of equivalents."  I will explain the doctrine of equivalents to you momentarily.

A claim requirement is literally present if it exists in the accused product or method just as it is described in the claim language, either as I have explained that language to you or, if I did not explain it, as you understand its ordinary meaning.

Literal infringement must be determined with respect to each asserted claim individually by comparing each of the claim's requirements to the accused product or method.  If the accused product or method does not have or perform a single requirement recited in a given claim, then you must find that the Defendant has not infringed that claim.  You must determine infringement with respect to each Asserted Claim and each accused product or method individually.

In determining whether any accused product or method literally infringes any asserted claim, you must take the following steps:

First, you must determine the scope of the asserted claim by reading the claim language, requirement by requirement, as those requirements have been construed by the court or, if they have not been specifically construed, according to their ordinary meaning; and

Second, you must compare each of the requirements of the Asserted Claim to the accused product or method.

If you find each and every requirement of the Asserted Claim is in or performed by the accused product or method, you must return a verdict of literal infringement as to that claim.

If you did not find each and every requirement of the Asserted Claim to be in or performed by the accused product or method, you may not return a verdict of literal infringement as to the claim.

You must repeat the above analysis with every Asserted Claim.  There is one exception to this rule.  If you find that an independent claim is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim.  On the other hand, if you find that an independent claim has been infringed, you must still decide, separately, whether the product or method meets the additional requirements of any claims that depend from the independent claim, thus, whether those dependent claims have also been infringed.

Remember the question is whether the accused product or method infringes any of the Asserted Claims, and not whether the accused product or method is similar or even identical to a product or method of plaintiff.  Accordingly, to determine infringement, you must be certain to compare the claims only to the accused product or method, and not to any product or method of the Plaintiff.

*Minerva's Sources: See* Judge Robinson's Model Final Jury Instructions.

## 2.    INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS [DISPUTED]

**Hologic's Proposal:** If you do not find literal infringement of a claim, you must then decide whether Hologic has proven infringement under the "doctrine of equivalents."

A claim element or step is present under the doctrine of equivalents if the differences between the claim element and the corresponding structure of the accused product, or the step performed in the accused use of the product, are insubstantial.  One way to determine this is to look at whether or not the accused product or use of the product performs: (1) substantially the same function; (2) in substantially the same way; (3) to achieve substantially the same result, as the element or step in the claimed invention.  Another way to consider the issue is whether people of ordinary skill in the art would have viewed the corresponding structure within, or use of, the accused product to be interchangeable with the element or step recited in the patent claim at the time of the alleged infringement.

Hologic must prove infringement under the doctrine of equivalents by a preponderance of the evidence.

> ***Hologic's Sources***: *See Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, No. 15-819-LPS-CJB, D.I. 749 at 27 (D. Del. June 7, 2018) (final instructions); *IOENGINE, LLC v. Interactive Media Corp.*, No. 14-1571-GMS, D.I. 157 at 26 (D. Del. Jan. 17, 2017) (final instructions); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 13-1534-SLR, D.I. 336 at 25 (D. Del. May 11, 2016) (final instructions); *Cellectis S.A. v. Precision Biosciences, Inc.*, No. 11-173-SLR, D.I. 298 at 24 (D. Del. Apr. 30, 2013) (final instructions).

**Minerva's Proposal:** Under the doctrine of equivalents, a product or method can infringe an asserted claim if it includes parts that are identical or substantially equivalent to the requirements of the claim.  Under the patent law, an infringing substantial equivalent is not

treated any differently than a product or method that literally infringes the claim requirements of the patent.

You may find that a claim requirement is present in an accused product or method under the doctrine of equivalents if a hypothetical person having ordinary skill in the art would have considered the differences between that claim requirement and a comparable element to be "insubstantial" or would have found that the structure or step:  (1) performs substantially the same function; (2) works in substantially the same way; (3) to achieve substantially the same result as the requirement of the claim.

Another equally valid test for substantial equivalence is whether the claimed structure or step is interchangeable with the accused structure or step.  In order for the accused structure or step to be considered interchangeable, the accused structure or step must have been known at the time of the alleged first infringement to a hypothetical person having ordinary skill in the art. Interchangeability at the present time is not sufficient.

In order to prove infringement by "equivalents," a Plaintiff must prove the substantial equivalency of the structure or steps to a claim requirement by a preponderance of the evidence. You may consider that when a claim requirement and the relevant structure or step in the accused product or method are opposites, the differences between the two are likely substantial and the doctrine of equivalents likely does not apply. You may also consider that when the Patent Office grants a patent that covers an accused product with knowledge of the Plaintiff's patents, you may consider it as evidence that the accused product is not equivalent to the invention disclosed by the Plaintiff's patents.

> **Minerva's Sources:** *See* Judge Robinson's Model Final Jury Instructions; *Motivation Innovations LLC v. Ulta Salon Cosmetics & Fragrance Inc*., 59 F. Supp. 3d 663, 674 (D. Del. 2014); *Brilliant Instr., Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013); *Planet Bingo, LLC v. GameTech Intern., Inc.*, 472 F.3d 1338, 1344-45 (2006);

*Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1280 (Fed. Cir. 2011); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 493 F.3d 1368, 1379 (Fed. Cir. 2007); *Nat'l Presto Indus. v. W. Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996); *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed. Cir. 1996); *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996); *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed. Cir. 1996); *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, No. CIV.07-190-SLR, 2008 WL 114361, at *4–5 (D. Del. Jan. 8, 2008) (Robinson, J.); *General Atomics v. Axis-Shield ASA*, 440 F.Supp.2d 1083, 1096 (N.D.Cal.2006); *Park v. CAS Enterprises, Inc.*, No. 08-CV-0385 DMS (NLS), 2009 WL 5218043, at *4 (S.D. Cal. Dec. 29, 2009).

### 3. INFRINGEMENT DESPITE ACCUSED INFRINGER'S IMPROVEMENT [DISPUTED]

**Hologic's Proposal:** The presence of additional features in an accused product does not mean that the product does not infringe a patent claim.  Likewise, a party cannot avoid liability for infringing a method by performing additional steps.  Whether or not an accused product represents an improvement either over the patent claims or over Hologic's NovaSure product does not determine whether or not that product can infringe the asserted patent claims.  As long as an accused product includes all of the elements of at least one of the asserted patent claims, then the patent claim is infringed by the accused product despite any improvements.

You have heard evidence about Hologic's NovaSure system.  In deciding the issue of infringement you may not compare Hologic's NovaSure system to the accused Minerva EAS to determine infringement.  You must compare the accused product to the inventions claimed in the Patents-in-Suit.

You may have heard evidence that Minerva has its own patents.  However, ownership of separate patents is not a defense to patent infringement.  Minerva can still infringe the Patents-in-Suit even if it has its own patents in the same area.

> **Hologic's Sources**: *See Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, No. 15-819-LPS-CJB, D.I. 749 at 22, 26 (D. Del. June 7, 2018) (final instructions); *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, No. 11-cv-00515-LPS-CJB, D.I. 777 at 24, 26 (D. Del. Mar. 7, 2017) (final instructions); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 13-1534-SLR, D.I. 336 at 19, 22 (D. Del. May 11, 2016) (final instructions); *EMC Corp. v. Zerto, Inc.*, No. 12-956-GMS, D.I. 208 at 22, 30 (D. Del. May 7, 2015) (final instructions); *Edwards Lifesciences LLC v. Medtronic CoreValve LLC*, No. 12-23 (GMS), D.I. 168 at 26-27 (D. Del. Jan. 14, 2014) (final instructions).

**Minerva's Proposal:** None.  (Minerva objects to Hologic's proposal as irrelevant, confusing, misleading, and prejudicial.)

### C.    INDIRECT INFRINGEMENT [DISPUTED]

I just discussed direct infringement of a patent literally and under the doctrine of equivalents.  Another type of infringement is called indirect infringement.  This type of infringement occurs when one actively induces another to infringe a patent or contributes to the infringement of another.  I will address inducement first.

### 1.    INDUCING INFRINGEMENT [DISPUTED]

**Hologic's Proposal:** In this case, Hologic alleges that Minerva actively induces its customers to directly infringe claims 7, 9, 11, 13, and 14 of the '183 Patent.

To find that Minerva induced infringement, it is not necessary to show that Minerva personally directly infringed.  To prove active inducement, Hologic must establish that it is more likely than not that:

1.    Minerva aided; instructed, such as through a user manual; or otherwise acted with the intent to cause acts by its customers that would constitute direct infringement of the '183 Patent;

2.    Minerva knew of the patent, or showed willful blindness to the existence of the patent, at that time;

3.    Minerva knew, or showed willful blindness that it consciously ignored the possibility, that its customers actions would infringe at least one claim of the patent; and

4.    Minerva's customers infringed at least one patent claim.

To find willful blindness: (1) Minerva must have subjectively believed that there was a high probability that a patent existed covering its products; and (2) Minerva must have taken deliberate actions to avoid learning of the infringement.

As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

> **Hologic's Sources**: *See IOENGINE LLC v. Imation, Corp.*, No. 14-cv-01572-GMS, D.I. 199 at 26 (D. Del. Feb. 17, 2017) (final instructions); *IOENGINE LLC v. Interactive Media Corp.*, No. 14-cv-01571-GMS, D.I. 157 at 27 (D. Del. Jan. 17, 2017) (final instructions); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 13-1534-SLR, D.I. 336 at 26 (D. Del. May 11, 2016) (final instructions); *Intellectual Ventures I LLC v. Toshiba Corp.*, No. 13-453-SLR, D.I. 635 at 19 (Feb. 10, 2017) (final instructions).

**Minerva's Proposal:** Hologic alleges that Minerva is liable for infringement by actively inducing its customers to directly infringe, either literally or under the doctrine of equivalents, claims 1, 2, 5-7, 9, 11, and 13-15 of the '183 Patent.  As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

Minerva is liable for active inducement of a claim only if Hologic proves the following by a preponderance of the evidence:

1.      That the claimed steps are actually carried out by Minerva's customers who then directly infringe that claim;

2.      That Minerva took action during the time the '183 patent was in force intending to cause Minerva's customers to directly infringe; and

3.      That Minerva was aware of the '183 patent and knew that the claimed steps, if taken, would constitute infringement of that patent.

In order to prove inducement, Hologic must prove that each of the above requirements is met.  If you find that Hologic has not proven each and every one of the above requirements by a preponderance of the evidence, Minerva cannot be liable for inducing infringement.  This proof

of each requirement must be by a preponderance of the evidence, i.e., that it is more likely than not that each of the above requirements is met.

For example, if you find that Minerva was aware of the '183 patent, but Minerva believed that the acts it encouraged did not infringe that '183 patent, Minerva cannot be liable for inducing infringement.

In order to establish active inducement of infringement, it is not sufficient that Minerva's customers themselves directly infringe the claim.  Nor is it sufficient that Minerva was aware of the act(s) by Minerva's customers that allegedly constitute the direct infringement.  Rather, in order to find active inducement of infringement, you must find either (1) that Minerva specifically intended that Minerva's customers infringe the '183 patent or (2) that Minerva believed there was a high probability that Minerva's customers would infringe the '183 patent, but deliberately avoided learning the infringing nature of Minerva's customers' acts.  The mere fact, if true, that Minerva knew or should have known that there was a substantial risk that Minerva's customers' acts would infringe the '183 patent would not be sufficient for active inducement of infringement.

> ***Minerva's Sources:*** *See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions.

## 2.   CONTRIBUTORY INFRINGEMENT [DISPUTED]

**Hologic's Proposal:** Hologic alleges that Minerva also contributed to the direct infringement of its customers of claims 7, 9, 11, 13 and 14 of the '183 Patent.  As with direct infringement, you must determine contributory infringement on a claim-by-claim basis.

Thus, to prove that Minerva is liable of contributory infringement, Hologic must prove by a preponderance of the evidence the following five things:

1.      Minerva's customers or end users have directly infringed at least one the Asserted Claims;

2.      Minerva sells, offers to sell, or imports within the United States a product for use in a claimed method during the time the '183 Patent is in force;

3.      The accused product has no substantial, noninfringing use;

4.      The accused product constitutes a material part of the claimed invention; and

5.      Minerva knew that the accused product was especially made for use in a method that infringed at least one claim of the '183 Patent.

> **Hologic's Sources**: *See Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, No. 15-819-LPS-CJB, D.I. 749 at 31 (D. Del. June 7, 2018) (final instructions); *IOENGINE LLC v. Imation, Corp.*, No. 14-1572-GMS, D.I. 199 at 27 (D. Del. Feb. 17, 2017) (final instructions); *IOENGINE, LLC v. Interactive Media Corp.*, No. 14-1571-GMS, D.I. 157 at 28 (D. Del. Jan. 17, 2017) (final instructions); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 13-1534-SLR, D.I. 336 at 27 (D. Del. May 11, 2016) (final instructions); *EMC Corp. v. Zerto, Inc.*, No. 12-956-GMS, D.I. 208 at 27 (D. Del. May 7, 2015) (final instructions); *Cellectis S.A. v. Precision Biosciences, Inc.*, No. 11-173-SLR, D.I. 298 at 27 (D. Del. Apr. 30, 2013) (final instructions).

**Minerva's Proposal:** Hologic alleges that Minerva also contributed to the direct infringement of its customers of claims 1, 2, 5-7, 9, 11, and 13-15 of the '183 Patent.  As with direct infringement, you must determine contributory infringement on a claim-by-claim basis.

Minerva is liable for contributory infringement of an Asserted Claim if Hologic proves by a preponderance of the evidence that:

1.      Minerva sells, offers to sell, or imports within the United States a component of a product, or apparatus for use in a process, during the time the '183 patent is in force;

2.      The component or apparatus has no substantial, noninfringing uses;

3.      The component or apparatus constitutes a material part of the invention;

4.      Minerva is aware of the '183 patent and knows that the process for which Minerva's EAS has no other substantial use that may be covered by an Asserted Claim of the '183 patent or may satisfy an Asserted Claim of the '183 patent under the doctrine of equivalents; and

5.      That use directly infringes the claim.

In order to prove contributory infringement, Hologic must prove that each of the above requirements is met.  If you find that Hologic has not proven each and every one of the above requirements by a preponderance of the evidence, Minerva cannot be liable for contributory infringement.  This proof of each requirement must be by a preponderance of the evidence, i.e., that it is more likely than not that each of the above requirements is met.

**Minerva's Sources:** *See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions.

### D.      WILLFUL INFRINGEMENT [DISPUTED]

**Hologic's Proposal:** In this case, Hologic contends that Minerva infringed both of the Patents-in-Suit willfully.  If you have decided that Minerva has infringed at least one Asserted Claim, either literally or under the doctrine of equivalents, then you must also determine whether or not Minerva's infringement was willful.

To prove that Minerva acted recklessly, Hologic must prove by a preponderance of the evidence that Minerva's infringement was egregious, measured against Minerva's knowledge at the time of the alleged infringement. Egregious conduct could also be described as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful or flagrant. In determining whether Minerva acted egregiously, you must consider the totality of circumstances surrounding the infringement, including, but not limited to, the following factors:

1.      Whether or not Minerva acted in accordance with the standards of commerce for its industry;

2.      Whether Minerva intentionally copied the technology of the Patents-in-Suit;

3.      Whether or not there is a reasonable basis to believe that Minerva did not infringe or had a reasonable defense to infringement and reasonably believed that the defense would be successful if litigated. Because this determination turns on Minerva's actual knowledge, Minerva cannot rely on a defense to infringement that was not known to Minerva at the time it engaged in the infringing conduct;

4.      Whether or not Minerva made a good-faith effort to avoid infringing the Patents-in-Suit, for example, whether Minerva attempted to design around the Patents-in-Suit;

5.      Whether or not Minerva tried to cover up its infringement; and

6.      Although there is no obligation to obtain an opinion of counsel, whether Minerva relied on a legal opinion that was well-supported and believable and that advised Minerva that

the product did not infringe Hologic's Patents-in-Suit or that the patent was invalid or unenforceable.

> **Hologic's Sources**: *IOENGINE LLC v. Imation, Corp.*, No. 14-1572-GMS, D.I. 199 at 29-30 (D. Del. Feb. 17, 2017) (final instructions); *EMC Corp. v. Zerto, Inc.*, No. 12-956-GMS, D.I. 208 at 27 (D. Del. May 7, 2015) (final instructions).

**Minerva's Proposal:** In this case, Hologic argues both that Minerva infringed and, further, that Minerva infringed willfully.  If you have decided that Minerva has infringed, you must go on and address the additional issue of whether or not this infringement was willful.  Willfulness requires you to determine whether Hologic has proved that it is more likely than not that the infringement by Minerva was especially worthy of punishment.  You may not determine that the infringement was willful just because Minerva knew of the '183 and '348 patents and infringed them.  Instead, willful infringement is reserved for only the most egregious behavior, such as where the infringement is malicious, deliberate, consciously wrongful, or done in bad faith.

To determine whether Minerva acted willfully, consider all facts.  These may include, but are not limited, to:

1.      Whether or not Minerva acted consistently with the standards of behavior for its industry;

2.      Whether or not Minerva intentionally copied a product of Hologic that is covered by the '183 and '348 patents;

3.      Whether or not Minerva reasonably believed it did not infringe or that the patents were invalid;

4.      Whether or not Minerva tried to cover up its infringement.

5.      Whether Minerva performed its own independent research and development of its

accused product; and

6.      Whether Minerva was awarded its own patents covering the accused product and

technology.

> **Minerva's Sources:** *See* 2016 Federal Circuit Bar Association Model Patent Jury
> Instructions; *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1465 (Fed. Cir.
> 1997) *Rexnord, Inc. v. Laitram Corp.*, No. 85-C-1039, 1988 U.S. Dist. LEXIS 9354, at
> *117 (E.D. Wis. Jan. 28, 1988); *King Instr. Corp. v. Otari Corp.*, 767 F.2d 853, 867 (Fed.
> Cir. 1985).

## V.      ASSIGNOR ESTOPPEL [DISPUTED]

**Hologic's Proposal[1]:** When a party sells his or her rights in a patent or a patent application or to future patents and patent applications, the person is said to have "assigned" the rights to the buyer.  The seller of those patent rights is called the "assignor" — a person who assigns.  Assignment agreements contain an implicit representation by the assignor that the patent rights assigned are not worthless.  Thus, assignor estoppel is an equitable doctrine that prevents the assignor who has assigned a patent or patent application from later contending in litigation that the patent is invalid.  In addition to these actual assignors, the doctrine also bars an invalidity challenge by any party who is in "privity" with the assignors.  Privity is a legal term.

Here, the assignors are the named inventors of the Patents-in-Suit.  Their names appear on the first page of each patent.  Hologic contends that Minerva is subject to the equitable doctrine of assignor estoppel, which bars Minerva from challenging the validity of any of the Patents-in-Suit.  Hologic contends that after one of the named inventors of each of the Patents-in-Suit, Mr. Csaba Truckai, sold his company and assigned his patents and patent applications to Hologic for $325 million, he later founded Minerva to create the accused product.

You are asked to advise the Court on whether you Minerva is in privity with any of the named inventors of the Patents-in-Suit.  To establish privity, Hologic must show by a preponderance of the evidence that there is a close enough relationship between and among Minerva and any of the named inventors of the Patents-in-Suit to align their interests, such as where a corporation is founded by the assignor or the accused infringer availed itself of the assignor's knowledge and assistance to conduct infringement.  Whether two parties are in privity

---

[1] Although proposed herein, Hologic contends that assignor estoppel should be decided as a matter of law by the Court and respectfully requests an Order on its pending motion for summary judgment on assignor estoppel as it will significantly streamline issues for trial.

depends on the nature of their relationship in light of the alleged infringement.  The closer that relationship, the more the equities will favor applying the doctrine of assignor estoppel.

The doctrine of assignor estoppel is ultimately one for the Court to apply, but you will be asked to answer the factual question of privity.

**Hologic's Sources**: *See Checkpoint Sys., Inc. v. All-Tag Security S.A.*, No. 2:01-cv-02223-PBT, D.I. 229 at 10, 2007 WL 5020242 (E.D. Pa. Feb. 8, 2007) (proposed instruction).

**Minerva's Proposal:** None.  (Minerva objects to Hologic's proposal as Hologic's defense of assignor estoppel is not an issue for the jury.)

## VI.    INVALIDITY

### A.    BURDEN OF PROOF [DISPUTED]

**Hologic's Proposal**[2]: The granting of a patent by the U.S. Patent Office carries with it the presumption that the patent is valid and that the patent's subject matter is new, useful, and constitutes an advance that was not, at the time the invention was made, obvious to one of ordinary skill in the art. The law presumes, in the absence of clear and convincing evidence to the contrary, that the U.S. Patent Office acted correctly in issuing the patent. Nevertheless, once the validity of a patent has been put at issue, it is the responsibility of a jury to review what the U.S. Patent Office has done consistent with these instructions on the law.

To prove that any claim of a patent is not valid, Minerva must persuade you by clear and convincing evidence that the claim is not valid.  Clear and convincing evidence means that it is highly probable that a fact is true.  Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence.

As with infringement, you must determine invalidity on a claim-by-claim basis.  Even if you find one Asserted Claim invalid, other claims of the same patent may still be valid.


*Hologic's Sources*: *See EMC Corp. v. Zerto, Inc.*, No. 12-cv-00956-GMS, D.I. 208 at 31 (D. Del. May 7, 2015) (final instructions).


**Minerva's Proposal:** I will now instruct you on the rules you must follow in deciding whether or not Minerva has proven that Asserted Claims of the '183 and '348 patents are invalid. To prove that any claim of a patent is invalid, Minerva must persuade you by clear and convincing evidence, i.e., you must be left with a clear conviction that the claim is invalid.

---

[2] Minerva's defenses and counterclaims regarding invalidity are barred by assignor estoppel.

*Minerva's Sources: See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions.

### B.      LEVEL OF ORDINARY SKILL [DISPUTED]

**Hologic's Proposal:** The person of ordinary skill is presumed to know all prior art that you have determined to be reasonably relevant. When faced with a problem, this ordinary skilled person is able to apply his or her experience and ability to the problem and also look to any available prior art to help solve the problem.

It is up to you to decide the level of ordinary skill in the field at the time of the claimed inventions.  For the '348 patent, the priority date is May 8, 1998.  For the '183 patent, the priority date is November 10, 1999.

In deciding what the level of ordinary skill in the field of the invention is, you should consider all the evidence introduced at trial, including but not limited to:

1.      The educational level and experience of people working in the field, including the inventor(s);

2.      The types of problems encountered in the field;

3.      Prior art patents and publications;

4.      Prior art solutions to those problems;

5.      The sophistication of the technology in the field at the time of the invention, including how rapidly innovations were made in the art at the time of the invention.

In this case, Hologic contends that a person of ordinary skill would have, through education and/or professional experience, the equivalent of a bachelor's degree in biomedical engineering, mechanical engineering, or a related technical field, and at least two years' experience designing or working with devices for use in the uterus.

Minerva contends that a person of ordinary skill is a person with: (i) a bachelor's degree (or an comparable equivalent to a bachelor' degree) or higher in biomedical engineering, mechanical engineering, electrical engineering physics, or a related field; and (ii) at least two to three years of work experience developing or implementing electrosurgical devices.

> **Hologic's Sources**: *See Greatbatch Ltd. v. AVX Corp.*, No. 13-cv-00723-LPS, D.I. 623 at 50 (D. Del. Aug. 10, 2017) (final instructions); *Edwards Lifesciences LLC v. Medtronic CoreValve LLC*, No 12-cv-0023-GMS, D.I. 168 at 37 (D. Del. Jan 14, 2014) (final instructions); *Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, No. 15-cv-00819-LPS-CJB, D.I. 749 at 38 (D. Del. June 7, 2018) (final instructions); *NOX Med. EHF v. Natus Neurology, Inc.*, No. 15-cv-00709-RGA, D.I. 259 at 19 (D. Del. May 7, 2018) (final instructions).

**Minerva's Proposal:** In this case, a hypothetical person of ordinary skill in the field relating to the Patents-in-Suit is a person with: (i) a bachelor's degree (or an comparable equivalent to a bachelor' degree) or higher in biomedical engineering, mechanical engineering, electrical engineering physics, or a related field; and (ii) at least two to three years of work experience developing or implementing electrosurgical devices.

OR

In deciding what the level of ordinary skill in the field of the alleged invention is, you should consider all the evidence introduced at trial, including but not limited to: (1) the levels of education and experience of the inventor and other persons actively working in the field; (2) the types of problems encountered in the field; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; and (5) the sophistication of the technology.

> **Minerva's Sources:** *See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions.

## C.     WRITTEN DESCRIPTION REQUIREMENT [DISPUTED]

**Hologic's Proposal:** Minerva contends that all Asserted Claims lack sufficient written description.  Minerva bears the burden of establishing lack of written description by clear and convincing evidence.

The patent law requires that a patent application contain an adequate written description of the invention to ensure that the inventor was in possession of the invention at the time the patent application was filed.  For the '348 patent, the priority date is May 8, 1998.  For the '183 patent, the priority date is November 10, 1999.

The written description requirement is satisfied if a person having ordinary skill reading the patent application would have recognized that the application describes the full scope of the claimed invention as it is finally claimed in the issued patent and that the inventor actually possessed that full scope by the filing date of the relevant application.  When determining whether the specification discloses the invention, the claim must be viewed as a whole.

In the patent application process, the applicant may keep the originally filed claims, or change the claims between the time the patent application is first filed and the time a patent is issued. An applicant may amend the claims or add new claims. These changes may narrow or broaden the scope of the claims. The written description requirement ensures that the issued claims correspond to the scope of the written description that was provided in the original application.

In deciding whether a specification satisfies this written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of technology of the patent when the application was filed. The written description requirement may be satisfied by any combination of words, structures, figures, diagrams, formulas, experiments, data, etc., contained in the patent application.  The full scope of a claim or any

particular requirement in a claim need not be expressly disclosed in the original patent application if a person having ordinary skill in the field of technology of the patent at the time of filing would have understood that the full scope or missing requirement is in the written description in the patent application.

The issue of written description is decided on a claim-by-claim basis, not as to the entire patent or groups of claims.

> ***Hologic's Sources***: *See IOENGINE LLC v. Imation, Corp.*, No. 14-cv-01572-GMS, D.I. 199 at 32 (D. Del. Feb. 17, 2017) (final instructions); *IOENGINE LLC v. Interactive Media Corp.*, No. 14-cv-01571-GMS, D.I. 157 at 31 (D. Del. Jan. 17, 2017) (final instructions); *Idenix Pharms., LLC v. Gilead Sciences, Inc.*, No. 14-cv-00846-LPS, D.I. 516 at 29-30 (D. Del. Dec. 15, 2016) (final instructions); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 13-cv-01534-SLR, D.I. 336 at 34 (D. Del. May 11, 2016) (final instructions); *Intellectual Ventures I LLC v. Motorola Mobility, LLC*, No. 11-cv-00908-SLR, D.I. 314 at 48 (D. Del. Feb. 4, 2014) (final instructions); *Edwards Lifesciences LLC v. Medtronic CoreValve LLC*, No 12-cv-0023-GMS, D.I. 168 at 31 (D. Del. Jan 14, 2014) (final instructions); *Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, No. 15-cv-00819-LPS-CJB, D.I. 749 at 54-55 (D. Del. June 7, 2018) (final instructions).

**Minerva's Proposal**:  The patent law contains certain requirements for the portion of the patent called the specification.  Minerva contends that all Asserted Claims of the '183 and '348 patents are invalid because the specification of each of the '183 and '348 patents does not contain an adequate written description of the invention.  To succeed, Minerva must show by clear and convincing evidence that the specification fails to meet the law's requirements for written description of the invention.  In the patent application process, the applicant may keep the originally filed claims, or change the claims between the time the patent application is first filed and the time a patent is issued.  An applicant may amend the claims or add new claims. These changes may narrow or broaden the scope of the claims.  The written description requirement ensures that the issued claims correspond to the scope of the written description that

was provided in the original application.  The patent system works because the applicant is required to describe the invention in clear and specific terms, so that the public know what the boundaries of the invention are.

In deciding whether the patent satisfies this written description requirement, you must consider the description from the viewpoint of a hypothetical person having ordinary skill in the field of technology of the patent as of the priority date of that patent.  For the '348 patent, the priority date is May 8, 1998.  For the '183 patent, the priority date is November 10, 1999.  The written description requirement is satisfied if a hypothetical person having ordinary skill reading the original patent application would have recognized that it describes the full scope of the claimed invention as it is finally claimed in the issued patent and that the inventor actually possessed that full scope by the filing date of the original application.  Where the full scope of the claims is broad enough to cover two distinct types of products, the specification must describe both types.  Thus, where a patent describes one type of product covered by the claims but does not describe another, including a type such as the accused product, the patent fails the written description requirement.  If the description in the specification does not show that the inventors actually invented the full scope of what is now claimed in the patent, the written description requirement is not satisfied and the patent is invalid.

The written description requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, etc., contained in the patent application.  The full scope of a claim or any particular requirement in a claim need not be expressly disclosed in the original patent application if a hypothetical person having ordinary skill in the field of technology of the patent at the time of filing would have understood that the full scope or missing requirement is in the written description in the patent application.  However, while the knowledge of a

hypothetical person of ordinary skill may be used to inform what is actually in the specification, such knowledge may not be used to fill in teachings or disclosure regarding the invention itself, even if those things would be obvious based on the description in the specification.

> ***Minerva's Sources:*** *See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions; *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc); *Rivera v. ITC*, 857 F.3d 1315, 1321-22 (Fed. Cir. 2017); *AbbVie Deutschland GmbH v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014); *Lockwood*, 107 F.3d at 1571); *D Three Enters., LLC v. SunModo Corp.*, No. 2018-1909, 2018 U.S. App. LEXIS 13175 (Fed. Cir. May 21, 2018); Federal Judicial Center Introduction to Patent System Video.

D.      ENABLEMENT [DISPUTED]

**Hologic's Proposal:** The patent law contains certain requirements for the part of the patent called the specification, which is the entirety of the patent before its claims. Minerva contends that the Asserted Claims of the Patents-in-Suit are invalid because the specification does not contain a sufficiently full and clear description of how to make and use the full scope of the claimed invention and that, therefore, the asserted claims are invalid. To succeed, Minerva must show by clear and convincing evidence that the Asserted Claims do not contain a sufficiently full and clear description of the claimed invention.

To be sufficiently full and clear, the description must contain enough information to have allowed a person having ordinary skill in the field of the technology of the patent to make and use the full scope of the claimed invention at the time of the priority date of the patent claim. This is known as the "enablement" requirement. If a patent claim is not enabled, it is invalid.

In order to be enabling, the patent must permit persons having ordinary skill in the field of technology of the patent to make and use the full scope of the claimed invention without having to conduct undue experimentation. However, some amount of experimentation to make and use the invention is allowable. A patent specification need not include the information already known to and available to one of ordinary skill in the art.

In deciding whether a person having ordinary skill would have to experiment unduly in order to make and use the invention, you may consider several factors:

1.      the time and cost of any necessary experimentation;

2.      how routine any necessary experimentation is in the field of endometrial ablation devices;

3.      whether the patent discloses specific working examples of the claimed invention;

4.      the amount of guidance presented in the patent;

5. the nature and predictability of the field of endometrial ablation devices;

6. the level of ordinary skill in the field of endometrial ablation devices; and

7. the scope of the claimed invention.

No one or more of these factors is alone dispositive.  Rather, you must make your decision whether or not the degree of experimentation required is undue based upon all of the evidence presented to you.  You should weigh these factors and determine whether or not, in the context of this invention and the state of the art at the time of the application, a person having ordinary skill would need to experiment unduly to make and use the full scope of the claimed invention.

**Hologic's Sources**: *See Amgen Inc. v. Sanofi*, No. 14-cv-01317-SLR, D.I. 299 at 21-22 (D. Del. Mar. 4, 2016) (final instructions); *IOENGINE LLC v. Imation, Corp.*, No. 14-cv-01572-GMS, D.I. 199 at 33-34 (D. Del. Feb. 17, 2017) (final instructions); *IOENGINE LLC v. Interactive Media Corp.*, No. 14-cv-01571-GMS, D.I. 157 at 32 (D. Del. Jan. 17, 2017) (final instructions); *Idenix Pharms., LLC v. Gilead Sciences, Inc.*, No. 14-cv-00846-LPS, D.I. 516 at 31-32 (D. Del. Dec. 15, 2016) (final instructions); *Intellectual Ventures I LLC v. Motorola Mobility, LLC*, No. 11-cv-00908-SLR, D.I. 314 at 50 (D. Del. Feb. 4, 2014) (final instructions).

**Minerva's Proposal**:  The patent law contains certain requirements for the part of the patent called the specification.  Minerva contends that the Asserted Claims of the '183 and '348 patents are invalid because the specification does not contain a sufficiently full and clear description of how to make and use the full scope of the claimed invention.  To succeed, Minerva must show by clear and convincing evidence that the '183 and '348 patents do not contain a sufficiently full and clear description of the claimed invention.  To be sufficiently full and clear, the description must contain enough information to have allowed a hypothetical person having ordinary skill in the field of technology of the patent to make and use the full scope of the

claimed invention at the time the original patent application was filed.  In other words, the description of the invention must be complete and clear enough to enable someone of ordinary skill in the field to actually make and use it.  This is known as the "enablement" requirement. The requirement prevents both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than what the inventors actually invented.  Where the full scope of the claims is broad enough to cover two distinct types of products, the patent must enable both types.  Thus, where the asserted claims cover two distinct types of embodiments, the specification must enable both.  If a patent claim is not enabled, it is invalid.

In order to be enabling, the patent must permit hypothetical persons having ordinary skill in the field of technology of the patent to make and use the full scope of the claimed invention as of the priority date without having to conduct undue experimentation.  However, some amount of experimentation to make and use the invention is allowable.  In deciding whether a hypothetical person ordinary skill would have to engage in undue experimentation in order to make and use the invention, you may consider several factors listed below, among others:

1.      The time and cost of any necessary experimentation;

2.      How routine any necessary experimentation is in the field of endometrial ablation;

3.      Whether the patent discloses specific working examples of the claimed invention;

4.      The amount of guidance presented in the patent;

5.      The nature and predictability of the field of endometrial ablation;

6.      The level of ordinary skill in the field of endometrial ablation; and

7.      The scope of the claimed invention.

No one or more of these factors is alone dispositive.  Rather, you must make your decision whether or not the degree of experimentation required is undue based upon all of the

evidence presented to you.  You should weigh these factors and determine whether or not, in the context of this invention and the state of the art as of the priority date, a hypothetical person having ordinary skill would need to experiment unduly to make and use the full scope of the claimed invention.  The specification, not the knowledge of a hypothetical person having ordinary skill, must describe how to make and use the novel aspects of the claimed invention.

> ***Minerva's Sources:*** *See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions; *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379 (Fed. Cir. 2007); *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1000 (Fed. Cir. 2008); *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1285 (Fed. Cir. 2007); *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997); Federal Judicial Center Introduction to Patent System Video.

## VII.    PATENT DAMAGES [DISPUTED]

### A.    INTRODUCTION [DISPUTED]

**Hologic's Proposal:** Patent law provides that in the case of infringement of a valid patent claim, the owner of the patent shall be awarded damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.

If you find that Minerva infringed at least one claim of any of the Patents-in-Suit, you must then consider what amount of damages to award to Hologic.  If, however, you find that every asserted claim is not infringed, then you do not need to consider damages in your deliberations.

In this case, Hologic seeks total damages of $17,824,534 on infringing sales of the Minerva EAS from August 2015 through March 31, 2018, comprising $16,234,761 in lost profits, $638,194 in reasonably royalty damages on sales not subject to lost profits, and $951,578 in prejudgment interest.  Alternatively, should the jury determine that Hologic is only entitled to reasonable royalty damages, Hologic seeks a 10% royalty on infringing sales from August 2015 through March 31, 2018, yielding damages of $2,973,265 and $171,679 in prejudgment interest, for a total of $3,144,944.

I will now instruct you about the measure of damages.  By instructing you on damages, I am not suggesting which party should win this case, on any issue.

The damages you award must be adequate to compensate Hologic for the infringement. Your damages award should put Hologic in approximately the same financial position that it would have been in had the infringement not occurred.  You should not add anything to the amount of damages to punish Minerva or to set an example.

Hologic must prove the amount of its damages by a preponderance of the evidence. While Hologic is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.

> **Hologic's Sources**: *See Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, No. 15-819-LPS-CJB, D.I. 749 at 58 (D. Del. June 7, 2018) (final instructions); *GlaxoSmithKline LLC v. Teva Pharm. USA, Inc.*, No. 14-878-LPS-CJB, D.I. 440 at 48 (D. Del. June 19, 2017) (final instructions); *MobileMedia Ideas, LLC v. Apple Inc.*, No. 10-258-SLR, D.I. 703 at 35 (D. Del. Sept. 20, 2016) (final instructions); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 13-1534-SLR, D.I. 336 at 35 (D. Del. May 11, 2016) (final instructions).

**Minerva's Proposal:** If you find that Minerva infringed any valid claim of the '183 patent or '348 patent, you must then consider what amount of damages to award to Hologic for each of the patent.  I will now instruct you about the measure of damages.  By instructing you on damages, I am not suggesting which party should win this case, on any issue.  If you find that Minerva has not infringed any claim of the patents, or that a claim, even if infringed, is invalid, then Hologic is not entitled to any damages.

The damages you award must be adequate to compensate Hologic for the infringement. They are not meant to punish an infringer.

Hologic has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that Hologic establishes that it more likely than not suffered.  While Hologic is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.  You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

There are different types of damages that Hologic may be entitled to recover.  In this case, Hologic seeks lost profits and a reasonable royalty.  Lost profits consist of any actual reduction in business profits Hologic suffered as a result of Minerva's infringement.  A reasonable royalty is defined as the money amount Hologic and Minerva would have agreed upon as a fee for use of the invention at the time prior to when infringement began.  But, regardless of the type of damages you may choose to award, you must be careful to ensure that award is no more or no less than the value of the patented invention.

I will give more detailed instructions regarding damages shortly.  Note, however, that is Hologic is entitled to recover no less than a reasonable royalty for each infringing sale.

***Minerva's Sources:*** *See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions.

**B.   LOST PROFITS [DISPUTED]**

**1.   "BUT FOR" TEST [DISPUTED]**

**Hologic's Proposal:** In this case, Hologic seeks to recover lost profits for some of Minerva's sales of the Minerva EAS, and a reasonable royalty on the rest of Minerva's sales.

I will address lost profits first.  To recover lost profits (as opposed to reasonable royalties), Hologic must show a causal relationship between the infringement and Hologic's loss of profit.  In other words, Hologic must show that, but for the infringement, there is a reasonable probability that Hologic would have earned higher profits.  To show this, Hologic must prove that, if there had been no infringement, it would have made some portion of the sales that Minerva made of the infringing product.

Hologic is entitled to lost profits if it establishes each of the following by a preponderance of the evidence:

1.      That there was demand for the patented product.

2.      That there were no available, acceptable, noninfringing substitute products, or, if there were, its market share of the number of the sales made by Minerva that Hologic would have made, despite the availability of other acceptable noninfringing substitutes.

3.      That Hologic had the manufacturing and marketing capacity to make any infringing sales actually made by Minerva and for which Hologic seeks an award of lost profits—in other words, that Hologic was capable of satisfying the demand.

4.      The amount of profit that Hologic would have made if Minerva had not infringed.

**Hologic's Sources**: *See Edwards Lifesciences LLC v. Medtronic CoreValve LLC*, No. 12-23 (GMS), D.I. 168 at 44 (D. Del. Jan. 14, 2014) (final instructions); *E.I. Du Pont De Nemours & Co. v. Unifrax I LLC*, No. 14-1250-RGA, D.I. 325 at 31 (D. Del. May 15, 2017) (final instructions).

**Minerva's Proposal:** In this case, Hologic seeks to recover lost profits for some of Minerva's sales of the Minerva EAS, and a reasonable royalty on the rest of Minerva's sales.

I will address lost profits first.  To recover lost profits (as opposed to reasonable royalties), Hologic must show a causal relationship between the infringement and Hologic's loss of profit.  In other words, Hologic must show that, but for the infringement, there is a reasonable probability that Hologic would have earned higher profits.  To show this, Hologic must prove that, if there had been no infringement, it would have made some portion of the sales that Minerva made of the infringing product.

Hologic is entitled to lost profits if it establishes each of the following by the preponderance of the evidence:

1.      There was demand for the patented product.

2.      There were no available, acceptable, noninfringing substitute products, or, if there were, its market share of the number of the sales made by Minerva that Hologic would have made, despite the availability of other acceptable noninfringing substitutes.

3.      Hologic had the manufacturing and marketing capacity to make any infringing sales actually made by Minerva and for which Hologic seeks an award of lost profits—in other words, that Hologic was capable of satisfying the demand.

The amount of profit that Hologic would have made if Minerva had not infringed.

***Minerva's Sources:*** *See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions.

## 2.   AMOUNT OF PROFIT [STIPULATED]

Hologic may calculate its lost profits on lost sales by computing the lost revenue for sales it claims it would have made but for the infringement and subtracting from that figure the amount of additional costs or expenses it would have incurred in making those lost sales, such as cost of goods, sales costs, packaging costs, and shipping costs.  Certain fixed costs that do not vary with increases in production or scale, such as taxes, insurance, rent, and administrative overhead, should not be subtracted from Hologic's lost revenue.

### 3.    LOST PROFITS—DEMAND [STIPULATED]

Demand for the patented product can be proven by significant sales of Hologic's patented product or significant sales of an infringing product containing the patented features.

### 4.      MARKET SHARE [STIPULATED]

If Hologic establishes it would have made some, but not all, of Minerva's sales but for the infringement, the amount of sales that Hologic lost may be shown by proving its share of the relevant market, excluding infringing products.  Hologic may be awarded a share of profits equal to its market share even if there were non-infringing substitutes available.  In determining a patent holder's market share, the market must be established first, which requires determining which products are in that market.  Products are considered in the same market if they are considered "sufficiently similar" to compete against each other.  Two products are sufficiently similar if one does not have a significantly higher price than, or possess characteristics significantly different from, the other.

### 5.    LOST-PROFITS—ACCEPTABILITY OF NON-INFRINGING SUBSTITUTES [STIPULATED]

To be an "acceptable, non-infringing substitute," a product must have the advantages of the patented invention that were important to people who purchased an Minerva's product.  If purchasers of Minerva's product were motivated to buy that product because of features available only from that product and Hologic's patented product, then some other, alternative product is not an acceptable substitute, even if it otherwise competed with a Hologic's and an Minerva's products.  On the other hand, if the realities of the marketplace are that competitors other than Hologic would likely have captured the sales made by Minerva, despite a difference in the products, then Hologic is not entitled to lost profits on those sales.

### 6.    LOST-PROFITS—AVAILABILITY OF NON-INFRINGING SUBSTITUTES [DISPUTED]

**Hologic's Proposal:** An alternative product may be considered "available" to Minerva, as a potential substitute for an infringing one, even if the alternative product was not actually on sale during the infringement period. Factors suggesting the alternative was available include whether the material, experience, and know-how for the alleged substitute were readily available to Minerva at the time of infringement. Factors suggesting the alternative was not available include whether an alleged infringer had to design or invent around the patented technology to develop an alleged substitute, whether the infringer lacked the necessary know-how, equipment, and experience to make the alternative, and whether the cost to make the alternative was high.

Minerva has the burden of proof by a preponderance of the evidence to show that an alternative not actually on sale was available to Minerva during the damages period. If Minerva proves the availability of such an alternative, it remains Hologic's burden to prove by a preponderance of the evidence that such an alternative was either infringing or not acceptable.

*Hologic's Sources: See EMC Corp. v. Pure Storage, Inc.*, No. 13-1985 (RGA), D.I. 448 at 34 (D. Del. Mar. 15, 2016) (final instructions).

**Minerva's Proposal:** An alternative product may be considered "available" as a potential non-infringing substitute even if the product was not actually on sale during the infringement period.  Factors suggesting the alternative was available include whether the material, experience, and know-how for the alleged substitute were readily available at the time of infringement.  Factors suggesting the alternative was not available include whether the material was of such high cost as to render the alternative unavailable and whether an alleged infringer had to design or invent around the patented technology to develop an alleged substitute.

***Minerva's Sources:*** *See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions.

### 7.      LOST PROFITS—CAPACITY [STIPULATED]

A patent holder is only entitled to lost profits for sales it could have actually made.  In other words, Hologic must show that it had the manufacturing and marketing capability to make the sales it alleges it lost.  This means Hologic must prove it is more probable than not that it could have made and sold, or could have had someone else make or sell for it, the additional products it could have sold but for the infringement.

## C.    REASONABLE ROYALTY [DISPUTED]

**Hologic's Proposal:** Hologic also seeks a reasonable royalty.  A reasonable royalty is defined as the money amount Hologic and Minerva would have agreed upon as a fee for use of the invention at the time prior to when infringement began.  Hologic is entitled to recover no less than a reasonable royalty for each infringing sale and/or the use of the accused product or method.

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of royalty payment that a patent holder and infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began.  In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.

In determining this, you must assume that both parties believed the patent was valid and infringed and that both parties were willing to enter into an agreement.  The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.  Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.  Although evidence of the actual profits Minerva made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits Minerva made.

*Hologic's Sources*: *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 13-1534-SLR, D.I. 336 at 35-36 (D. Del. May 11, 2016) (final instructions); *MobileMedia Ideas, LLC v. Apple Inc.*, No. 10-258-SLR, D.I. 703 at 35-36 (D. Del. Sept. 20, 2016) (final instructions).

**Minerva's Proposal:** If you find that Hologic has established infringement, Hologic is entitled to at least a reasonable royalty to compensate it for that infringement.  If you find that Hologic has not proved its claim for lost profits, or has proved its claim for lost profits for only a portion of the infringing sales, then you must award Hologic a reasonable royalty for all infringing sales for which it has not been awarded lost profits damages.

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of royalty payment that a patent holder and infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began.  In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.

In determining this, you must assume that both parties believed the patent was valid and infringed and that both parties were willing to enter into an agreement.  The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.  Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.  Although evidence of the actual profits Minerva made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits Minerva made.

*Minerva's Sources: See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions.

70

1.     **FACTORS FOR DETERMINING A REASONABLE ROYALTY [DISPUTED]**

**Hologic's Proposal:** In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determination are:

1.     The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty;

2.     The rates paid by the licensee for the use of other patents comparable to the patents-in-suit;

3.     The nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold;

4.     The licensor's established policy and marketing program to maintain his or her patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly;

5.     The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter;

6.     The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his nonpatented items, and the extent of such derivative or convoyed sales;

7.     The duration of the patents-in-suit and the term of the license;

8.     The established profitability of the product made under the patents, its commercial success, and its current popularity;

9.      The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

10.     The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

11.     The extent to which Minerva has made use of the invention and any evidence probative of the value of that use;

12.     The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions;

13.     The portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by Minerva;

14.     The opinion and testimony of qualified experts; and

15.     The amount that a licensor (such as the patentee) and a licensee (such as Minerva) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors.  You may also consider any other factors

which in your mind would have increased or decreased the royalty Minerva would have been willing to pay and Hologic would have been willing to accept, acting as normally prudent business people.

> ***Hologic's Sources***: *See IOENGINE LLC v. Imation, Corp.*, No. 14-1572-GMS, D.I. 199 at 43-45 (D. Del. Feb. 17, 2017) (final instructions); *IOENGINE, LLC v. Interactive Media Corp.*, No. 14-1571-GMS, D.I. 157 at 52-54 (D. Del. Jan. 17, 2017) (final instructions); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 13-1534-SLR, D.I. 336 at 37-39 (D. Del. May 11, 2016) (final instructions); *EMC Corp. v. Zerto, Inc.*, No. 12-956-GMS, D.I. 208 at 47-49 (D. Del. May 7, 2015) (final instructions).

**Minerva's Proposal:** In determining the reasonable royalty, you should assume that both Hologic and Minerva knew all pertinent information at the time of the hypothetical negotiations. Some of the kinds of factors that you may consider in making your determination are:

1.      The value that the claimed invention contributes to the accused product.

2.      The value that factors other than the claimed invention contribute to Minerva's EAS.

The following factors also can be considered to inform the hypothetical negotiations:

1.      The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty;

2.      The rates paid by the licensee for the use of other patents comparable to the patents-in-suit;

3.      The nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold;

4.      The licensor's established policy and marketing program to maintain his or her patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly;

5.      The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter;

6.      The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his nonpatented items, and the extent of such derivative or convoyed sales;

7.      The duration of the patents-in-suit and the term of the license;

8.      The established profitability of the product made under the patents, its commercial success, and its current popularity;

9.      The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

10.      The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

11.      The extent to which Minerva has made use of the invention and any evidence probative of the value of that use;

12.      The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions;

13.     The portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by Minerva;

14.     The opinion and testimony of qualified experts; and

15.     The amount that a licensor (such as the patentee) and a licensee (such as Minerva) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors.  You may also consider any other factors which in your mind would have increased or decreased the royalty Minerva would have been willing to pay and Hologic would have been willing to accept, acting as normally prudent business people.

*Minerva's Sources: See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions.

## 2.   AVAILABILITY OF NON-INFRINGING SUBSTITUTES [DISPUTED]

**Hologic's Proposal:** In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of non-infringing alternatives to using the patented invention.  Use the same factors that I suggested earlier in the context of lost profits [Page __] to determine if an alternative product may be considered "available" to Minerva.

Minerva has the burden of proof by a preponderance of the evidence to show that an alternative not actually on sale was available to Minerva during the damages period. If Minerva proves the availability of such an alternative, it remains Hologic's burden to prove by a preponderance of the evidence that such an alternative was either infringing or not acceptable.

*Hologic's Sources*: *See EMC Corp. v. Pure Storage, Inc.*, No. 13-1985 (RGA), D.I. 448 at 34 (D. Del. Mar. 15, 2016) (final instructions).

**Minerva's Proposal: None.**  (Minerva objects to Hologic's proposal as irrelevant, confusing, misleading, and prejudicial.)

### D.      DAMAGES APPORTIONMENT [DISPUTED]

**Hologic's Proposal**[3]**:** A damages award must reflect the portion of the profits or royalty attributable to the respective inventions of the Asserted Claims. In other words, your damages award must reflect the value you find attributable to the patented inventions.  The evidence tending to separate or apportion damages between the patented features and unpatented features must be reliable and tangible, and not conjectural or speculative.

> **Hologic's Sources**: *See Greatbatch Ltd. v. AVX Corp.*, No. 13-cv-00723-LPS, D.I. 623 at 58 (D. Del. Aug. 10, 2017) (final instructions).

**Minerva's Proposal:** Where there are multiple components in the accused product, patent damages—in form of lost profits or reasonable royalty—must only reflect the value attributable to the infringing features of the accused product, here Minerva's EAS.  In other words, non-infringing features of Minerva's EAS should not be included in the damages calculation and must be separated out.  In addition, the patent damages—in form of lost profits or reasonable royalty—must also reflect only the accused features' improvement, and not the conventional components of the multicomponent product.

> **Minerva's Sources:** *See* 2016 Federal Circuit Bar Association Model Patent Jury Instructions; *Mentor Graphics Corp. v. Eve-USA, Inc.*, 851 F.3d 1275, 1287 (Fed. Cir. 2017); *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir.

---

[3] Hologic contends that an instruction regarding apportionment of multi-component is not relevant in this case.  *See, e.g., Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("Using the accused lawn mower sales as the royalty base is particularly appropriate in this case because the asserted claim is, in fact, directed to the lawn mower as a whole. . . . Thus, claim 1 covers the infringing product as whole, not a single component of a multi-component product. . . . We hold that such apportionment can be done in this case through a thorough and reliable analysis to apportion the royalty rate.").  If the Court is inclined to provide any instruction at all, Hologic's proposal above is in the alternative.

2014); *Garretson v. Clark*, 111 U.S. 120, 121 (1884); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014); *Exmark Mfg. Co. v. Briggs & Stratton Power Prods.*, 879 F.3d 1332, 1348 (Fed. Cir. 2018).

**E.      DATE OF COMMENCEMENT OF DAMAGES [STIPULATED]**

Damages for infringement of the patents-in-suit should be calculated beginning on August 2015, when Minerva first sold the accused Minerva EAS.

The hypothetical negotiation would also occur by August 2015, when Minerva began selling the accused Minerva EAS.

## VIII.   UNFAIR COMPETITION UNDER THE LANHAM ACT (15 U.S.C. § 1125) [DISPUTED]

### A.     DEFINITION OF A TRADEMARK [DISPUTED]

**Hologic's Proposal**: A trademark includes any word, name, symbol, or device, or any combination thereof used to identify and distinguish goods from those manufactured or sold by others and to indicate the source of the goods.  The owner of a trademark, in this case Hologic, has the right to exclude others from using that trademark.

Once the owner of a trademark has obtained the right to exclude others from using the trademark, the owner may obtain a certificate of registration issued by the United States Patent and Trademark Office. Thereafter, when the owner brings an action for infringement, the owner may rely solely on the registration certificate to prove that the owner has the right to exclude others from using the trademark in connection with the type of goods specified in the certificate.

Hologic owns United States trademark registration No. 2513050, which was registered November 27, 2001 for NovaSure.  I will refer to this trademark as "the NovaSure mark."

Hologic asserts that Minerva has unfairly competed by unlawfully using Hologic's NovaSure mark in connection with selling Minerva's competing Minerva EAS.

> ***Hologic's Sources***: *See Keurig, Inc. v. Sturm Foods, Inc.*, No. 10-841-SLR-MPT, D.I. 413 at 21, 24 (D. Del. Feb. 8, 2013) (proposed final instructions); 15 U.S.C. § 1127.

**Minerva's Proposal**: A trademark is a word, symbol, or combination of words or symbols used by a person to identify his product, to distinguish his product from those manufactured or sold by others, and to indicate the source of his product.

The purpose of trademark law is to prevent confusion among consumers about the source of products and to permit trademark owners to show ownership of their products and control their product's reputation.

Hologic asserts that Minerva has unfairly competed by using Hologic's NovaSure trademark to confuse customers as to the source of Minerva's EAS.

Minerva denies using the NovaSure mark to describe Minerva's EAS.  Minerva contends that its use of the NovaSure mark, if any, was to accurately describe the differences between the NovaSure and Minerva's EAS devices, to accurately describe the relationship of the parties, and/or to accurately describe the professional accomplishments of its founders and management team.

> ***Minerva's Sources:*** *See* Seventh Circuit Pattern Civil Jury Instructions, Instruction No. 13.1.1; 15 U.S.C. § 1127; *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992).

### B.      UNFAIR COMPETITION [DISPUTED]

**Hologic's Proposal**: To establish unfair competition under 15 U.S.C. § 1125(a)(1)(A), Hologic must prove by a preponderance of the evidence that:

1.      Minerva uses a false designation of origin;

2.      Minerva's false designation of origin occurs in interstate commerce in connection with the Minerva EAS;

3.      Minerva's false designation is likely to cause confusion, mistake, or deception as to the origin of the Minerva EAS by another person;

4.      Hologic has been or is likely to be damaged.

**Hologic's Sources**: *See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1428 (3d Cir. 1994).

**Minerva's Proposal**: To establish Unfair Competition under Section 1125(a)(1)(A) of the Lanham Act, Hologic must prove by a preponderance of the evidence that:

1.      The NovaSure mark is a valid, protectable trademark;

2.      Hologic owns rights to the mark;

3.      Minerva used the NovaSure mark in interstate commerce;

4.      Minerva used the NovaSure mark without the consent of Hologic in a manner that is likely to cause confusion among ordinary purchasers as to the source of the Minerva EAS; and

5.      Minerva's use of the NovaSure mark caused an injury to Hologic's commercial interest in sales or business reputation.

**Minerva's Sources:** *See* Seventh Circuit Pattern Civil Jury Instructions, Instruction No. 13.1.2; 15 U.S.C. § 1125(a)(1)(A); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1384 (2014); *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 230

(3d Cir. 2017); *Bd. of Dirs. of Sapphire Bay Condos. W. v. Simpson*, 641 F. App'x 113, 114 (3d Cir. 2015); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000); *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, No. 1:10-cv-00161-GMS, slip op. at 3 n.4 (D. Del. Oct. 11, 2016); *N.J. Physicians United Reciprocal Exch. v. Boynton & Boynton, Inc*., 141 F. Supp. 3d 298, 304-06 (D.N.J. 2015); *Lundgren v. Ameristar Credit Sols., Inc*., 40 F. Supp. 3d 543, 548-51, 551 n.4 (W.D. Pa. 2014); *Scholz v. Goudreau*, 132 F. Supp. 3d 239, 254-55 (D. Mass. 2015); *New Legion Co. v. Jasbir Sing Thandi*, No. 18-cv-778, 2018 U.S. Dist. LEXIS 77225, at *11-12 (E.D. Pa. May 8, 2018); *UHS of Del., Inc. v. United Health Servs.*, 227 F. Supp. 3d 381, 403 (M.D. Pa. 2016).

## C.        LIKELIHOOD OF CONFUSION – LAPP FACTOR TEST [DISPUTED]

**Hologic's Proposal**: To determine if Minerva's use of the NovaSure mark is likely to cause confusion, you should consider the following factors.  The presence or absence of any particular factor should not necessarily resolve whether there was a likelihood of confusion, because you must consider all relevant evidence.  When you consider the likelihood of confusion you should examine the following:

1.        The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

2.        The length of time Minerva has used the NovaSure mark without evidence of actual confusion;

3.        The intent of Minerva in adopting the mark;

4.        The evidence of actual confusion – if use by Minerva of the NovaSure trademark has led to instances of actual confusion, this strongly suggests a likelihood of confusion; however, actual confusion is not required for a finding of likelihood of confusion.  Even if actual confusion did not occur, Minerva's use of the NovaSure mark may still be likely to cause confusion;

5.        Whether the goods are marketed through the same channels of trade and advertised through the same media – if Hologic's and Minerva's products are likely to be sold at the same or similar locations, or advertised in similar media, this may increase the likelihood of confusion;

6.        The extent to which the targets of Hologic's and Minerva's sales efforts are the same – if Hologic and Minerva use the NovaSure mark in connection with the same, related, or complementary kinds of goods there may be a greater likelihood of confusion about the source of the goods than otherwise;

7.      The relationship of the goods in the minds of consumers because of the similarity of functions; and

8.      Other facts suggesting that the intended consumers might expect Hologic to manufacture or approve of the accused Minerva products.

You need not give all of these factors equal weight, nor do you need to apply every factor. None of these factors, standing alone, is determinative [*24] in the likelihood of confusion analysis. Nor is a determination of likelihood of confusion based on adding up the number of factors that favor one party or another. In some situations, one or two factors will be more persuasive. In other situations, different factors will seem more important. In this case, it is your job to determine which factors you find to be most telling, and each factor must be weighed and balanced against the others in light of the total evidence presented at trial. In short, the factors are meant to be tools, not hurdles.

**Hologic's Sources**: *See Keurig, Inc. v. Sturm Foods, Inc.*, No. 10-841-SLR-MPT, D.I. 413 at 21, 24 (D. Del. Feb. 8, 2013) (proposed final instructions); *Ateliers de La Haute-Garonne v Broetje Automation-USA Inc.*, No. 09-cv-00598-LPS, 2011 Jury Instr. LEXIS 650, at *104-105 (D. Del. Sept. 14, 2011) (proposed final instructions).

**Minerva's Proposal**: Hologic must prove that Minerva used the NovaSure mark in a manner that is likely to deceive customers as to the source of Minerva's product.  The source means the company that manufactures the product.  In other words, that customers purchasing a Minerva's EAS believed that they were purchasing a device from Hologic, not Minerva. Hologic must prove a likelihood of confusion among a significant number of people who buy or use, or consider buying or using, Minerva's EAS.

Under the law, Minerva is allowed to use the NovaSure mark in ways that are not likely to deceive customers, such as describing differences between the products or accurately describing the relationship between the parties as competitors.

To determine if Minerva's use of the NovaSure mark is likely to cause confusion amongst customers, you should consider the following factors.  The presence or absence of any particular factor that should not necessarily resolve whether there was a likelihood of confusion, because you must consider all relevant evidence.  When you consider the likelihood of confusion you should examine the following:

1.       Price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase. This may depend on the level of sophistication of potential buyers of the product, the cost of the product as well as the deliberation and scrutiny that these customers apply when deciding to purchase medical devices;

2.       Length of time Minerva has used the mark without evidence of actual confusion;

3.       Whether Minerva intended to pass off its product as that of Hologic, or intended to confuse consumers into thinking they were purchasing a device from Hologic;

4.       Evidence of actual confusion – It is Hologic's burden to produce evidence of customer confusion.  If use by Minerva of the NovaSure mark has led to instances of actual confusion, this strongly suggests a likelihood of confusion. However actual confusion is not required for a finding of likelihood of confusion. Even if actual confusion did not occur, Minerva's use of the NovaSure mark may still be likely to cause confusion;

5.       Whether the goods are marketed through the same channels of trade and advertised through the same media - If Hologic's and Minerva's products are likely to be sold in

the same or similar stores or outlets, or advertised in similar media, this may increase the likelihood of confusion;

6.    The extent to which the targets of the parties' sales efforts are the same - If Hologic and Minerva use the NovaSure mark on the same, related, or complementary kinds of goods there may be a greater likelihood of confusion about the source of the goods than otherwise;

7.    The relationship of the goods in the minds of consumers because of the similarity of function; and

8.    Other facts suggesting that the consuming public might expect Hologic to manufacture the accused Minerva products  - If Minerva uses distinctive branding, disclaimers, or materials to distinguish the Minerva EAS from the NovaSure, that may lessen any likelihood of confusion.

Hologic is asking you to decide whether Minerva's violation of the Lanham Act was willful, which means that Minerva intended to deceive customers as to the source of the Minerva EAS.  For you to find willfulness, Hologic must have presented evidence that is clear and convincing.

> ***Minerva's Sources:*** *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462-63 (3d Cir. 1983); *Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 202-08 (3d Cir. 1995); *Checkpoint Sys. v. Check Point Software Techs.,Inc.*, 269 F.3d 270, 279-301 (3d Cir. 2001); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215-27 (3d Cir. 2000); *Securacomm Consulting, Inc. v. Securacom, Inc.*, 224 F.3d 273, 281 (3d Cir. 2000); *Callaway Golf Co. v. Dunlop Slazenger*, 384 F. Supp. 2d 735, 747-48 (D. Del. 2005).

### D.      DAMAGES [DISPUTED]

**Hologic's Proposal**[4]: If you decide for Hologic on the question of liability, then you should consider what amount of money to award to Hologic as damages.  This should include profits that Minerva made because of its false designation of origin and any damages that Hologic sustained because of Minerva's false designation of origin.  Damages consist of the amount of money required to compensate Hologic for the injury caused by Minerva's false designation of origin.  Hologic must prove its damages by a preponderance of the evidence.  You should consider the following:

1.      Hologic's lost profits on lost sales.  Hologic's lost profits would be calculated by estimating the revenue Hologic lost due to Minerva's false designation of origin and subtracting out what it would have cost Hologic to generate that revenue.  In other words, Hologic may prove lost profit damages by showing the amount of sales it would have made, but did not make, because of Minerva's false designation of origin and the amount of profit that Hologic would have earned on each of those sales, net of all operating costs, overhead costs, production costs, and other deductible expenses that would have been incurred in making those sales.

2.      The injury to Hologic's goodwill, including injury to Hologic's general business reputation.

---

[4] Minerva's characterization below that Hologic 'amended' its pre-trial materials is misleading. The parties agreed to exchange interim drafts of verdict forms and jury instructions.  Hologic's final proposed verdict form is consistent with Hologic's claims for non-patent damages as referenced in its earlier filed Joint Proposed Pre-Trial Order.  (*See, e.g.*, D.I. 367, ¶ 7 (Joint Proposed Pre-Trial Order); D.I. 367-2, ¶¶ 26, 29 (Ex. 2, Hologic's Issues of Fact to be Litigated); D.I. 367-4 at 25 (Ex. 4, Hologic's Issues of Law to be Litigated).)  Finally, Minerva's cited authority does not support the proposition that actual consumer deception must be proven to make out a claim under § 1125(a)(1)(A) of the Lanham Act.  *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1021 (3d Cir. 2008) ("For claims brought under subsection (a)(1)(A), only a likelihood of confusion is required."); *see also Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994).

In addition to Hologic's damages, Hologic may recover the profits Minerva gained from the false designation of origin.  You may not, however, include in any award of profits any amount that you took into account in determining Hologic's actual damages.

Profit is determined by deducting expenses from gross revenue.  Gross revenue is all of the money Minerva received due to its false designation of origin.  Hologic is required only to prove Minerva's gross revenue due to its false designation of origin.  Minerva is required to prove any expenses that it argues should be deducted in determining its profits.  Hologic is entitled to recover Minerva's total profits from its false designation of origin, except for the portion of the profit that Minerva proves is due to factors other than its false designation of origin.

**Hologic's Sources**: *See Surgiquest, Inc. v. Lexion Med., LLC*, No. 14-382-GMS, D.I. 265 at 24-25 (D. Del. June 27, 2017) (final instructions); 15 U.S.C. § 1117(a).

**Minerva's Proposal**:  None.  (Minerva objects to Hologic's proposed instruction regarding the award of damages for non-patent claims on the grounds of irrelevance, waiver and estoppel, juror confusion, prejudice, and unnecessary delay to the proceedings.  Hologic amended its pre-trial materials (i.e., its proposed verdict form and final instructions) the day before the submission and now purports to seek actual damages on its non-patent claims after expressly disclaiming its ability or intent to do so during discovery, in its expert reports, and in opposing Minerva's motion summary judgment.  In the event Hologic is permitted to move forward with a damages theory on these claims, the jury must be instructed that, in order to seek monetary damages, Hologic must prove actual consumer deception, reliance, and proximate injury.  *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 92 (3d Cir. 2000).)

## IX.     DECEPTIVE TRADE PRACTICES UNDER 6 DEL. C. § 2532 [DISPUTED]

**Hologic's Proposal**: Hologic contends that Minerva has engaged in deceptive trade practices under the Delaware Deceptive Trade Practices Act.  To prove a violation of the Delaware Deceptive Trade Practices Act, Hologic must prove by a preponderance of the evidence that, in the course of its business, Minerva either:

1.      Represented that its goods have characteristics, uses, or benefits that they do not have; or

2.      Disparages the goods, services or business of Hologic by false or misleading representation of fact; or

3.      Advertises the Minerva EAS with an intent not to sell it as advertised; or

4.      Engaged in other conduct which creates likelihood of confusion or misunderstanding.

Hologic does not need to prove competition between the parties or actual confusion or misunderstanding to prevail on this claim.  If you find that Hologic has proven unfair competition under the Lanham Act, then you must also find that Hologic has proven its claim under the Delaware Deceptive Trade Practices Act.

The Delaware Deceptive Trade Practices Act is directed at patterns of deceptive conduct, not isolated statements or isolated incidents.  Hologic must prove through a preponderance of the evidence there is a reasonable probability of deception as opposed to a speculative or possibility of confusion.

If you decide for Hologic, you must also decide whether Minerva has willfully engaged in a deceptive trade practice.

**Hologic's Sources**: *See Surgiquest, Inc. v. Lexion Med., LLC*, No. 14-382-GMS, D.I. 265 at 24-25 (D. Del. June 27, 2017) (final instructions); 6 Del. C. §§ 2532, 2533(b); *Schering-Plough Healthcare Prod., Inc. v. Neutrogena Corp.*, 702 F. Supp. 2d 266, 272 (D. Del. 2010); 6 Del. C. § 2533(b).

**Minerva's Proposal:** Hologic contends that Minerva has engaged in deceptive trade practices under the Delaware Uniform Deceptive Trade Practices Act.  To prove a violation of the Delaware Deceptive Trade Practices Act, Hologic must prove by a preponderance of the evidence that in the course of Minerva's business, it either:

(a)      Represented that its goods have characteristics, uses, or benefits that they do not have; or

(b)      Disparages the goods, services or business of another by false or misleading representation of fact; or

(c)      Advertises goods with an intent not to sell them as advertised; or

(d)      Engaged in other conduct which creates or likelihood of confusion or misunderstanding.

In order to prevail on this claim, Hologic need not prove competition between the parties or actual confusion or misunderstanding.  The Delaware Deceptive Trade Practices Act is directed at patterns of deceptive conduct, not isolated statements or isolated incidents.  Hologic must prove through a preponderance of the evidence there is a reasonable probability of deception as opposed to a speculative or possibility of confusion.

**Minerva's Sources:** *See* 6 Del. C. § 2532; *Porter v. Farmers Supply Serv., Inc.*, 617 F. Supp. 1175, 1189 (D. Del. 1985); Wright v. Portfolio Recovery Affiliates, No. 09-612-GMS, 2011 U.S. Dist. LEXIS 33612, at *15 (D. Del. Mar. 30, 2011).

## X.       UNFAIR COMPETITION UNDER DELAWARE COMMON LAW [DISPUTED]

**Hologic's Proposal**: Hologic also contends that Minerva has engaged in unfair competition under Delaware common law.  This claim is different than Hologic's claims under the Delaware Deceptive Trade Practices Act and the Lanham Act that I mentioned previously.

To prove unfair competition under Delaware common law, Hologic must show by a preponderance of the evidence that:

1.      Hologic had a reasonable expectancy of entering a valid business relationship with its customers in the form of product sales;

2.      Minerva wrongfully interfered with that relationship;

3.      Minerva's wrongful interference defeated Hologic's legitimate expectancy of entering a valid business relationship; and

4.      Hologic was injured as a result of Minerva's unfair competition.

In considering this claim, remember that some amount of interference is justified and encouraged in a free market system and companies have a right to compete in the market.  The essential element separating unfair competition from legitimate market participation is an unfair action on the part of defendant that prevents plaintiff from legitimately earning revenue.

*Hologic's Sources*: *See Cellectis S.A. v. Precision Biosciences, Inc.*, No. 11-173-SLR, D.I. 298 at 41 (D. Del. Apr. 30, 2013) (final instructions).

**Minerva's Proposal**: Hologic also contends that Minerva has engaged in unfair competition under Delaware Common Law.

To prove unfair competition under Delaware Common Law, Hologic must show by a preponderance of the evidence that:

1.      Hologic had a reasonable expectancy of entering a valid business relationship with its customers (in the form of product sales). Hologic must identify a specific customer who was prepared to enter into a business relationship with Hologic

2.      Minerva has wrongfully interfered with that relationship.  There is nothing wrongful about providing customers with truthful information; and

3.      Minerva's wrongful inference defeated Hologic's legitimate expectancy of entering a valid business relationship; and

4.      Hologic was injured as a result of Minerva's unfair competition

In considering this claim, remember that companies have a right to compete in the market. The essential element separating unfair competition from legitimate market participation is an unfair action on the part of defendant that prevents plaintiff from legitimately earning revenue.

> **Minerva's Sources:** *See FMC Corp. v. Summit Agro USA, LLC*, Civil Action No. 14-51-LPS, 2014 U.S. Dist. LEXIS 185308, at *44-46 (D. Del. Nov. 14, 2014); *Ethypharm S.A. v. Abbott Labs.*, 598 F. Supp. 2d 611, 618-19 (D. Del. 2009); *Lynch v. Coinmaster USA, Inc.*, 614 F. Supp. 2d 494, 505-06 (D. Del. 2009); *EDIX Media Grp., Inc. v. Mahani*, No. 2186-N, 2006 Del. Ch. LEXIS 207, at *45 (Del. Ch. Dec. 12, 2006); *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057-58 (Del. Super. Ct. 2001).

## XI.   TORTIOUS INTERFERENCE UNDER DELAWARE COMMON LAW
[DISPUTED]

**Hologic's Proposal**: Hologic also contends that Minerva tortiously interfered with its

business relationships.  To prove tortious interference with business relationships, Hologic must

prove by a preponderance of the evidence that:

1.      Hologic had a valid business relationship or a reasonable probability of a business

opportunity;

2.      Minerva knew of Hologic's relationship or business opportunity;

3.      Minerva intentionally interfered which induced or caused a termination of the

relationship or expectancy; and

4.      Hologic was damaged as a result of Minerva's intentional interference.

You should remember that Minerva has the privilege to interfere in some ways with

business opportunities.  The key is whether the interference is both intentional and improper.

There are several factors you can use to help you determine whether Minerva's acts of

interference are improper.  They include: (a) the nature of Minerva's conduct; (b) Minerva's

motive; (c) the interests of Hologic; (d) the interests sought to be advanced by Minerva; (e) the

societal interests in protecting the freedom of action of Minerva and the contractual interests of

Hologic; (f) the proximity or remoteness of Minerva's conduct to the interference; and (g) the

relations between the parties.

You should also remember that Hologic's claim for tortious inference with its business

relationship does not require a breach of contract.

> **Hologic's Sources**: *See Padcom, Inc. v. Netmotion Wireless, Inc.*, No. 03-983-SLR,
> D.I. 485 at 52-53 (D. Del. Mar. 24, 2006) (final instructions); *Ethypharm S.A. France v.
> Abbott Labs.*, 598 F. Supp. 2d 611, 619 (D. Del. 2009).

**Minerva's Proposal**: Hologic also contends that Minerva tortiously interfered with its business relationships.  To prove tortious interference, Hologic must demonstrate by a preponderance of the evidence that:

1.      Hologic had a reasonable probability of a business opportunity.  Again, Hologic must identify a specific customer who was prepared to enter into a business relationship with Hologic;

2.      Minerva knew of that specific relationship or probability of a business opportunity;

3.      Minerva intentionally interfered by inducing or causing a termination of the relationship or expectancy; and

4.      Hologic was damaged.

There are several factors you can use to help you determine whether Minerva's acts of interference are improper.  They include: (a) the nature of Minerva's conduct, including whether the information was truthful; (b) Minerva's motive; (c) the interests of Hologic; (d) the interests sought to be advanced by Minerva; (e) the societal interests in protecting the freedom of action of Minerva and the contractual interests of Hologic; (f) the proximity or remoteness of Minerva's conduct to the interference; and (g) the relations between the parties.

> *Minerva's Sources: See Bowl-Mor Co. v. Brunswick Corp.*, 297 A.2d 61, 65 (Del. Ch. 1972); *Bove v. Goldenberg*, No. 05C-10-134 (CHT), 2007 Del. Super. LEXIS 398, at *11-12 (Super. Ct. Feb. 7, 2007); *Ethypharm S.A. v. Abbott Labs.*, 598 F. Supp. 2d 611, 619 (D. Del. 2009); *Wilco AG v. Packaging Techs. & Inspection LLC*, 615 F. Supp. 2d 320, 324-25 (D. Del. 2009); *Soterion Corp. v. Soteria Mezzanine Corp.*, No. 6158-VCN, 2012 Del. Ch. LEXIS 257, at *46-47 (Ch. Oct. 31, 2012); *Bohatiuk v. Del. Chiropractic Servs. Network, L.L.C.*, C.A. No. 95C-10-277 SCD, 1997 Del. Super. LEXIS 215, at *7-9 (Super. Ct. Apr. 11, 1997); Restatement (Second) of Torts § 767.

## XII.   DAMAGES FOR DELAWARE COMMON LAW CLAIMS [DISPUTED]

### A.   <u>COMPENSATORY DAMAGES</u> [DISPUTED]

**Hologic's Proposal**[5]: For Hologic to recover any monetary relief for its Delaware unfair competition claim separately from its Lanham Act unfair competition claim, it must prove by a preponderance of the evidence all of the elements of a Delaware unfair competition claim and that it suffered actual monetary damage resulting from Minerva's unfair competition.  However, you cannot award Hologic monetary damages for lost sales in connection with both its Lanham Act unfair competition claim and Delaware unfair competition claim.  Because Hologic's Lanham Act unfair competition claim and its Delaware unfair competition claim are based on the same alleged conduct, an award of monetary damages for both claims to compensate for lost sales would result in impermissible double recovery.

Similarly, for Hologic to recover any monetary relief for its tortious interference with business relationships claim separately from its Lanham Act unfair competition and Delaware unfair competition claims, it must prove by a preponderance of the evidence all of the elements of a tortious interference with business relationships claim and that it suffered actual monetary damage resulting from Minerva's interference.  However, you cannot award Hologic monetary damages for lost sales in connection with each of its Lanham Act unfair competition claim,

---

[5] Minerva's characterization below that Hologic 'amended' its pre-trial materials is misleading. The parties agreed to exchange interim drafts of verdict forms and jury instructions.  Hologic's final proposed verdict form is consistent with Hologic's claims for non-patent damages as referenced in its earlier filed Joint Proposed Pre-Trial Order.  (*See, e.g.*, D.I. 367, ¶ 7 (Joint Proposed Pre-Trial Order); D.I. 367-2, ¶¶ 26, 29 (Ex. 2, Hologic's Issues of Fact to be Litigated); D.I. 367-4 at 25 (Ex. 4, Hologic's Issues of Law to be Litigated).)  Finally, Minerva's cited authority does not support the proposition that actual consumer deception must be proven to make out a claim under § 1125(a)(1)(A) of the Lanham Act.  *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1021 (3d Cir. 2008) ("For claims brought under subsection (a)(1)(A), only a likelihood of confusion is required."); *see also Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994).

Delaware unfair competition claim, and tortious interference with business relationships claim. Because Hologic's Lanham Act unfair competition claim, its Delaware unfair competition claim, and its tortious interference with business relationships claim are based on the same alleged conduct, an award of monetary damages for each claim to compensate for lost sales would result in impermissible multiple recovery.

> ***Hologic's Sources***: *See Surgiquest, Inc. v. Lexion Med., LLC*, No 1:14-CV-00382-GMS, D.I. 242 at 43 (D. Del. Apr. 7, 2017) (final instructions).

**Minerva's Proposal**:  None.  (Minerva objects to Hologic's proposed instruction regarding the award of damages for non-patent claims on the grounds of irrelevance, waiver and estoppel, juror confusion, prejudice, and unnecessary delay to the proceedings.  Hologic amended its pre-trial materials (i.e., its proposed verdict form and final instructions) the day before the submission and now purports to seek actual damages on its non-patent claims after expressly disclaiming its ability or intent to do so during discovery, in its expert reports, and in opposing Minerva's motion summary judgment.  In the event Hologic is permitted to move forward with a damages theory on these claims, the jury must be instructed that, in order to seek monetary damages, Hologic must prove actual consumer deception, reliance, and proximate injury.  *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 92 (3d Cir. 2000).)

## B.   __PUNITIVE DAMAGES__ [DISPUTED]

**Hologic's Proposal**[6]: If you decide to award compensatory damages to Hologic, you must determine whether Minerva is also liable to Hologic for punitive damages.

Punitive damages are different from compensatory damages.  Compensatory damages are awarded to compensate the plaintiff for the injury suffered.  Punitive damages, on the other hand, are awarded in addition to compensatory damages.

You may award punitive damages to punish a party for outrageous conduct and to deter a party, and others like it, from engaging in similar conduct in the future.  To award punitive damages, you must find by a preponderance of the evidence that Minerva acted intentionally or recklessly.  Punitive damages cannot be awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence.

Intentional conduct means it is the person's conscious object to engage in conduct of that nature.  Reckless conduct is a conscious indifference that amounts to an "I don't care" attitude.  Reckless conduct occurs when a person, with no intent to cause harm, performs an act so unreasonable and dangerous that it knows or should know that there is an eminent likelihood of harm that can result.  Each requires that the defendant foresee that its conduct threatens a particular harm to another.

---

[6] Minerva's characterization below that Hologic 'amended' its pre-trial materials is misleading. The parties agreed to exchange interim drafts of verdict forms and jury instructions.  Hologic's final proposed verdict form is consistent with Hologic's claims for non-patent damages as referenced in its earlier filed Joint Proposed Pre-Trial Order.  (*See, e.g.*, D.I. 367, ¶ 7 (Joint Proposed Pre-Trial Order); D.I. 367-2, ¶¶ 26, 29 (Ex. 2, Hologic's Issues of Fact to be Litigated); D.I. 367-4 at 25 (Ex. 4, Hologic's Issues of Law to be Litigated).)  Finally, Minerva's cited authority does not support the proposition that actual consumer deception must be proven to make out a claim under § 1125(a)(1)(A) of the Lanham Act.  *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1021 (3d Cir. 2008) ("For claims brought under subsection (a)(1)(A), only a likelihood of confusion is required."); *see also Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994).

The law provides no fixed standards for the amount of punitive damages.

In determining any award of punitive damages, you may consider the nature of Minerva's conduct and the degree to which the conduct was reprehensible.  Finally, you may assess an amount of damages that will deter Minerva and others like it from similar conduct in the future. You may consider Minerva's financial condition when evaluating deterrence.  Any award of punitive damages must bear a reasonable relationship to Hologic's compensatory damages. Minerva's financial condition must not be considered in assessing compensatory damages.

*Hologic's Sources*: *See* Del. P.J.I. Civ. § 22.27 (2000).

**Minerva's Proposal**:  None.  (Minerva objects to Hologic's proposed instruction regarding the award of damages for non-patent claims on the grounds of irrelevance, waiver and estoppel, juror confusion, prejudice, and unnecessary delay to the proceedings.  Hologic amended its pre-trial materials (i.e., its proposed verdict form and final instructions) the day before the submission and now purports to seek actual damages on its non-patent claims after expressly disclaiming its ability or intent to do so during discovery, in its expert reports, and in opposing Minerva's motion summary judgment.  In the event Hologic is permitted to move forward with a damages theory on these claims, the jury must be instructed that, in order to seek monetary damages, Hologic must prove actual consumer deception, reliance, and proximate injury.  *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 92 (3d Cir. 2000).)

## XIII.   MINERVA'S COUNTERCLAIMS [DISPUTED]

### A.      LANHAM ACT [DISPUTED]

**Hologic's Proposal**: Minerva claims that Hologic has engaged in unfair competition under 15 U.S.C. § 1125(a)(1)(A).[7]  To succeed on this claim, Minerva must prove by a preponderance of the evidence that:

1.      Hologic uses a false or misleading description of facts;

2.      Hologic's false or misleading description of facts occurs in interstate commerce in connection with the NovaSure system;

3.      Hologic's false or misleading description of facts is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Hologic with Minerva, or as to the origin, sponsorship, or approval of Hologic's goods, services, or commercial activities by Minerva;

4.      Minerva has been or is likely to be damaged.

To determine if Hologic's use is likely to cause confusion, you should consider the same factors I discussed earlier with respect to Hologic's claim against Minerva.  The presence or absence of any particular factor should not necessarily resolve whether there was a likelihood of confusion, because you must consider all relevant evidence.  When you consider the likelihood of confusion you should examine the following:

1.      The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

---

[7] Although proposed herein, Minerva has never pled a claim under 15 U.S.C. § 1125(a)(1)(A) because it has never alleged that Hologic's conduct is likely to cause confusion as to the "affiliation, connection, or association" or as to the "origin, sponsorship, or approval" of Minerva's goods or services or Hologic's commercial activities. (*See* D.I. 83, ¶¶ 179-87.)

2.      The length of time Minerva has used the NovaSure mark without evidence of actual confusion;

3.      The intent of Minerva in adopting the mark;

4.      The evidence of actual confusion – if use by Minerva of the NovaSure trademark has led to instances of actual confusion, this strongly suggests a likelihood of confusion; however, actual confusion is not required for a finding of likelihood of confusion.  Even if actual confusion did not occur, Minerva's use of the NovaSure mark may still be likely to cause confusion;

5.      Whether the goods are marketed through the same channels of trade and advertised through the same media – if Hologic's and Minerva's products are likely to be sold at the same or similar locations, or advertised in similar media, this may increase the likelihood of confusion;

6.      The extent to which the targets of Hologic's and Minerva's sales efforts are the same – if Hologic and Minerva use the NovaSure mark in connection with the same, related, or complementary kinds of goods there may be a greater likelihood of confusion about the source of the goods than otherwise;

7.      The relationship of the goods in the minds of consumers because of the similarity of functions; and

8.      Other facts suggesting that the intended consumers might expect Hologic to manufacture or approve of the accused Minerva products.

You need not give all of these factors equal weight, nor do you need to apply every factor. None of these factors, standing alone, is determinative [*24] in the likelihood of confusion analysis. Nor is a determination of likelihood of confusion based on adding up the

number of factors that favor one party or another. In some situations, one or two factors will be more persuasive. In other situations, different factors will seem more important. In this case, it is your job to determine which factors you find to be most telling, and each factor must be weighed and balanced against the others in light of the total evidence presented at trial. In short, the factors are meant to be tools, not hurdles.

Minerva also claims that Hologic has engaged in false advertising.  To succeed on this claim, Minerva must prove by a preponderance of the evidence that:

1.      Hologic has made a false or misleading statement of fact in a commercial advertisement about its own products or Minerva's products;

2.      Hologic's statement constituted actual deception or had the tendency to deceive a substantial segment of the intended audience;

3.      Hologic's false or misleading statement of fact was material to the purchasing decision of customers in that it was likely to influence purchasing decisions;

4.      Hologic's advertised goods and services travel in and/or affect interstate commerce; and

5.      Minerva has been or was likely to be injured as a result of Hologic's false or misleading statement of fact.

Hologic's statements constitute commercial advertising if: (1) the statements constitute commercial speech in that they propose a commercial transaction; (2) Hologic is in commercial competition with Minerva; (3) the statements are made for the purpose of influencing consumers to by Hologic's goods or services; and (4) the statements are disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry.

As to the second element, actual deception or a tendency to deceive is presumed if a plaintiff proves that a statement is unambiguous and literally false.  If the message conveyed by the statement is literally true or ambiguous, however, the plaintiff must prove actual deception or a tendency to deceive.

If you decide for Minerva on the question of liability, then you should consider whether Minerva is entitled to damages.  To recover damages under the Lanham Act, Minerva must prove by a preponderance of the evidence for each false or misleading statement of fact that:

1.	Hologic's false or misleading statement of fact was intentionally deceptive or caused actual confusion among consumers; and

2.	That the false or misleading statement of fact was a material factor in causing Minerva's actual damages.

Once Minerva establishes Hologic's deceptive intent, the burden then shifts to Hologic to demonstrate the absence of customer deception.

If you find that Minerva has proved these things, then you must consider what amount of money to award to Minerva as damages.  This should include actual damages that Minerva sustained because of Hologic's false advertising, and profits that Hologic made because of its false advertising.  Damages consist of the amount of money required to compensate Minerva for the injury caused by Hologic's false advertising.  Minerva must prove its damages by a preponderance of the evidence.  You should consider the following:

1.	Minerva's lost profits on lost sales.  Minerva's lost profits would be calculated by estimating the revenue Minerva lost due to Hologic's false or misleading statements of fact and subtracting out what it would have cost Minerva to generate that revenue.  In other words, Minerva may prove lost profit damages by showing the amount of sales it would have made, but

did not make, because of Hologic's alleged false advertising and the amount of profit that Minerva would have earned on each of those sales, net of all operating costs, overhead costs, production costs, and other deductible expenses that would have been incurred in making those sales.

2.      The injury to Minerva's goodwill, including injury to Minerva's general business reputation.

3.      Cost of corrective advertising.  If Minerva has proven that Hologic has engaged in false advertising, you may award any cost of pretrial or post-trial corrective advertising that Minerva has proven by a preponderance of the evidence.  The cost of corrective advertising may include reasonable expenditures made by Minerva in order to prevent, correct, or mitigate the confusion or deception of past and prospective purchasers resulting from Hologic's false advertising.

In addition to Minerva's damages, Minerva may recover the profits Hologic gained from the false advertising.  You may not, however, include in any award of profits any amount that you took into account in determining Minerva's actual damages.

Profit is determined by deducting expenses from gross revenue.  Gross revenue is all of the money Hologic received due to its false advertising.  Minerva is required only to prove Hologic's gross revenue due to its false advertising.  Hologic is required to prove any expenses that it argues should be deducted in determining its profits.  Minerva is entitled to recover Hologic's total profits from its false advertising, except for the portion of the profit that Hologic proves is due to factors other than false advertising.

***Hologic's Sources***: *See Cellectis S.A. v. Precision Biosciences, Inc.*, No. 11-173-SLR, D.I. 298 at 39-40 (D. Del. Apr. 30, 2013) (final instructions); *Surgiquest, Inc. v. Lexion*

*Med., LLC*, No. 14-382-GMS, D.I. 265 at 24-25 (D. Del. June 27, 2017) (final instructions); 15 U.S.C. §§ 1117(a), 1125(a)(1)(A)-(B); *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1428 (3d Cir. 1994); *Keurig, Inc. v. Sturm Foods, Inc.*, No. 10-841-SLR-MPT, D.I. 413 at 21, 24 (D. Del. Feb. 8, 2013) (proposed final instructions); *Ateliers de La Haute-Garonne v Broetje Automation-USA Inc.*, No. 09-cv-00598-LPS, 2011 Jury Instr. LEXIS 650, at *104-105 (D. Del. Sept. 14, 2011) (proposed final instructions).

**Minerva's Proposal**: Minerva claims that Hologic has engaged in false advertising. To succeed on this claim, Minerva must prove five things by a preponderance of the evidence:

1.      Hologic made a false or misleading statement of fact in a commercial advertisement about the nature, quality, or characteristic of the NovaSure product or that Hologic made a false or misleading statement of fact about Minerv'sa EAS.  A statement is misleading if it conveys a false impression and actually misleads a consumer. A statement can be misleading even if it is literally true or ambiguous.

2.      The statement actually deceived some customers or had the tendency to deceive a substantial segment of its audience.

3.      The deception was likely to influence the purchasing decisions of consumers.

4.      Hologic caused the false statement to enter interstate commerce. A false statement enters interstate commerce if either parties' are advertised or sold across state lines and Hologic's activities have a substantial effect on Minerva's business.

5.      Minerva has been or is likely to be injured as a result of the false statement. Injury includes a diversion of sales from Minerva to Hologic; a loss of goodwill associated with Minerva's products.

If you find that Minerva has proved each of these things, then you must find for Minerva. If, on the other hand, you find that Minerva has failed to prove any one of these things, then you must find for Hologic.

If you decide for Minerva on the question of liability, then you should consider the amount of money to award to Minerva. This should include damages that Minerva sustained because of Holgoic's false advertising, and profits that Hologic made because of its false advertising.

If you decide for Hologic on the question of liability, then you should not consider this issue.

To recover damages under the Lanham Act, Minerva must prove two things by a preponderance of the evidence:

1.      Hologic's false advertising was intentionally deceptive or caused actual confusion among consumers; and

2.      As a result, Minerva sustained injury.

If you find that Minerva has proved these things, then you must consider what amount of money to award to Minerva as damages. Damages consist of the amount of money required to compensate Minerva for the injury caused by Hologic's false advertising. Minerva must prove its damages by a preponderance of the evidence. You may consider the following types of damages:

•      Minerva's lost profits on lost sales, which consists of the revenue Minerva would have earned but for Hologic's false advertising, less the expenses Minerva would have sustained in earning those revenues.

•      Loss of goodwill. In determining loss of goodwill, you should compare the value of Minerva's goodwill before the false advertising with the value of Minerva's goodwill after the false advertising.

- Cost of corrective advertising. This is the amount spent by Minerva to counteract the effects of Hologic's false advertising and the amount necessary to dispel any public confusion that lingers.

In addition to Minerva's damages, Minerva may recover the profits Hologic gained from the false advertising. You may not, however, include in any award of profits any amount that you took into account in determining Minerva's actual damages.

Profit is determined by deducting expenses from gross revenue. Gross revenue is all of the money Hologic received due to its false advertising. Minerva is required only to prove Hologic's gross revenue. Hologic is required to prove any expenses that it argues should be deducted in determining its profits. Minerva is entitled to recover Hologic's total profits from its false advertising, except for the portion of the profit that Hologic proves is due to factors other than false advertising.

If you find that Hologic engaged in false advertising, you must also determine whether Minerva has proven that, at the time Hologic engaged in the false advertising, Hologic acted willfully. Hologic acted willfully if it knew that its advertising was false or misleading or if it acted with indifference to whether its advertising was false or misleading.

> ***Minerva's Sources:*** *See* Seventh Circuit Pattern Civil Jury Instructions, Instruction Nos. 13.3.1, 13.6.1, 13.6.3  13.6.4, 13.6.5; 15 U.S.C. § 1125(a)(1)(B); 15 U.S.C. § 1117(a); *United States Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922-23 (3d Cir. 1990); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 176-78 (3d Cir. 2005); *Callaway Golf Co. v. Dunlop Slazenger*, 384 F. Supp. 2d 735, 740-44 (D. Del. 2005).

### B.     DELAWARE STATE LAW CLAIMS [DISPUTED]

#### 1.     DECEPTIVE TRADE PRACTICES UNDER 6 DEL. C. § 2532 [DISPUTED]

**Hologic's Proposal**: Minerva contends that Hologic violated Delaware's Deceptive Trade Practices Act.  I have already described the required elements.  To prove a violation of the Delaware Deceptive Trade Practices Act, Minerva must prove by a preponderance of the evidence that, in the course of its business, Hologic either:

1.     Represented that NovaSure has characteristics, uses, or benefits that it does not have; or

2.     Disparaged Minerva or the Minerva EAS with a false or misleading representation of fact; or

3.     Engaged in other conduct which creates likelihood of confusion or misunderstanding.

Minerva does not need to prove competition between the parties or actual confusion or misunderstanding to prevail on this claim.  If you find that Minerva has proven unfair competition under the Lanham Act, then you must also find that Minerva has proven its claim under the Delaware Deceptive Trade Practices Act.

The Delaware Deceptive Trade Practices Act is directed at patterns of deceptive conduct, not isolated statements or isolated incidents.  Minerva must prove through a preponderance of the evidence there is a reasonable probability of deception as opposed to a speculative or possibility of confusion.

**Hologic's Sources**: *See Surgiquest, Inc. v. Lexion Med., LLC*, No. 14-382-GMS, D.I. 265 at 24-25 (D. Del. June 27, 2017) (final instructions); 6 Del. C. §§ 2532, 2533(b); *Schering-Plough Healthcare Prod., Inc. v. Neutrogena Corp.*, 702 F. Supp. 2d 266, 272 (D. Del. 2010).

**Minerva's Proposal**: Minerva contends that Hologic violated Delaware's Deceptive Trade Practices Act. I have already described the required elements. To recap, Minerva must prove by a preponderance of the evidence that Hologic:

(a)     Represented that Novasure has characteristics, uses, or benefits that it does not have; or

(b)     Disparaged Minerva or the Minerva EAS with a false or misleading representation of fact; or

(c)     Engaged in other conduct which creates or likelihood of confusion or misunderstanding.

   ***Minerva's Sources:*** *See* 6 Del. C. § 2532; *Porter v. Farmers Supply Serv., Inc.*, 617 F. Supp. 1175, 1189 (D. Del. 1985); *Wright v. Portfolio Recovery Affiliates*, No. 09-612-GMS, 2011 U.S. Dist. LEXIS 33612, at *15 (D. Del. Mar. 30, 2011).

### 2.      UNFAIR COMPETITION UNDER DELAWARE LAW [DISPUTED]

**Hologic's Proposal**: Minerva contends that Hologic has engaged in unfair competition under Delaware common law.  I have already described the required elements.  To prove unfair competition under Delaware common law, Minerva must show by a preponderance of the evidence that:

1.      Minerva had a reasonable expectancy of entering a valid business relationship with its customers in the form of product sales;

2.      Hologic wrongfully interfered with that relationship;

3.      Hologic's wrongful inference defeated Minerva's legitimate expectancy of entering a valid business relationship; and

4.      Minerva was injured as a result of Hologic's unfair competition.

In considering this claim, remember that some amount of interference is justified and encouraged in a free market system and companies have a right to compete in the market.  The essential element separating unfair competition from legitimate market participation is an unfair action on the part of Hologic that prevents Minerva from legitimately earning revenue.

> ***Hologic's Sources***: *See Cellectis S.A. v. Precision Biosciences, Inc.*, No. 11-173-SLR, D.I. 298 at 41 (D. Del. Apr. 30, 2013) (final instructions).

**Minerva's Proposal**: Minerva contends that Hologic violated Delaware's prohibition against unfair competition.  I have already described the required elements.  To recap, Minerva must show:

1.      It had a reasonable expectancy of entering a valid business relationship with a specific customer who was prepared to enter into a business relationship with Minerva

2.      Hologic wrongfully interfered with that relationship.  That wrongful inference

defeated Minerva's legitimate expectancy of entering a valid business relationship; and

3.      Minerva was injured as a result.

**Minerva's Sources:** *See FMC Corp. v. Summit Agro USA, LLC*, Civil Action No. 14-51-LPS, 2014 U.S. Dist. LEXIS 185308, at *44-46 (D. Del. Nov. 14, 2014); *Ethypharm S.A. v. Abbott Labs.*, 598 F. Supp. 2d 611, 618-19 (D. Del. 2009); *Lynch v. Coinmaster USA, Inc.*, 614 F. Supp. 2d 494, 505-06 (D. Del. 2009); *EDIX Media Grp., Inc. v. Mahani*, No. 2186-N, 2006 Del. Ch. LEXIS 207, at *45 (Del. Ch. Dec. 12, 2006); *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057-58 (Del. Super. Ct. 2001).

### 3. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS [DISPUTED]

**Hologic's Proposal**: Minerva contends that Hologic tortiously interfered with its business relationships.  I have already described the required elements.  To prove tortious interference with business relationships, Minerva must prove by a preponderance of the evidence that:

1.      Minerva had a valid business relationship or a reasonable probability of a business opportunity;

2.      Hologic knew of Minerva's relationship or business opportunity;

3.      Hologic intentionally interfered which induced or caused a termination of the relationship or expectancy; and

4.      Minerva was damaged as a result of Hologic's intentional interference.

You should remember that Hologic has the privilege to interfere in some ways with business opportunities.  The key is whether the interference is both intentional and improper.

There are several factors you can use to help you determine whether Hologic's acts of interference are improper.  They include: (a) the nature of Hologic's conduct, including whether the information was truthful; (b) Hologic's motive; (c) the interests of Minerva; (d) the interests sought to be advanced by Hologic; (e) the societal interests in protecting the freedom of action of Hologic and the contractual interests of Minerva; (f) the proximity or remoteness of Hologic's conduct to the interference; and (g) the relations between the parties.

You should also remember that Minerva's claim for tortious inference with its business relationships does not require a breach of contract.

**Hologic's Sources**: *See Padcom, Inc. v. Netmotion Wireless, Inc.*, No. 03-983-SLR, D.I. 485 at 52-53 (D. Del. Mar. 24, 2006) (final instructions); *Ethypharm S.A. France v. Abbott Labs.*, 598 F. Supp. 2d 611, 619 (D. Del. 2009).

**Minerva's Proposal**: Minerva contends that Hologic tortiously interference with its business relationships.  I have already described the required elements.  To recap, Minerva must prove that:

1.      Minerva had a reasonable probability of a business opportunity with a specific customer who was prepared to enter into a business relationship with Hologic;

2.      Minerva knew of that specific relationship or probability of a business opportunity;

3.      Minerva intentionally interfered by inducing or causing a termination of the relationship or expectancy; and

4.      Hologic was damaged.

**Minerva's Sources:** *See Bowl-Mor Co. v. Brunswick Corp.*, 297 A.2d 61, 65 (Del. Ch. 1972); *Bove v. Goldenberg*, No. 05C-10-134 (CHT), 2007 Del. Super. LEXIS 398, at *11-12 (Super. Ct. Feb. 7, 2007); *Ethypharm S.A. v. Abbott Labs.*, 598 F. Supp. 2d 611, 619 (D. Del. 2009); *Wilco AG v. Packaging Techs. & Inspection LLC*, 615 F. Supp. 2d 320, 324-25 (D. Del. 2009); *Soterion Corp. v. Soteria Mezzanine Corp.*, No. 6158-VCN, 2012 Del. Ch. LEXIS 257, at *46-47 (Ch. Oct. 31, 2012); *Bohatiuk v. Del. Chiropractic Servs. Network, L.L.C.*, C.A. No. 95C-10-277 SCD, 1997 Del. Super. LEXIS 215, at *7-9 (Super. Ct. Apr. 11, 1997); Restatement (Second) of Torts § 767.

4.     **DAMAGES FOR DELAWARE COMMON LAW CLAIMS [DISPUTED]**

a.     **COMPENSATORY DAMAGES [DISPUTED]**

**Hologic's Proposal**: For Minerva to recover any monetary relief for its Delaware unfair competition claim separately from its Lanham Act claims, it must prove by a preponderance of the evidence all of the elements of a Delaware unfair competition claim and that it suffered actual monetary damage resulting from Hologic's unfair competition.  However, you cannot award Minerva monetary damages for lost sales in connection with both its Lanham Act claims and Delaware unfair competition claim.  Because Minerva's Lanham Act claims and its Delaware unfair competition claim are based on the same alleged conduct, an award of monetary damages for both claims to compensate for lost sales would result in impermissible double recovery.

Similarly, for Minerva to recover any monetary relief for its tortious interference with business relationships claim separately from its Lanham Act and Delaware unfair competition claims, it must prove by a preponderance of the evidence all of the elements of a tortious interference with business relationships claim and that it suffered actual monetary damage resulting from Hologic's interference.  However, you cannot award Minerva monetary damages for lost sales in connection with each of its Lanham Act claims, Delaware unfair competition claim, and tortious interference with business relationships claim.  Because Minerva's Lanham Act claims, its Delaware unfair competition claim, and its tortious interference with business relationships claim are based on the same alleged conduct, an award of monetary damages for each claim to compensate for lost sales would result in impermissible multiple recovery.

**Hologic's Sources**: *See Surgiquest, Inc. v. Lexion Med., LLC*, No 1:14-CV-00382-GMS, D.I. 242 at 43 (D. Del. Apr. 7, 2017) (proposed final instructions).

**Minerva's Proposal**: For Minerva to recover any monetary relief for its Delaware deceptive trade practices or unfair competition claim, it must prove by a preponderance of the evidence all of the elements of a Delaware unfair competition claim and that it suffered actual monetary damage as a result.

> ***Minerva's Sources:*** *See* DEL. P.J.I. CIV. § 22.27 (2000); *Ethypharm S.A. v. Abbott Labs.*, 598 F. Supp. 2d 611, 618-19 (D. Del. 2009); *Lynch v. Coinmaster USA, Inc.*, 614 F. Supp. 2d 494, 505-06 (D. Del. 2009).

#### b.        PUNITIVE DAMAGES [DISPUTED]

**Hologic's Proposal**: If you decide to award compensatory damages to Minerva, you must determine whether Hologic is also liable to Minerva for punitive damages.

Punitive damages are different from compensatory damages.  Compensatory damages are awarded to compensate the plaintiff for the injury suffered.  Punitive damages, on the other hand, are awarded in addition to compensatory damages.

You may award punitive damages to punish a party for outrageous conduct and to deter a party, and others like it, from engaging in similar conduct in the future.  To award punitive damages, you must find by a preponderance of the evidence that Hologic acted intentionally or recklessly.  Punitive damages cannot be awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence.

Intentional conduct means it is the person's conscious object to engage in conduct of that nature.  Reckless conduct is a conscious indifference that amounts to an "I don't care" attitude.  Reckless conduct occurs when a person, with no intent to cause harm, performs an act so unreasonable and dangerous that it knows or should know that there is an eminent likelihood of harm that can result.  Each requires that the defendant foresee that its conduct threatens a particular harm to another.

The law provides no fixed standards for the amount of punitive damages.

In determining any award of punitive damages, you may consider the nature of Hologic's conduct and the degree to which the conduct was reprehensible.  Finally, you may assess an amount of damages that will deter Hologic and others like it from similar conduct in the future.  You may consider Minerva's financial condition when evaluating deterrence.  Any award of punitive damages must bear a reasonable relationship to Minerva's compensatory damages.  Hologic's financial condition must not be considered in assessing compensatory damages.

***Hologic's Sources***: *See* Del. P.J.I. Civ. § 22.27 (2000).

**Minerva's Proposal**: If you decide to award compensatory damages to Minerva for unfair competition under Delaware Common Law, you must determine whether Hologic is also liable to Minerva for punitive damages.

Punitive damages are different from compensatory damages. Compensatory damages are awarded to compensate the plaintiff for the injury suffered. Punitive damages, on the other hand, are awarded in addition to compensatory damages You may award punitive damages to punish a party for outrageous conduct and to deter a party, and others like it, from engaging in similar conduct in the future. To award punitive damages, you must find by a preponderance of the evidence that Hologic acted intentionally or recklessly. Punitive damages cannot be awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence.

Intentional conduct means it is the person's conscious object to engage in conduct of that nature. Reckless conduct is a conscious indifference that amounts to an "I don't care" attitude. Reckless conduct occurs when a person, with no intent to cause harm, performs an act so unreasonable and dangerous that it knows or should know that there is an eminent likelihood of harm that can result. Each requires that the defendant foresee that its conduct threatens a particular harm to another.

In determining any award of punitive damages, you may consider the nature of Hologic's conduct and the degree to which the conduct was reprehensible. Finally, you may assess an amount of damages that will deter Hologic and others like it from similar conduct in the future. You may consider Hologic's financial condition when evaluating deterrence.

***Minerva's Sources:*** *See* DEL. P.J.I. CIV. § 22.27 (2000); *Ethypharm S.A. v. Abbott Labs.*, 598 F. Supp. 2d 611, 618-19 (D. Del. 2009); *Lynch v. Coinmaster USA, Inc.*, 614 F. Supp. 2d 494, 505-06 (D. Del. 2009).

### 5.      TRADE LIBEL CLAIMS [DISPUTED]

**Hologic's Proposal**: Minerva contends that Hologic engaged in trade libel.  To prove trade libel, Minerva must demonstrate by a preponderance of the evidence that:

1.      Hologic made a false statement – Hologic is not liable if the facts stated are true or if the statement is an opinion;

2.      Hologic either intended the false statement to cause economic loss or reasonably should have recognized that it would result in economic loss;

3.      Minerva suffered an economic loss; and

4.      Hologic either knew that the statement was false or acted in reckless disregard for its truth or falsity.

If you find that Hologic committed trade libel, Minerva is entitled to compensation in an amount that will compensate it for economic losses sustained as a result of Hologic's false statement.  Minerva must prove by a preponderance of the evidence actual economic losses as a result of Hologic's false statement.


*Hologic's Sources*: *See Incyte Corp. v. Flexus Biosciences, Inc.*, No. N15C-09-055 MMJ CCLD, 2017 WL 7803923, at *7 (Del. Super. Ct. Nov. 1, 2017) (quoting *Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.*, 809 A.2d 243, 246 (Pa. 2002)).


**Minerva's Proposal**: Minerva contends that Hologic engaged in trade libel. To prove trade libel, Minerva must demonstrate by a preponderance of the evidence that:

1.      Hologic made a false statement;

2.      Hologic either intended the false statement to cause economic loss or reasonably should have recognized that it would result in economic loss;

3.      Minerva suffered an economic loss; and

4.      Hologic either knew that the statement was false or acted in reckless disregard for

its truth or falsity.

> ***Minerva's Sources:*** *See Incyte Corp. v. Flexus Biosciences, Inc.*, No. N15C-09-055
> MMJ CCLD, 2017 Del. Super. LEXIS 703, at *15-16 (Del. Super. Ct. Nov. 1, 2017); *Pro
> Golf Mfg., Inc. v. Tribune Review Newspaper Co.*, 809 A.2d 243, 246 (Pa. 2002);
> Restatement (Second) of Torts § 623(A).

## 6.      BREACH OF CONTRACT [DISPUTED]

**Hologic's Proposal**: Minerva contends that Hologic breached the parties' January 6, 2010 Non-Disclosure Agreement.  To prove breach of contract, Minerva must prove by a preponderance of the evidence that:

1.      Minerva and Hologic entered into a contract;

2.      Minerva did all, or substantially all, of the significant things that the contract required it to do or that it was excused from doing those things;

3.      Hologic materially breached an obligation set forth in that contract; and

4.      The breach resulted in damage to Minerva.

If you find that Hologic committed a breach of contract, Minerva is entitled to compensation in an amount that will place it in the same position it would have been if the contract had been properly performed.  The measure of damages is the loss actually sustained as a result of the breach of the contract.

A party that is harmed by a breach of contract is entitled to damages in an amount calculated to compensate it for the harm caused by the breach.  The compensation should place the injured party in the same position it would have been in of the contract had been performed.

If you find that Minerva is entitled to a verdict in accordance with these instructions, but do not find that Minerva has sustained actual damages, then you may return a verdict for Minerva in some nominal sum such as one dollar.  Nominal damages are not given as an equivalent for the wrong but rather merely in recognition of a technical injury and by way of declaring the rights of Minerva.

*Hologic's Sources*: *See Personalized User Model, LLP v. Google, Inc.*, No. 09-525-LPS, D.I. 663 at 47 (D. Del. Mar. 19, 2014) (final instructions); *Norman v. Elkin*, No. 06-005-LPS, D.I. 245 at 24 (D. Del. Dec. 12, 2014) (final instructions).

**Minerva's Proposal**: Minerva contends that Hologic breached the parties' January 6, 2010 Non-Disclosure Agreement. To prove breach of contract, Minerva must prove by a preponderance of the evidence that

1.      The parties entered a contract;

2.      Hologic breached an obligation set forth in that contract; and

3.      The breach resulted in damage to Minerva.

Again, for Minerva to recover any monetary relief for these claims, it must prove by a preponderance of the evidence all of the elements of the claim and that it suffered actual monetary damage as a result.  Minerva is not seeking punitive damages for these claims.

One final note on damages. Because many of Minerva's claims claim are based on the same alleged conduct and seek damages for the same harms, you should be careful to not result award a double recovery for the same harm.  For example, if you find for Minerva on its Lanham Act claims and award damages, you should not award those same damages for its Delaware law claims.  If you find that Minerva is entitled to the same amount of damages under both theories, you should indicate so on the verdict form by writing "same damages as above."

*Minerva's Sources: See Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011); *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*, No. 2993–VCS, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003); *Ethypharm S.A. v. Abbott Labs.*, 598 F. Supp. 2d 611, 618-19 (D. Del. 2009); *Lynch v. Coinmaster USA, Inc.*, 614 F. Supp. 2d 494, 505-06 (D. Del. 2009); *Callaway Golf Co. v. Dunlop Slazenger*, 384 F. Supp. 2d 735, 740-41 (D. Del. 2005).

## XIV.   DELIBERATION AND VERDICT

### A.      INTRODUCTION [STIPULATED]

Let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case.  If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.  I will have to talk to the lawyers about what you have asked, so it may take me some time to get back to you.  Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is the juror seated in the first seat, first row.

One more thing about messages.  Do not ever write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be.  That should stay secret until you are finished.

One more thing about messages.  Do not ever write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be.  That should stay secret until you are finished.

## B.     UNANIMOUS VERDICT [STIPULATED]

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.  Remember at all times that you are judges – judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

A verdict form has been prepared for you.  The verdict form asks you a series of questions about the parties' claims.  Unless you are directed otherwise in the form of the verdict, you must answer all of the questions posed, and you all must agree on each answer.  When you have reached a unanimous agreement as to your verdict, you will return your verdict to the courtroom deputy.

Nothing said in these instructions and nothing in the form of verdict is meant to suggest or convey in any way or manner what verdict you should find.  What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

### C.   DUTY TO DELIBERATE [STIPULATED]

Now that all the evidence is in and the arguments are completed, you are free to talk to each other about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence and to make every reasonable effort you can to reach a unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views and keep an open mind as you listen to what your fellow jurors have to say.

Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and your original position was wrong . But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that — your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say.  So you should all feel free to speak your minds.  Please note that copies of admitted exhibits are available for your review.

We generally end our business day at 4:30 p.m.  If we do not hear from you by 4:30pm, I will be sending you a note to see whether you are close enough to a verdict to want to deliberate after 4:30pm or whether you are going to recess for the evening and resume your deliberations on the next business day.  You will need to respond in writing to that question.

I am going to remind you now, if you go home this evening and resume your deliberations on the next business day, you are not to talk about the case among yourselves or with anyone else during the evening recess.  You may not read or listen to any news about the case in a newspaper, online, or on television or radio during the evening recess.

You may talk about the case only while you are in the jury room and everyone on the jury is present.  Unless I hear from you that you have a different schedule in mind, I will expect you

all to come back the next business day at 9:30am.  You are not to start deliberating until you are all present in the jury room and participating together.

Because the lawyers have to make themselves available to respond to questions or receive the verdict, I generally give them between 12:30pm and 1:30pm to step away from the phone.  So whenever you are deliberating over the lunch hour, let me remind you, if you ask a question during this time, you probably will not get an answer right away because we are all going to be stepping away from our phones.

**D.      COURT HAS NO OPINION [STIPULATED]**

Let me finish up by repeating something that I said to you earlier.  Nothing that I have said or done during this trial was meant to influence your decision in any way.  You must decide the case yourselves based on the evidence presented.

Finally, if I have read any of these instructions inconsistently with the written text, you are to rely on the written instructions during your deliberations.

## <u>CERTIFICATE OF SERVICE</u>

I, Karen L. Pascale, Esquire, hereby certify that on June 11, 2018, I caused to be

electronically filed a true and correct copy of the foregoing document with the Clerk of the Court

using CM/ECF (which will send notification that such filing is available for viewing and

downloading to all registered counsel), and in addition caused true and correct copies of the

foregoing document to be served upon the following counsel of record by electronic mail:

---

*Attorneys for Defendant Minerva Surgical, Inc.:*

Benjamin J. Schladweiler              schladweilerb@gtlaw.com
**GRRENBERG TRAURIG LLP**
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, DE 19801

Vera M. Elson                  velson@wsgr.com
Dale R. Bish                   dbish@wsgr.com
Christopher D. Mays          cmays@wsgr.com
**WILSON SONSINI GOODRICH & ROSATI**
650 Page Mill Road
Palo Alto, CA 94304-1050

Olivia M. Kim                okim@wsgr.com
Neil N. Desai                 ndesai@wsgr.com
Edward G. Poplawski        epoplawski@wsgr.com
**WILSON SONSINI GOODRICH & ROSATI**
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071

---

01:17986910.1

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Karen L. Pascale*

June 11, 2018

_____
Karen L. Pascale (No. 2903) *[kpascale@ycst.com]*
Pilar G. Kraman (#5199) *[pkraman@ycst.com]*
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  302-571-6600

*Attorneys for Plaintiffs, Hologic, Inc.*
*and Cytyc Surgical Products, LLC*