# EXHIBIT J

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HOLOGIC, INC., et al.,    :

    Plaintiffs,   :  No. 1:15-1031-SLR

    v.   :

MINERVA SURGICAL, INC.,   :

    Defendant.   :

Thursday, January 5, 2016
3:00 p.m.

Discovery Dispute Hearing
Courtroom of Judge Sherry R. Fallon

844 King Street
Wilmington, Delaware

BEFORE:   THE HONORABLE Sherry R. Fallon,
    United States District Court Magistrate

APPEARANCES:

    YOUNG, CONAWAY, STARGATT & TAYLOR LLP
    BY:  KAREN PASCALE, ESQ.

        -and-

    ARNOLD PORTER KAYE SCHOLER LLP
    BY:  MARC COHN, ESQ.

        On behalf of Plaintiffs

**Page 2**

APPEARANCES CONTINUED:

    ROSS ARONSTAM & MORITZ LLP
    BY:  BENJAMIN SCHLADWEILER, ESQ.

        -and-

    WILSON SONSINI GOODRICH & ROSATI
    BY:  OLIVIA KIM, ESQ.

        On behalf of Defendant

**Page 3**

THE COURT:  Hello, everyone. Please be seated.  I just need a moment.  I need to access the docket.

All right.  Let's start with the introductions for Hologic, et al.

MS. PASCALE:  Good afternoon, Your Honor.  Karen Pascale from Young Conaway for Hologic and I would like to introduce Marc Cohn from Arnold Porter Kaye Scholer.  And also in the courtroom today are two Hologic representatives Anne Liddy and Robert Smith.

THE COURT:  Thank you, and good afternoon.  And for the Defendants?

MR. SCHLADWEILER:  Good afternoon, Your Honor.  Ben Schladweiler from Ross, Aronstam & Moritz on behalf of Minerva.  I'm joined today by Olivia Kim from Wilson Sonsini.

MS. KIM:  Good afternoon.

THE COURT:  Good afternoon.

MR. SCHLADWEILER:  And Dom Filloux from Minerva.

THE COURT:  All right.  I have read the submissions.  I believe the best order of the proceeding is to take each item

**Page 4**

separately, hear argument and opposition and then go from there, so let me get out my papers.

So this is a Motion to Compel Answers to Requests for Production and Interrogatories.  We'll start with the first item Requests For Production, Nos. 13 and 22.

MR. COHN:  Thank you, Your Honor. Mark Cohn for Hologic.  Before we jump in, I want to just preamble this briefly, Your Honor, by saying we may have more disputes down the road.  I believe the scheduling order has a deadline of February for completion of documents and we learned in the meet-and-confer process by late November that it was unclear to us whether Minerva had even started collecting documents for the production and the rest of the case.

Obviously, both parties have produced documents and responses before the preliminary injunction around January of this year.  In the summer we had served substantial additional requests for discovery going into the rest of the case not related to the preliminary injunction and then asked to have the prior requests updated.  Since then we only received

5

1  about 500 documents from Minerva.
2        We expect that there may be a
3  large document dump on us at the very last day
4  of the period.  When we have a chance to review
5  that, we may have further disputes on that.
6  Your Honor, we have been trying to roll
7  Hologic's production out.  I think we are not
8  fully complete but substantially complete by
9  this point.
10        THE COURT:  Very well.  The
11  scheduling order, the production of paper or
12  electronic documents by each party shall be
13  completed before February 1.  All right.  I'm
14  not going to do anything affirmatively in
15  response to that.  I will allow the normal
16  course of proceedings to take place and the
17  parties can reach out to me if you need to put
18  another item on the calendar.
19        Typically, if you envision that
20  there will be a number of disputes, and
21  particularly when each side has a number of
22  disputes, I like those outlined so that I can
23  assess just how much time to set aside and
24  whether or not that lends itself to additional

6

1  pages of briefing.  So just keep that in mind if
2  you're going to reach out to chambers to put
3  another date on the calendar.
4        MR. COHN:  Sure, we will do that.
5  Thank you, Your Honor.  So the first dispute
6  that we raised in our letter brief relates to
7  Requests For Production Nos. 13 and 22, and
8  these are directed quite simply, Your Honor,
9  documents relating to Hologic's NovaSure system
10  and there were three disputes, but I think there
11  has been some agreement on the third aspect.
12        These relate to searches in
13  electronic information for the word NovaSure and
14  for the phrase NS --
15        THE COURT:  The space before and
16  after --
17        MR. COHN:  Yes, the space before
18  and after.  I think that Minerva has agreed to
19  do the search for the space NS space term and
20  also to do the search for the word NovaSure but
21  we have a dispute as to who and when.  So the
22  first issue is who.  Hologic has identified
23  three engineer custodians that they requested
24  Minerva to do the search on.  I can name them.

7

1  Their names are listed in the brief.
2        THE COURT:  They're listed just
3  for the record as I believe Ms. Estela Hilario,
4  Mr. Tejas Mazmudar and Mr. Akos Toth; is that
5  correct?
6        MR. COHN:  That sounds correct to
7  me, Your Honor.
8        THE COURT:  It says that Minerva
9  did not identify these custodians in their
10  initial disclosures of 10 custodians.  Elaborate
11  for me how these disclosures came about, how you
12  became aware of these custodians and their
13  significance in terms of the accused product.
14        MR. COHN:  Sure.  So we understand
15  that these are three of the lead engineers who
16  worked under Mr. Filloux who was the head of R&D
17  in terms of developing the product.  And as a
18  senior R&D engineer, that's Mr. Mazmudar.
19  Mr. Toth is a principal engineer and Ms. Hilario
20  is a named inventor on two of the four
21  patents-in-suit.  As Your Honor is well aware,
22  these patents originated at a company called
23  Novasep and they were then purchased by Cytyc
24  and Hologic, and some of those people are now

8

1  working at Minerva.
2        So we think that these three
3  people have information that is clearly relevant
4  or could be relevant.  We don't know because we
5  haven't seen it in terms of the development of
6  the Minerva product.  Now, the objection that
7  we've heard from Minerva is that these are going
8  to be cumulative of the records kept by
9  Mr. Filloux who is their boss.
10        But to the extent that any of
11  these three were talking among themselves and
12  not communicating with Mr. Filloux and if they
13  said anything about the NovaSure, either let's
14  do it like the NovaSure or let's not do it like
15  the NovaSure or anything like this, assessing
16  the benefits, the pros and the cons of any
17  NovaSure feature in the context of developing
18  the Minerva product, we think that would be
19  highly relevant.
20        The notion that they're cumulative
21  of Mr. Filloux's papers I think is not -- we
22  just don't know that, Your Honor, until we
23  search it because I assume that these three
24  individuals have communications that don't

9

1  involve Mr. Filloux.  Obviously, to the extent
2  they do, we have those but we would like the
3  searches done to make sure we have a complete
4  record of discussions about the NovaSure in the
5  context of the development of the Minerva
6  product.
7       THE COURT:  Have you gone through
8  the production made from the search of the
9  custodian Mr. Filloux?
10      MR. COHN:  We haven't received
11  that, Your Honor.
12      THE COURT:  Okay.
13      MR. COHN:  Correct me if I'm
14  wrong.
15      MS. KIM:  Your Honor, we did
16  produce production for Mr. Filloux in the
17  preliminary injunction phase and we will be
18  supplementing the production by February 1st, so
19  some of the documents have been produced.
20      MR. COHN:  So I guess the answer,
21  Your Honor, is we haven't received all of them.
22  We don't know how complete the production is in
23  that regard.
24      THE COURT:  I see.

10

1       MR. COHN:  The second issue, Your
2  Honor, relates to the date.  I think Minerva has
3  asserted a cut-off of February 1, 2015 which
4  precedes their FDA approval by a few months, but
5  obviously because we are looking for development
6  of the Minerva product and any discussion of the
7  NovaSure in the course of that development,
8  which is a very important part of this case
9  which involves willfulness and copying
10  allegations, we think that any discussions of
11  the NovaSure and the NS tag prior to the
12  February 1, 2015 date are going to be at least
13  critical for showing copying and willfulness
14  allegations.
15      In other words, if they're talking
16  about NovaSure in the context of their product
17  development, that's something that is relevant
18  or would lead to the admissibility of relevant
19  evidence, and also the increased burden of
20  having to search in the computer for more
21  documents, there may be an increased review in
22  terms of getting it out the door, but it's just
23  a different search on the computer.
24      THE COURT:  So how much earlier

11

1  than February 1, 2015?
2       MR. COHN:  So the company, I
3  believe, was founded in '08, Your Honor.  I'm
4  not sure we would feel that there is a date by
5  which we can say that we would be comfortable
6  saying that there would be an appropriate
7  cut-off.  This company Minerva was started and
8  immediately began developing their product to
9  compete against the NovaSure, and I would say
10  from day one, Your Honor, those discussions
11  would be critical.
12      THE COURT:  All right.  Anything
13  further before I hear from Minerva in
14  opposition?
15      MR. COHN:  Let me just check my
16  notes, please.  That's all I have.  Thank you,
17  Your Honor.
18      THE COURT:  Ms. Kim?
19      MS. KIM:  Thank you, Your Honor.
20  For the first issue the who, we identified 10
21  top custodians in accordance with the ESI order
22  which requires us to identify 10 custodians for
23  the purpose of ESI and out of those 10 there are
24  three key custodians that go to research and

12

1  development and design of the products, and in
2  particular, we have Mr. Filloux who led the
3  research and development in operation of Minerva
4  and the Minerva accused product.
5       We also have Mr. Eugene Skalnyi
6  who is the Vice-president of Medical Affairs and
7  we also have Mr. Csaba Truckai who is the
8  founder of Minerva.  And just to be clear, for
9  these three custodians we did not input any time
10  limitations.  We have collected all of their
11  emails and documents in researching NovaSure,
12  and indeed we did that in the preliminary phase
13  as well and we will be supplementing further
14  documents and emails in that regard.
15      With regard to three additional
16  custodians that they're asking for, these are
17  engineers that worked under Filloux and there's
18  no indication that there will be any unique
19  information that they possess that would be
20  otherwise not possessed by Mr. Filloux.  So it
21  will be a duplicate effort and Minerva is a
22  small company, and adding three more custodians
23  in addition to the 10 custodians that we're
24  already collecting will be very burdensome for a

13

1  company like Minerva.
2          THE COURT:  How would it be
3  burdensome?  Describe for me the burden that
4  would be created if the Court or hypothetically
5  the Court would order for these custodians to be
6  searched.
7          MS. KIM:  Of course.  We would
8  have to collect all of their emails of the three
9  custodians and we're not putting any time
10  limitations on those emails.  Then we would have
11  to search for the NovaSure term and the NS term
12  that we agreed to search for other custodians.
13  And we would have to then review those documents
14  for any privilege and relevance, and that is --
15  it is more than electronically searching
16  documents and we do have to review those
17  documents for privilege and also for relevance.
18          With regard to the second issue,
19  the time limitation for February 1, 2015, that
20  only goes to custodians that relate to sales and
21  marketing of Minerva products.  We're not having
22  any time limitation for those who are involved
23  in research, development and design of the
24  accused products.

14

1          The Minerva product was approved
2  by the FDA in July of 2015 and Minerva started
3  selling the product in August of 2015.  There
4  was no reason to search for any document
5  relating to marketing and sales before February
6  1, 2015.  And it appears that Hologic is
7  requesting that we collect all emails and
8  documents without any time limitation with
9  regard to those terms.  That will be very
10  burdensome to Minerva as well.  And we're just
11  trying to put a reasonable limitation to the
12  discovery dispute here, Your Honor.  And I think
13  that theme goes throughout the disputes here
14  today.
15          THE COURT:  Very well.  Thank you.
16  Anything further?
17          MR. COHN:  Yes, Your Honor.  Two
18  short points.  If the search is done on the
19  three engineers that we discussed earlier and
20  it's a small volume of documents, then the
21  burden is minimal.  If it's a large volume of
22  documents, then clearly it's not cumulative of
23  what's been pulled before.  And I think
24  electronically they can pull out documents that

15

1  have Mr. Filloux's name on them and, therefore,
2  very quickly have the computer determine what is
3  new and not cumulative in that area.  If it's
4  small, there's no burden.  If it's a lot, it's
5  not cumulative and would be important.
6          The second issue on timing, Your
7  Honor, Minerva limited their search to sales and
8  marketing but among the people, the custodians
9  to which Minerva is applying this time
10  limitation is Mr. Clapper, the President and
11  CEO, the Director of Marketing Mr. Pendlebury,
12  the Chief Operating Officer, so we're not
13  talking about sales reps.  We're talking about
14  the principals of the company.
15          And clearly what Mr. Clapper was
16  saying about the NovaSure in 2009 or 2008 in
17  developing the Minerva product, those will be
18  very important documents too as he was running
19  the company.  So our view is that those are not
20  as a practical matter being limited only to
21  sales reps or marketing activities post-approval
22  but that the restriction on the date is being
23  applied by Minerva to cover from more than that
24  and that is what we oppose.

16

1          THE COURT:  All right.  I'm going
2  to grant the Motion to Compel with respect to
3  the additional custodians and with respect to
4  the production of documents prior to February 1,
5  2015.  In hearing the arguments and reviewing
6  the papers, these three custodians may
7  potentially have relevant information because of
8  their position as engineers who worked under
9  Mr. Filloux and may have relevant information
10  that might not be generated based upon the
11  searches that have been conducted and continue
12  to be conducted through this time.
13          As was argued by Plaintiffs, if it
14  turns out there's a very small number of
15  documents, then that should not be a burdensome
16  exercise and would reinforce that the searches
17  that have been done to date have largely
18  collected the balance of relevant or potentially
19  relevant information from the custodians.  If it
20  turns out to be a large number of documents,
21  then it may require some greater effort on the
22  part of the Defendant to go through for purposes
23  of privilege or other potential objections, but
24  that would also indicate that they are not

17

1  cumulative of the search that's been conducted
2  to date.
3           And in order to be sure that both
4  sides have the information that is relevant with
5  respect to the accused product and
6  patents-in-suit, my ruling is to permit or grant
7  the Motion to Compel with respect to the
8  custodians and not limiting the time period to
9  February 1, 2015 as the cut-off with respect to
10 these three custodians.
11          The remaining part of the motion
12 is moot as it pertains to Requests for
13 Production 13 and 22 in that Minerva has
14 indicated it is willing to run the terms
15 NovaSure and the letters NS with a space before
16 and after in conducting the search for relevant
17 records, so that is my ruling with respect to
18 Requests for Production Nos. 13 and 22.
19          Shall we move on to Request for
20 Production No. 3?
21          MR. COHN:  Thank you, Your Honor.
22 So Request for --
23          MS. KIM:  Your Honor, can I ask
24 for clarification on that ruling?

18

1           THE COURT:  Sure.
2           MS. KIM:  With regard to the date
3  February 1, 2015, does that apply to all of the
4  custodians and not only the three additional
5  custodians?
6           THE COURT:  If the custodians who
7  were important individuals in the company as
8  Mr. Cohn has represented that that cut-off was
9  placed primarily to affect the search for sales
10 and marketing, if these custodians
11 have roles beyond that and were involved in the
12 development of the product and running of the
13 company, then that cut-off date does not apply.
14 You should search for everything.
15          Certainly, these rulings that I
16 make with respect to compelling discovery are
17 without prejudice for the parties to come back
18 and seek additional relief or if you encounter a
19 greater burden than you anticipate with respect
20 to the search, you can make a further
21 application once you've met and conferred with
22 counsel to see if you can further limit it.  If
23 you can't agree, you can come back to the Court;
24 but I suspect that you're either going to find

19

1  very few additional documents because your
2  additional searches have produced what is likely
3  to be primarily relevant in the case.
4           If you find there is a large
5  quantity of documents yet to be produced and for
6  some reason it creates an unusual burden in
7  going through them or you need additional time
8  beyond the deadline set in the scheduling order
9  for producing documents, that's a matter that
10 the Court can address at another time.
11          MR. COHN:  Your Honor, if I may
12 indulge 30 seconds on that topic?
13          THE COURT:  Yes.
14          MR. COHN:  Hologic's position is
15 that in terms of the custodians who would be
16 more important than mere ongoing sales reps
17 would be Mr. Clapper who is the President and
18 CEO, the Director of Marketing, the Chief
19 Operating Officer, the VP of Sales and Marketing
20 and then the territory managers who manage the
21 sales and assist in the sales strategies, so we
22 think that documents before that date from those
23 people would be important because they would be
24 developing a strategy and a sales plan that

20

1  would then be implemented after the date and we
2  can limit the date just to the sales reps.  We
3  just want it to be clear that the people that
4  Hologic thinks should not be subject to the
5  limitation are those that I just identified.
6           THE COURT:  I will compel the
7  production with regard to those individuals and
8  as I said, these rulings are without prejudice
9  for either party to come back and seek further
10 relief or in the case of the Defendants further
11 limitations on that depending on what's
12 encountered when the search process is begun.
13          MR. COHN:  Thank you, Your Honor.
14 The next topic is RFP No. 3 regarding FDA
15 materials.  There are two categories of
16 documents in this dispute.  One is the design
17 history file and the second is the complaint
18 file.  I'm actually going to start with the
19 burden argument first, Your Honor, which is a
20 little unusual in the discovery dispute.
21 Minerva admits they have all of these documents
22 collected in a filing cabinet, so in terms of
23 burden they can get those and they're collected,
24 so the burden on collection is extremely

21

1  minimal.
2        And the reason I have those, Your
3  Honor, is the FDA requires medical device
4  manufacturers to maintain these types of
5  documents.  So the question here is really one
6  of relevance and these are highly relevant.  The
7  design history file, Your Honor, is at the
8  center of every medical device patent case.  It
9  contains the official history of the product
10  development that the FDA requires for
11  traceability purposes so the FDA can go back and
12  determine the state of the product.
13        This design history file we feel
14  is going to be important, Your Honor, because
15  Minerva has made statements in the FDA in other
16  documents specifically regarding the NovaSure
17  and the similarity to NovaSure.  The NovaSure
18  product is one of the products to which Minerva
19  has compared itself in its FDA filings and we
20  feel that the design history file will be
21  important to review to see if there are more
22  admissions in that regard.
23        THE COURT:  If you know the answer
24  to this, I'm going to ask Minerva as well.  But,

22

1  Mr. Cohn, if you happen to know the answer to
2  this, it's my understanding that Minerva has
3  already produced the design history file.  In
4  your client's estimation, has there been less
5  than a complete production and what reasons do
6  you have to believe that the production is less
7  than complete?
8        MR. COHN:  Sure.  So we've been
9  told that they have produced documents
10  sufficient to show the structure and the
11  operation of the product.  And a part of that is
12  what Minerva thinks is sufficient may be a
13  little different than what Hologic thinks is
14  sufficient.  In terms of understanding the
15  product and how it works in its structures
16  currently, I think we do have an understanding
17  of that from the documents.
18        But in terms of how that product
19  was developed over time, Your Honor, I'm not
20  sure we have the complete picture.  And that's
21  important for two reasons.  One, it's important
22  to see whether they were steering into these
23  patents or away from these patents.  And in our
24  paper we talked about one of the reasons the

23

1  design history file is important because it will
2  explain why changes were made and how changes
3  were made, whether they were difficult or not.
4        These things go to the damages
5  proposition as well in terms of how valuable
6  some of these features are.  Reasons why they
7  were made is also important, whether they were
8  made for a customer benefit or a
9  manufacturability benefit.  Those are relevant
10  to the damages aspect as well.  Then of course
11  the copying, the willfulness, to the extent that
12  changes were made or unmade because of the
13  NovaSure, because customers liked things the
14  NovaSure has, we just don't know, Your Honor.
15  But we feel that the answers to the questions
16  will be in the design history file.
17        THE COURT:  All right.  And the
18  complaint files?
19        MR. COHN:  Your Honor, the
20  complaint files are critical here.  We should
21  not forget that this case also involves claims
22  by Hologic against Minera under the Lanham Act,
23  false advertising and unfair trade practices
24  regarding statements that Minerva has made in

24

1  the market about the safety of products.
2        Conversely, Minerva has asserted
3  counterclaims that are similar alleging that
4  Hologic has made false statements regarding the
5  safety of the Minerva product.  Now, for Hologic
6  to defend itself against a claim that its
7  statements that Minerva is unsafe or untrue, the
8  complaint files is one of the clearest ways
9  where Hologic could look at Minerva's own
10  documents and say look at all of these
11  complaints from customers.  This shows your
12  product is not safe and what we said about it is
13  not false.
14        THE COURT:  Hasn't Hologic made
15  its pitch, so to speak, to Judge Robinson for
16  this type of discovery in connection with the
17  preliminary injunction motion and didn't Judge
18  Robinson find that it is not to be produced?
19        MR. COHN:  She did in the context
20  of the preliminary injunction motion, that's
21  true.  It's unclear exactly why Judge Robinson
22  did that.  I think the opinion was brief in
23  light of the preliminary nature of those
24  proceedings.  I think that Judge Robinson was

25

1   trying to keep discovery circumscribed as
2   possible given that it was at the beginning of
3   the case.  Frankly, both parties had been
4   engaged in a lot of discovery and I think the
5   judge at that point was trying to keep things
6   from expanding further.  I'm not sure that Her
7   Honor questioned the relevance of the documents
8   to the case as a whole, but at that point in the
9   case I think Judge Robinson didn't feel that
10  they were relevant for the injunction.
11          THE COURT:  Well, let me ask the
12  direct question that perhaps wasn't covered or
13  maybe it was.  It would be helpful for me if
14  Hologic would explain why the complaints which
15  are publicly available from the FDA are not
16  sufficient to satisfy this request?
17          MR. COHN:  That is critically
18  important and perhaps that issue was not
19  explained to Her Honor in the previous ruling as
20  clearly as it should have been by me and us.
21  The complaints that are published to the FDA
22  site, Minerva makes a decision whether or not to
23  do that.  We believe that far more complaints
24  come into Minerva than are published.

26

1          There is a protocol in terms of
2   what complaints must be published publicly and
3   what don't.  Minerva makes that decision.
4   Hologic feels based on its experience with
5   having acquired Novasep and seeing the state of
6   Novasep's reporting policy when it stepped into
7   the company and knowing that the same people at
8   Minerva are running that, Minerva is not
9   publishing the kinds of complaints it should be.
10  That's Hologic's position.
11          Hologic feels that there will be
12  documents in Minerva's files reflecting other
13  product safety issues that Minerva is not
14  publishing, so the public record on these
15  complaints, Your Honor, is very thin.  There are
16  one or two a month that are being published.
17  Our sales force at Hologic provides far more
18  evidence of issues that are out there and not
19  being published.  So our own sales people, Your
20  Honor, are giving us evidence that there may be
21  more complaints in the documents at Minerva than
22  we're seeing in the public record.
23          Again, Your Honor, we don't really
24  know what's there because they haven't produced

27

1   it.  If we see their complaint files, their
2   intake, there's a 1-800 number that doctors can
3   call, there are emails that doctors make to the
4   sales reps complaining about the product, if
5   Minerva determines that it was the doctor's
6   fault and not their fault and maybe they feel
7   like they don't need to publish it, it's not
8   necessarily our client's policy, but I think we
9   feel that those documents could be highly
10  relevant if there are a lot of them.  And if
11  there are not a lot of them, then the burden
12  will be very low.  So again, similar to the last
13  issue we think that those documents at discovery
14  should be had of those so we can at least see
15  what's in there.
16          THE COURT:  All right.
17          MR. COHN:  Thank you, Your Honor.
18          THE COURT:  Ms. Kim?
19          MS. KIM:  Your Honor, with regard
20  to the design history file, there is a
21  regulation under the FDA where Minerva has to
22  keep all of its design files whether it's
23  significant or not and Minerva keeps that in
24  hard copies.  There are probably more than 12

28

1   feet of these printed copies of documents and
2   that's what Hologic is asking Minerva to
3   produce.
4          We have already produced research
5   and development documents, the design of the
6   Minerva product and in particular we've produced
7   documents that show any differences that Minerva
8   has in its current generation to product from
9   its original design which is a Generation 1
10  product which was submitted to the FDA.  In
11  other words, the document details any
12  differences that were made to the product so
13  Hologic has all of the information that it needs
14  with regards to any design changes and research
15  and development for the product itself.  They do
16  not need this 12 feet of hard copies of
17  documents --
18          THE COURT:  How does the Court
19  weigh in on its determination of relevance
20  that's made by a party?  I can accept your
21  representations.  But beyond that, there's
22  nothing in the record necessarily to support
23  that or give the Court a comfort level that a
24  party who is making its own determination of

29

1  relevance of what to produce is producing all
2  relevant documents, and I say that without
3  suggesting or implying that there's any
4  dishonesty or deceitfulness or wrongdoing on the
5  part of counsel.
6           I'm just saying that people in
7  some respect when you're on both sides of a
8  litigation have different impressions of what is
9  or is not relevant and ultimately, the Court
10 makes the decision I suppose when there's a
11 dispute.  And if you're telling me that there's
12 a 12-foot high pile of documents, then certainly
13 that could be either internally copied or
14 outsourced.
15          And if the burden and expense of
16 doing that is a factor, then that's something
17 that the Court can address through cost-shifting
18 by making the requesting party pay for paper
19 copies.  That application hasn't been to me and
20 I don't have anything in front of me to support
21 what the cost of doing that would be, but I
22 leave that open-ended.
23          I'm just concerned about how I am
24 to weigh in on one party's good faith

30

1  representations to the Court that we've given
2  them what's relevant without allowing them to
3  weigh in or the Court to weigh in on what's
4  relevant.
5           MS. KIM:  Your Honor, the
6  documents that we have produced that are
7  pertinent to this case are the documents that
8  were submitted to the FDA in order to get
9  approval, so there are a lot of different
10 regulations and the detailed descriptions that
11 we have provided to the FDA which included the
12 historical design changes and kind of explaining
13 the research and development of the product.
14          And that's called the PMA
15 application, the premarket approval application,
16 and those documents sufficiently show the
17 information that Hologic is seeking that relate
18 to copying, willfulness and others because it
19 does show the historical design changes that
20 have happened and that is already available to
21 them, and these were documents that were
22 submitted to the FDA.
23          Your Honor, as to the
24 cost-shifting issue, to the extent that the

31

1  Court grants its motion for us to produce all of
2  these hard-copied documents, as for the
3  cost-shifting issue, we may ask for that, Your
4  Honor.
5           THE COURT:  It's without prejudice
6  and you're free to do that.
7           MS. KIM:  The second issue is the
8  complaint files and this was an issue that we
9  already went to the Court a few months ago in
10 front of Judge Robinson.  As to the complaint
11 files, the FDA requires Minerva to keep every
12 single complaint regardless of how trivial the
13 complaint is and they keep it in hard copy.
14 Minerva is then required to report certain
15 complaints and recently the FDA actually audited
16 Minerva with regards to the complaint files and
17 found that Minerva is properly reporting the
18 complaints that they have to report to the FDA
19 database.
20          Judge Robinson had held that in
21 regards to the safety issue that the FDA has
22 already determined the safety and efficacy of
23 the product and it's not privy of the Court to
24 look at that issue.  And also, the FDA has

32

1  already determined that Minerva is properly
2  following the regulations to report the
3  complaints.  And for Hologic to say that they
4  believe Minerva isn't doing that, that's not in
5  their purview.  The FDA has already audited and
6  approved the process that Minerva is doing
7  already.
8           THE COURT:  Very well.  Anything
9  further, Mr. Cohn?
10          MR. COHN:  If I may briefly, Your
11 Honor.  The first topic, the design history
12 files, the PMA, the premarket approval
13 application that Ms. Kim referred to the
14 description of the design history, the changes
15 are very summary.  It's not a highly technical
16 description that would be in a design history
17 file.  It doesn't provide the technical detail,
18 it doesn't apply to reasons why changes were
19 made or how they were made.
20          With respect to the complaint
21 files, the public database -- again, as I said
22 it just has a few entries a month versus we're
23 talking about a pile of documents, so right
24 there you see a very large difference between

33

1 the complaint files that Minerva has versus what
2 has been made public.
3         And the key there, Your Honor,
4 Ms. Kim kept referring to complaints that they
5 have to report. There are many other complaints
6 that maybe they don't have to report under the
7 regulation which does not make those irrelevant
8 to this case. It makes them highly irrelevant
9 if there are a lot of them. I think Hologic
10 should be allowed to inspect those and have its
11 experts opine on how important they are.
12        Lastly, Your Honor, with respect
13 to your question regarding Judge Robinson's
14 ruling, the PI was directed to the patent
15 issues. Minerva had a PI directed to unfair
16 competition issues. There was no discussion of
17 damages at all and I think that for a product
18 that may have a lot of complaints about it,
19 other kinds of safety issues that may be
20 tarnishing the reputation of Hologic's brand,
21 that those would be relevant to the damages
22 calculation for Hologic's claims, both its
23 patent claims and also for its unfair
24 competition claims, how much is our brand being

34

1 hurt by the problems that Minerva's product has.
2 So for all of those reasons we think that the
3 complaint files should be discoverable at the
4 least. Thank you.
5         THE COURT: So my ruling on this
6 is I'm going to order the production of the hard
7 copies of the design history files, and that's
8 without prejudice to Minerva to make an
9 application to the Court if it decides to do
10 such regarding shifting the cost of reproducing
11 what I've heard is a 12-foot stack of hard
12 copies of documents, shifting the cost to
13 Hologic. I'm not ruling on whether or not I
14 will order a cost-shifting. I'm just making
15 this ruling without prejudice to make the
16 application.
17        However, with respect to the
18 complaint files, I'm just not satisfied on this
19 record to go in a path differently than what
20 Judge Robinson did, and I realize that the scope
21 of her ruling was narrowly focused at that time
22 on the issues that were important to
23 consideration of the application for preliminary
24 injunction. But nonetheless, complaints are

35

1 publicly available from the FDA and production
2 of that should be sufficient to satisfy this
3 request.
4         If it turns out through review of
5 other documents that there are important
6 complaints that perhaps are not publicly
7 recorded that are in the files of Minerva and
8 may be relevant to issues in this case, it's
9 without prejudice to ask me to reconsider this.
10 But on the present record, I'm not satisfied to
11 go beyond what Judge Robinson has done and what
12 is publicly available with respect to complaints
13 from the FDA.
14        I'm not sure how it would be
15 relevant and proportional to the needs of the
16 case to have Plaintiffs review every single
17 documented complaint that Minerva has kept and
18 do its own auditing and policing of whether or
19 not those should have been passed along to the
20 FDA, at least not on this record right now.
21        All right. Shall we move on to
22 Request For Production No. 20?
23        MR. COHN: Thank you, Your Honor.
24 Document Request No. 20 asks for documents

36

1 relating to the conception, design and
2 development, R&D evaluation and testing of the
3 Minerva device. I think the objection has been
4 that they have provided documents sufficient to
5 show the structure, function and operation.
6         But again, this doesn't show the
7 direction that Minerva took to get to that
8 structure, function and operation, what they
9 relied on to get there, whether they looked to
10 the NovaSure and to what degree in order to
11 develop the structure, function and operation.
12        We think that these documents are
13 critical for the copying and willfulness story
14 so that we can explore the genesis of their
15 product, where they got the ideas for this
16 structure, function and operation of their
17 product and how they went about trying to
18 implement those. We feel that these products
19 are the kinds of products that are standard in
20 any patent case and the documents sufficient to
21 show how the product currently functions don't
22 give you the story about how the Defendant got
23 there in the first place. In the copying case,
24 Your Honor, I think these documents are central

37

1　to that inquiry.

2　　　　THE COURT:  Your request seeks, at

3　least I'm looking at your letter brief Document

4　Item No. 164 on Page 3 where this is discussed

5　that Request For Production No. 20, and it says

6　Hologic requests the research and development

7　documentation for the accused Minerva device.

8　　　　Research and development

9　documentation is a broad category.  I'm hearing

10　on the other hand from Minerva that it has

11　produced documents that satisfy this request.

12　What is there before me that allows me to test

13　the sufficiency of the production and/or

14　determine that less than a complete production

15　has been made by Minerva?

16　　　　MR. COHN:  Your Honor, just based

17　off what Minerva said in its response to the

18　letter brief, the only example that they give

19　for documents relating to research and

20　development is the PMA application and its

21　supplements.  That PMA application and its

22　supplements describe the structure, function and

23　operation of the product, but it doesn't

24　describe how they got there.

38

1　　　　For example, Your Honor, it

2　doesn't describe perhaps failures that happened

3　in R&D.  Perhaps they tried to design around

4　some of the key features and they undertook

5　testing to do that and they determined that they

6　needed the features that the patent claims so

7　they wouldn't be in the PMA and they wouldn't be

8　in the documents that at least Minerva has told

9　us they produced yet.

10　　　　THE COURT:  Where would they be?

11　Would they be in the production of records

12　custodian?  Would they be in some other category

13　of requests for production that are included in

14　your set.  It's too general.  I'm trying to get

15　more granular on this than just a general

16　request for "R&D documentation."

17　　　　MR. COHN:  I would expect them to

18　come from the custodians, the engineering

19　custodians, and frankly, Your Honor, from the

20　three custodians that we just discussed earlier

21　that Your Honor compelled the discovery from

22　regarding NovaSure.  This is a small company,

23　Minerva, and they had a very well-defined

24　research and development group.

39

1　　　　I think if Your Honor is asking me

2　how we can limit this request, I would say that

3　we can limit it to the features that are accused

4　of infringing so the cavity assessment test and

5　how Minerva conducted its R&D regarding

6　assessing for perforations, whether they

7　conducted research and development on how to

8　remove moisture from the cavity, research and

9　development regarding the shape of the

10　applicator head.  These are features in the

11　claims of the patents, Your Honor.

12　　　　And I do want to keep this as

13　narrow as possible, but having not knowing what

14　they worked on and not knowing what's there,

15　it's hard to say.  I can imagine a number of

16　tests that were done or that may have been done

17　to the product to try to do things that it

18　doesn't do now and I wouldn't know if those

19　exist and Minerva's effort to try to do those

20　things could establish that they need the

21　accused features and that it was not another way

22　to do it.  I just don't know, Your Honor,

23　because I don't have the discovery.

24　　　　I would submit that even a broad

40

1　request as documents relating to the research

2　and development testing and evaluation of the

3　accused product is not overbroad.  That is the

4　kind of materials that Minerva would keep in its

5　engineering group and would have archived and

6　produced.  Is it a lot of documents?  It may be

7　a lot of documents, Your Honor, but those are

8　the kind of documents that get produced

9　routinely in these patent cases so we can

10　explore the how and the why of the product

11　development and not merely the endpoint of what

12　is the product today.

13　　　　THE COURT:  Very well.

14　　　　MR. COHN:  Thank you, Your Honor.

15　　　　THE COURT:  Ms. Kim?

16　　　　MS. KIM:  I think the RFP No. 20

17　is now moot in light of your order today

18　concerning the design history file as --

19　　　　THE COURT:  I was just going to

20　ask if there was any overlap in that.

21　　　　MS. KIM:  And in addition to

22　Mr. Filloux and others, you have ordered us to

23　produce the three custodians using the search

24　terms NovaSure and NS and also we're producing

41

1  and searching for any documents or emails from
2  other custodians relating to the patents-in-
3  suit, so I think RFP No. 20 will be covered
4  under all of the documents that you've compelled
5  us to do today.
6          THE COURT:  Very well.  Mr. Cohn,
7  do --
8          MR. COHN:  I have nothing further.
9          THE COURT:  I'm going to deny it
10  without prejudice.  I will permit Hologic to ask
11  the Court to reconsider this if after receiving
12  the documents that are being compelled for
13  production today and other documents that
14  Minerva was going to supplement in the normal
15  course, in any event that if there is still a
16  concern or you have a basis based on what you're
17  seeing in certain documents there's a basis to
18  believe that documents have been held back which
19  are responsive to this particular request for
20  production relating to the how and why of
21  product development as you've described it, then
22  I will reconsider the application at that time.
23          Are we ready to move on to
24  Requests For Production Nos. 31 and 33?

42

1          MR. COHN:  Yes, Your Honor.
2  Requests Nos. 31 and 33 seek documents regarding
3  Minerva's efforts to design around the NovaSure
4  device and then descriptions of embodiments in
5  patent applications that led to the asserted
6  patents, so these asserted patents are children
7  of a larger patent family that extends back into
8  the 2000s before Minerva had come out.
9          There is testimony that we
10  provided in the course of the PI proceedings
11  that Minerva was aware of the patent
12  applications that led to asserted patents so
13  they knew about this family before the
14  patents-in-suit came around.  So Hologic is
15  asking for documents that reflect efforts to
16  design around descriptions in those applications
17  even before the claims in this case issued, and
18  that's relevant because there may have been
19  other claims directed at the same features and I
20  think it shows a pattern of behavior of
21  knowledge of our patent portfolio and I think to
22  limit it only to the particular claims that have
23  been asserted would not capture the full scope
24  of the knowledge of Minerva.  We think that

43

1  limiting it just to these claims could cut out a
2  significant portion of potential evidence.
3          THE COURT:  All right.
4          MS. KIM:  Your Honor, RFP Nos. 31
5  and 33 go to Minerva's effort to the design
6  around and we have already agreed to search and
7  produce documents relating to designing around
8  the patents-in-suit and the issued claims of the
9  patents-in-suit which is the relevant issue for
10  the design around.  Now, they are asking for the
11  so-called design around of patent applications
12  and related patents are not at issue in this
13  case and they cannot really explain what the
14  relevance of any such efforts would be.  There's
15  no relevance to that, Your Honor.
16          The issue in this case is
17  infringement of the claims that were issued for
18  the patents-in-suit that was in the case.  It's
19  not about the related patents and it's not about
20  any claims that were not issues during the
21  prosecution of the patents-in-suit, so we see no
22  relevance to the claims or any issues in this
23  case for us to go and search for any such
24  documents.

44

1          THE COURT:  Plaintiffs point out,
2  however, that in other discovery responses
3  Minerva admits that it was aware of the
4  application that led to certain of the
5  patents-in-suit, so why wouldn't design around
6  efforts with respect to those applications for
7  the patents-in-suit potentially lead to relevant
8  information and isn't such a request
9  proportional to the needs of the case?
10          MS. KIM:  Your Honor, the
11  knowledge that there was application out there,
12  they already know about that and that
13  information was provided to them.  But the issue
14  is the design around of changing the Minerva
15  accused product and the applications or the
16  related patents are not at issue for
17  infringement.  The only issue for infringement
18  is the patents-in-suit and we've already agreed
19  to produce any documents that go to the patents-
20  in-suit and design around of any of these
21  patents-in-suit.
22          We do not understand how -- you're
23  not infringing on patent applications.  There is
24  no such designing around that is relevant to

45

1  this case. Same thing with the related patents,
2  there are at least five related patents. Any
3  effort to design around the related patents have
4  nothing to do with any of the claims or issues
5  in this case. The case is about infringement of
6  the patents-in-suit that they asserted.
7          THE COURT: All right. If you can
8  respond to Ms. Kim's last comment along with
9  anything else you want to bring to my attention.
10         MR. COHN: Sure. Very briefly,
11 Your Honor. At the least, design around efforts
12 for other patents in the family we show a
13 pattern of design around. They design around
14 other features but not these patents; that shows
15 that these features in this case are pretty
16 important. They usually design around features
17 but they didn't design around the features in
18 this case.
19         They never designed around any of
20 Hologic's patents, even the other ones that show
21 what we would consider a willful disregard to
22 our patent portfolio, and another standard
23 Minerva practiced that I think is relevant to
24 the willfulness inquiry. Lastly, I think

46

1  Ms. Kim suggested you can't design around the
2  patent application. Of course, you can.
3  Companies do this all of the time. They look at
4  pending applications. Whether there's claims
5  there or not, you can ask yourself whether an
6  application would support claims that could be
7  prosecuted and whether you want to try and
8  develop into that description or not. That
9  happens all of the time as well. Whether
10 Minerva has done this on these patents or other
11 patents is highly relevant to the willfulness
12 inquiry in this case.
13         MS. KIM: I just wanted to point
14 out the timing of these applications in the
15 patents. So three of the patents were issued in
16 2015 and 2016. Minerva's accused product
17 essentially had all of their designs set by June
18 2011. We've told Hologic that Minerva became
19 aware of the applications to these patents
20 around 2014. So there was no relevance here,
21 Your Honor, because the relevant functionality
22 in features was pretty much set by June 2011.
23         And there was one more patent, the
24 '183 patent, which was issued in 2005 even

47

1  before Minerva was founded. So any knowledge
2  about the application for the '183 patent is
3  irrelevant to the case.
4          MR. COHN: Your Honor, if I may,
5  Minerva has been aware of the whole patent
6  family from the beginning of this. Mr. Truckai
7  is the leading inventor of these patents so
8  they've known about these applications that have
9  supported the claims asserted in this case.
10         I don't understand the comment
11 about the '183 patent being issued in 2005.
12 Clearly, any efforts undertaken to design around
13 that patent or related patents would be relevant
14 to the willfulness inquiry. So the fact that a
15 patent claim has not been asserted in this case
16 doesn't mean that efforts to design around it
17 are irrelevant. They are irrelevant.
18         They show a pattern of behavior.
19 They show the standard of conduct at Minerva and
20 Hologic should be able to explore that and allow
21 the jury to test that pattern and answer whether
22 it's willful. Thank you, Your Honor.
23         THE COURT: Thank you. I'm going
24 to grant the request in part and deny it in

48

1  part. Documents reflecting design around
2  efforts relating to the applications leading to
3  the patents-in-suit I'm ordering to be produced.
4  They may be relevant to the issues that relate
5  to scope of knowledge, willfulness, et cetera.
6  But with respect to design around discovery as
7  to what I believe are the six related patents,
8  I'm not thoroughly convinced that that would be
9  relevant and proportional to the needs of the
10 case, even if it is relevant.
11         Again, I make this ruling without
12 prejudice. If you can make a showing at a
13 future time that design around discovery should
14 be compelled with respect to six patents that
15 are not the patents-in-suit but are in the
16 family of patents, then I'm leaving that open
17 without prejudice. But presently, I will just
18 limit this ruling to the patent applications for
19 the patents-in-suit.
20         Let's move on to Request For
21 Production No. 32.
22         MR. COHN: Thank you, Your Honor.
23 I suggest this one will go quickly in light of
24 Your Honor's last ruling. Request For

49

Production No. 32 seeks analyses and studies of documents involving comparisons between Minerva and claims of the asserted patents for their patent applications and the same objection was made that they agreed to provide some materials relating to the patents-in-suit but not to the applications from which those patents came, and I think Your Honor's prior ruling should apply to this as well, that those other analyses to the applications in the family should be produced.

THE COURT: All right. Ms. Kim?

MS. KIM: Your Honor, in light of your ruling on our RFP Nos. 31 and 33, we agree with opposing counsel on that same issue.

THE COURT: All right. Then I will apply that ruling and extend that ruling to Request For Production No. 32.

The next one I believe is the pricing information Request For Production No. 23.

MR. COHN: Your Honor, the way that these companies work is that they do sometimes sell products one at a time to doctors

50

on a la carte or ad hoc basis, but very frequently they will enter into contracts that last for certain amounts of time with certain institutions, physician groups, hospitals, hospital purchasing, HPGs and other groups. The larger the group, generally the larger the order. There may be discounts. Suffice it to say that these are the kinds of documents that are routine in producing the patent.

Now, Minerva responds that they have produced their financials from an aggregate level, the top average sales price and they've also shown sales to particular customers and what that customer paid. What that data doesn't show, Your Honor, is the discounts that had been offered so we don't know if the sales price that Customer X has paid was the rack price that was offered and they took it or there was a negotiation that went on and they paid -- there was a discount. It's difficult to tease that out from the documents that have been produced.

There may be non-monetary parts of the agreements, Your Honor, that could affect the value, for example, commitments only to

51

purchase Minerva products or a certain percentage of their needs from Minerva versus competitors. There may be other practices in terms of commitments to purchase other kinds of products or services and --

THE COURT: Well, Minerva has already said it's doesn't bundle it in a product. I believe that's what Minerva has argued. One of the things it's argued in its response, the only product Minerva produces it cannot be bundled with another product if that's what you're getting at.

MR. COHN: That's not what I'm getting at. I guess what I mean, Your Honor, is that there are different parts of the Minerva system, and the way that those parts are sold is relevant to the value proposition. There's certain capital equipment. Sometimes it's sold and it sits in the doctor's office and then it's used for all the different procedures.

There's a razor and blade model, Your Honor. There's capital equipment and then there's all of the disposables, and how the customer pays for that in various ways is not

52

always reflected in the top document. Some of the capital equipment is given for free to the customer and then they pay a higher rate for the disposable over time. Sometimes the capital is purchased and then that customer may pay a lower price for the disposable or not. We wouldn't know without seeing the agreement, Your Honor.

Some customers don't buy the capital equipment at all. They might lease it. They might borrow it from the sales reps. We just don't know without seeing these agreements. Also, Your Honor, the time commitment that the agreement might contain could affect -- there's a three-year agreement versus a six-month commitment which would affect the price and that's something that the damages expert would need to tease out in order to come to an accurate damages figure.

So it's really the non-monetary provisions of these agreements in addition to some monetary figures like discounts and things like this that may not be apparent from the top line numbers. Your Honor, we suspect that these agreements are kept in a pretty discreet

53

1 location at Minerva and could be collected and
2 produced easily, so we would request that they
3 be produced.
4 　　　MS. KIM:  Thank you, Your Honor.
5 As we indicated in our briefing, Minerva has a
6 form agreement which is not changed by the sales
7 representatives and we have produced that form
8 agreement and these are the same.  It just
9 changes the customer's name.  There's no use for
10 Hologic to get those agreements.
11 　　　　　In addition to that with regards
12 to the price issue, Minerva has produced the
13 average sales price for each month.  It also
14 produced a list of all the discounted
15 disposable, so we have two parts to the system.
16 One is the controller.  The other one is what we
17 call the disposable which is the hand piece
18 part.  The controllers are rarely sold by
19 Minerva.  These are loaned out and we also
20 produced lists of all of the loaner controllers
21 that we gave to the customers.  They have that
22 information.
23 　　　　　There are not a lot of instances
24 of discounted disposables and they have a list

54

1 of all the disposable prices and how many units
2 each customer buys on these prices.  They also
3 have a total sales volume information which has
4 the total revenue from each of the customers.
5 With regards to all of that information, they
6 have all of the information they need with
7 regard to whether any disposables were
8 discounted and for which customers.
9 　　　THE COURT:  Mr. Cohn?
10 　　　MR. COHN:  Sure, Your Honor.  I'm
11 not sure that the information we have shows
12 discounts customer by customer.  Again, I think
13 it's all rolled up so it will be hard to
14 evaluate the value of any particular transaction
15 with simply rolled-up figures.  I would say I
16 heard from counsel that the form agreement that
17 Minerva uses never changes.  I'm not imputing
18 counsel's honesty, but that's not evidence that
19 Hologic can rely on in the case.  So I think the
20 whole point of discovery is that we get to see
21 the evidence and figure out if that's actual or
22 not.
23 　　　　　I think in our brief we had
24 proposed a compromise of a representative sample

55

1 of 20 agreements to address the burden issue so
2 we can see whether they are all indeed the same
3 or whether there's any differences or anything
4 like this.  But we would submit that the
5 rolled-up figures that we were provided and then
6 counsel's assertion that the form agreement
7 never changes is not sufficient for us to
8 prepare the evidence that we would need to prove
9 our case.
10 　　　THE COURT:  Ms. Kim?
11 　　　MS. KIM:  Your Honor, I'm not sure
12 what counsel means by rolled-up figures.  I have
13 an exemplary document which they used in a
14 deposition which shows by each customer the
15 discounted disposable and the price and how many
16 units they bought so I'm not sure what he means
17 by rolled up.  We have produced very specific
18 information with regards to discounted
19 disposables.
20 　　　　　With regard to the form agreement,
21 they can confirm with the witnesses when they
22 depose our sales representatives to see whether
23 there are any other sales agreements that's
24 followed by the form agreement.  It's our

56

1 understanding that the form agreement is never
2 changed.
3 　　　THE COURT:  On this particular
4 request for production, I'm going to grant it in
5 part and deny it in part.  The part that I will
6 grant is I will order Minerva to produce the
7 compromise, that is, the 20 representative
8 agreements including five agreements from each
9 of its sales territories.  And this is without
10 prejudice that upon review of those agreements
11 if this matter Request No. 23 needs to be
12 addressed further in that Hologic wants to
13 compel further information with respect to
14 pricing discounting sales, form agreements, et
15 cetera, that it is without prejudice to come
16 before the Court once it has the representative
17 agreements they can make that application.
18 　　　MR. COHN:  Your Honor, if I may at
19 the risk of pressing my luck?
20 　　　THE COURT:  Sure.
21 　　　MR. COHN:  If I could ask, we
22 heard a representation that there are no
23 agreements different than the form agreement.
24 Can we ask that if there are such agreements

57

1  that have non-monetary provisions different than
2  the form agreement, that those be produced?  If
3  the representation is there are none or maybe
4  there's one or two that -- I just want to make
5  sure that if there's anything different than
6  that form, that they will include it in the
7  samples.
8          THE COURT:  Ms. Kim, do you want
9  to speak to that?
10         MS. KIM:  Your Honor, I'm sorry.
11 It is the proposal that we only produce the
12 agreements that are different or that we produce
13 the 20 representative agreements but include in
14 those any changes that were made?
15         THE COURT:  It's the latter, you
16 produce the 20 representative agreements and
17 make sure that you include any agreements that
18 would show either the non-monetary parts of the
19 agreement or changes from the standard form
20 agreement in light of your representation that
21 Minerva always uses this form agreement and
22 never changes it.
23         If there should be agreements
24 which are not consistent with that

58

1  representation, even if there are only a few,
2  they should be included in the representative
3  sampling so that Plaintiffs can explore that
4  issue.
5          MS. KIM:  Your Honor, I think it
6  would make more sense for us to go and see if
7  there are non-monetary changes to any agreements
8  and produce only those that are different from
9  the form agreement.  I don't see any reason why
10 we would have to produce representative
11 agreements in addition to looking for any
12 changes that were made to the form agreement.
13 We have to do this exercise anyway.  I do not
14 see the need for them to have the additional
15 representative agreements which are the same as
16 the form agreements.
17         We're willing to go and search and
18 see whether there were any changes made to the
19 non-monetary provisions and if so, we will
20 produce those agreements.
21         THE COURT:  Very well.  Mr. Cohn,
22 do you want to speak to that?
23         MR. COHN:  Sure.  I think the
24 point of asking for samples was for us to

59

1  confirm that the table that Ms. Kim had shown
2  provides all of the information that we need.
3  If we get the 20 samples and five from each
4  territory, okay, we can correlate all of this
5  now to the form agreement and all of the data
6  that we have in that table, I think we will be
7  satisfied but I feel that the samples will be
8  necessary for us to do that.
9          THE COURT:  I'm going to permit
10 the sampling as well.  I think that would put to
11 rest the questions that Hologic has.  It's not a
12 burdensome exercise to ask Defendants to produce
13 the representative agreements even if it turns
14 out that they are identical to the form
15 agreement and also to produce those agreements
16 in which changes from the form agreement, so the
17 non-monetary parts of the form agreement.
18         Again, the ruling is without
19 prejudice for the parties to come back before
20 the Court with respect to that particular
21 interrogatory and anything that may be generated
22 by the search for documents responsive to it.
23         All right.  Request For Production
24 No. 10.

60

1          MR. COHN:  So Request For
2  Production No. 10 seeks marketing plans,
3  strategic plans and/or business plans regarding
4  commercialization of the Minerva system.  I
5  think Minerva has committed to get us the first
6  of those, the marketing plans.  They provided
7  that they will "produce documents that reflected
8  sales and marketing plans and product
9  positioning including marketing pieces provided
10 to physicians, patient brochures sales training
11 handbooks and marketing plans."
12         I think we should also be seeing
13 strategic plans or business plans that might not
14 be strictly directed at marketing but other
15 aspects of the development and commercialization
16 of the Minerva product in terms of changes they
17 might wish to make to the product, forecasts,
18 sales forecasts, things like this that might
19 be in a -- we're just concerned that there are
20 business plans and strategic plans out there
21 that might be excluded by Minerva's response.
22         If they get up and they say we're
23 giving you strategic plans and business plans
24 too and not limiting you to what a "marketing

61

1  plan is," then I don't think we would have a
2  dispute.  But I think our concern is that there
3  are strategic commercialization plans, documents
4  that reflect commercialization of the product
5  that are somehow being excluded by this answer
6  in the discovery responses.
7          So to summarize that, we're after
8  the strategic plans and the business plans in
9  addition to the marketing plans.
10         THE COURT:  Very well.  Ms. Kim?
11         MS. KIM:  Your Honor, I thought
12  that the real dispute was they were planning
13  that we did not complete "actual plans
14  themselves" and as Minerva is a small company
15  there is no "business plan," but we tried to
16  gather documents that reflect such things that
17  would reflect the sales plans, marketing plans
18  and product positioning to hopefully include the
19  information that Hologic is seeking.
20         I am not quite sure what they are
21  looking for other than what we've already
22  searched for, because there's no actual thing
23  that's called plan or business plan, but we did
24  search for anything that would reflect such

62

1  things such as product positioning, sales and so
2  forth.
3          THE COURT:  Mr. Cohn, anything
4  further?
5          MR. COHN:  I've never heard of a
6  business that doesn't have a business plan.  I
7  don't know what to add to that other than to ask
8  that they be compelled to produce business plans
9  and strategic plans.  And if they have done
10  that, then we can confirm that with witnesses
11  down the road.  If they haven't done that, then
12  they should.  As our view in light of counsel's
13  comment, that would factor in favor of granting
14  this motion and we will look at the documents
15  that have been produced.
16         THE COURT:  Very well.  With
17  respect to this particular interrogatory, I'm
18  always in a quandary as how I compel a party to
19  produce something that they tell me they've
20  already produced and there's nothing more.
21         Just for purposes of clarification
22  should that be the case I would ask that Minerva
23  make sure and double check its previous search
24  for responses to this particular interrogatory

63

1  to be sure that if there are strategic
2  commercialization plans and business plans in
3  addition to marketing plans and anything along
4  those lines that might be responsive beyond what
5  has already been produced, that supplement its
6  response, and that's the best I can do under
7  these circumstances without prejudice to Hologic
8  to come back to the Court and demonstrate how
9  the production remains incomplete beyond some
10  speculation that most businesses have this,
11  therefore, Minerva must have this.
12         I need something more concrete
13  than that, that will demonstrate that these
14  materials were held back either intentionally or
15  inadvertently if that's the position Hologic
16  takes.
17         MR. COHN:  Your Honor, I think our
18  concern was that we had asked for marketing,
19  business and strategic plans and their answer
20  said we will give you marketing plans.  If they
21  amend their answer to say we will give you
22  marketing, business and strategic plans to the
23  extent we have them, I don't think we will have
24  a dispute, Your Honor.

64

1          THE COURT:  I will ask that they
2  supplement their response to be sure that they
3  have made an adequate production to make a
4  Request For Production No. 10 and we will take
5  it up at another time if there is an issue with
6  respect to the sufficiency of that response.
7          All right.  The last
8  interrogatory, the clinical trial before FDA
9  approval Interrogatory No. 7.
10         MR. COHN:  Yes, Your Honor.  We
11  asked Minerva to identify all of the clinical
12  trials and clinical studies they had done before
13  FDA approval and I think their response was that
14  they would limit it only to the clinical studies
15  they actually submitted.  Obviously, Your Honor,
16  if there were other studies that provided poor
17  results or any different results, that we should
18  at least know what they are so we can determine
19  whether there's something that's important to
20  the case.
21         I think that if the product didn't
22  perform differently in other studies, that's
23  something that was highly relevant and I don't
24  think there's a dispute about that.  I think the

65

1　core of Minerva's objection is that the studies
2　referred to an earlier product, the Gen 1
3　product that they didn't launch, just the Gen 2.
4　But the Gen 2, the regulatory approval for Gen 2
5　was based on the studies that were done with the
6　Gen 1 product.  And our concern is that that was
7　only a subset of the studies that had been
8　performed.
9　　　　We asked for an identification of
10　what other clinical studies had been done on the
11　product so that we could then seek discovery on
12　those to determine that we had a complete
13　picture of the clinical history of the product.
14　I don't think there's an allegation or assertion
15　regarding burden on this.  I think the
16　allegation is one of relevance, but I think that
17　the clinical performance of the Minerva product
18　is clearly something that is relevant in this
19　case in terms of its function and operation in
20　the clinical environment.
21　　　　THE COURT:  Very well.  Ms. Kim?
22　　　　MS. KIM:  Your Honor, Minerva's
23　position is indeed that these are irrelevant
24　under the safe harbor provision.  But in any

66

1　event, all of the clinical trials that have been
2　done by Minerva, Hologic has that information
3　through the PMA application that we produced.  I
4　can confirm that Minerva did not do any other
5　clinical studies other than what was approved by
6　the FDA and what was audited by the FDA and all
7　of those clinical trials are detailed in the PMA
8　application.
9　　　　So in light of that, Hologic
10　already has that information and I think this
11　request is moot.
12　　　　MR. COHN:  Your Honor, if I may,
13　if Minerva's position is that they have produced
14　documents that give us the answer, then they
15　should amend that answer to rely on Rule 33(d)
16　and then they would need to follow the
17　strictures of Rule 33(d) which is that they
18　should point us to those documents by Bates Nos.
19　which I don't think they have done.
20　　　　So if that's their response to
21　this interrogatory, that they can 33(d) us and
22　refer us to the document production, I would
23　suggest they need to do that.  But simply not
24　answering -- they produced the documents so

67

1　clearly it's relevant.  They should answer the
2　interrogatory in the appropriate manner, Your
3　Honor.
4　　　　MS. KIM:  We're happy to do that
5　under 33(d) and identify the documents.
6　　　　THE COURT:  All right.  Very well.
7　In light of the representations on the record, I
8　will order that Minerva respond pursuant to Rule
9　33(d) and provide a supplemental response.
10　　　　How much time do you need to do
11　that, Ms. Kim?
12　　　　MS. KIM:  Your Honor, we can
13　provide that in two weeks.
14　　　　THE COURT:  Okay.  Very well.  I
15　think that concludes all of the issues that were
16　before the Court in dispute.  Are there any
17　further matters that counsel for the Plaintiffs
18　would like to bring to the Court's attention at
19　this time?
20　　　　MR. COHN:  Not at this time, Your
21　Honor.  Thank you for a long day.
22　　　　THE COURT:  Okay.  Very well.
23　Anything further, Ms. Kim, that you would like
24　to bring to the attention of the Court?

68

1　　　　MS. KIM:  No, Your Honor.
2　　　　THE COURT:  Very well.  I thank
3　counsel for their stamina and endurance today
4　and for being succinct with respect to these
5　specific requests for production and
6　interrogatories that were in dispute.  I think
7　that covers everything that we needed to
8　accomplish today.  I will also thank the
9　representatives from the different parties for
10　being here as well.  We are adjourned.
11　　　　(The proceedings ended at
12　4:30 p.m.)

69

1    C E R T I F I C A T I O N

2        I, Taneha Carroll, Professional

3    Court Reporter, certify that the foregoing is a

4    true and accurate transcript of the foregoing

5    proceeding.

6        I further certify that I am neither

7    attorney nor counsel for, nor related to nor

8    employed by any of the parties to the action in

9    which this proceeding was taken; further, that I am

10   not a relative or employee of any attorney or

11   counsel employed in this case, nor am I financially

12   interested in this action.

13

14

15

16       /s/Taneha Carroll
         Taneha Carroll

17   Professional Reporter and Notary Public

18

19

20

21

22

23

24

# EXHIBIT K

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HOLOGIC, INC., et al., )
                          A   )
        Plaintiff,        )   C.A. No. 15-1031-SLR-SRF
                          )
v.                        )
                          )
MINERVA SURGICAL, INC.,)
et al.,                   )
                          )
        Defendant.        )


Wednesday, June 21, 2017
12:30 p.m.
Room 6100


844 King Street
Wilmington, Delaware


BEFORE:  THE HONORABLE SHERRY R. FALLON
         United States District Court Judge


APPEARANCES:


YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
  BY:  SAMANTHA WILSON, ESQ.

            -and-

ARNOLD & PORTER KAYE SCHOLER, LLP
  BY:  RYAN J. CASAMIQUELA, ESQ.

                Counsel for the Plaintiff

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697 FAX (302) 658-8418

---

2

1   APPEARANCES CONTINUED:

2

3   ROSS, ARONSTAM & MORITZ, LLP
    BY:  BENJAMIN J. SCHLADWEILER, ESQ.

4            -and-

5   WILSON, SONSINI, GOODRICH & ROSATI, P.C.
    BY:  OLIVIA M. KIM, ESQ.

6
                Counsel for the Defendant
7

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697 FAX (302) 658-8418

---

3

1        THE COURT:  All right.  Good
2   afternoon, everyone.  All right.  Let's start
3   with a role call.  Who is on the line for
4   Hologic?
5        MS. WILSON:  Good afternoon, Your
6   Honor.  Samantha Wilson from Young, Conaway,
7   Stargatt & Taylor on behalf of Plaintiffs and
8   I'm joined today by our co-counsel, Ryan
9   Casamiquela from Arnold & Porter Kaye Scholer.
10        THE COURT:  Okay.  Very good.  And
11   who is on the line for Minerva?
12        MR. SCHLADWEILER:  Good afternoon,
13   Your Honor.  Ben Schladweiler from Ross Aronstam
14   stamp on behalf of Minerva and I'm joined today
15   by Olivia Kim from Wilson Sonsini.
16        THE COURT:  Good afternoon,
17   everyone.  Well, I have read the submissions.
18   This is Plaintiff's application for an order
19   compelling production of certain lab notebooks,
20   so let me hear from the Plaintiffs and then I'll
21   here from the Defendants.
22        MR. CASAMIQUELA:  Thank you, Your
23   Honor.  This is Ryan Casamiquela on behalf of
24   Hologic.  So what we have here is, you know,

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697 FAX (302) 658-8418

---

4

1   we're moving to compel the lab notebooks.  And
2   basically these lab notebooks had been put at
3   issue specifically by Minerva in their
4   interrogatory response they identified 25 issued
5   patents and in addition to that, 24 pending
6   applications relating -- and they are going to
7   argue that these 25 plus 24, almost 50 total
8   patents and patent applications cover the
9   accused product, the Minerva Appalachian System.
10   And it seems like they want to argue in front of
11   the jury that these are novel inventions and
12   that they developed the technology themselves.
13   Our position is that they, in fact, designed
14   around the Novasure technology.  As Your Honor
15   compelled a few months ago, we were looking for
16   the term Novasure as a search term across
17   different documents.  Now, of course Novasure
18   was a run across the lab notebooks because
19   they're hard copies, they're hard copy
20   materials.  And so we're looking to get the lab
21   notebooks to address both their contentions
22   about how they allegedly invented almost 50
23   inventions, related to the conception and
24   reduction to practice of those items and also,

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697 FAX (302) 658-8418

5

1 you know, relating to their design-around of
2 Novasure.
3         And then also they have this
4 theory of undue experimentation. So this is in
5 their invalidity contentions they argue that our
6 patents are invalid based on the theory that
7 they conducted an undue amount of
8 experimentation on the accused product. And so
9 we want to test that contention as well. And we
10 want to look at the lab notebooks and see what
11 type of undue experimentation actually happened.
12 So it's just really about testing the
13 contentions.
14         You know, I think it's pretty
15 clear that these are highly relevant. Minerva
16 essentially agreed to produce four custodian --
17 a very limited set of notebooks, specifically
18 four custodians from the inception of the
19 company to July of 2014. And so they're willing
20 to do that or at least they offered do that a
21 day before our brief was due. But we think that
22 that's a very limited set of materials and we
23 were looking for basically the lab notebooks
24 relating to the development of the accused

6

1 product.
2         THE COURT: Let me ask you this.
3 They say in their responsive brief, they being
4 obviously Minerva, that significantly the design
5 and functionality of the accused features of
6 Minerva system did not change since early 2011.
7 State for me, Mr. Casamiquela, why Hologic needs
8 lab notebooks through June of 2014.
9         MR. CASAMIQUELA: Sure, Your
10 Honor. That's a good question. So their
11 interrogatory response lists, lists 25 patents,
12 14 of which were filed between 2011 and 2014.
13 And then they have -- they list another 24
14 pending applications, 16 of which were filed
15 between 2011 and 2014. So we're looking at 30
16 patents and patent applications that were filed
17 between 2011 and 2014. That's number one.
18         Number two is that Minerva
19 continued to design their accused system. They
20 had a generation one. Generation one was, was
21 worked on between 2009 and 2011. And then they
22 had generation two. General two, generation two
23 was worked on between 2013 and 2014 and then
24 they filed their application with the FDA in

7

1 July of 2014. That's when they filed for FDA
2 approval, July 2014. And so we feel like -- and
3 also they just happened to produce two pages of
4 lab note --
5         So the reason why we even know
6 about this is they produced two pages of the lab
7 notebooks and those two pages are --
8         THE COURT: Yeah, I was going to
9 ask that. I think that came attached to an
10 e-mail and that's how your client determined it
11 was worth pursuing these lab notebooks. Tell me
12 a little bit about that, what the significance
13 is of the two pages in your client's view.
14         MR. CASAMIQUELA: Right. So those
15 two pages were dated June 2013 and July 2013.
16 So those two pages were later in time. And we
17 actually marked those at the deposition of the
18 author of those two pages, Ms. Hilario, who was
19 an associate engineer. We found those to be
20 highly relevant because they talked about the
21 accused functionality relating to -- if you look
22 at those pages, Exhibit 4 and 5 --
23         THE COURT: Right. I have them in
24 front of me.

8

1         MR. CASAMIQUELA: Yeah. They talk
2 about the width. It's -- one of the allegations
3 in this case is relating to the width -- whether
4 or not the accused -- the accused product
5 measures or indicates the width measurement.
6 And so here they say the three dots and the four
7 dots. One of the design-arounds -- our position
8 is that the three dots is not -- their position
9 is the three dots is not equal to three
10 millimeters.
11         THE COURT: Okay.
12         MR. CASAMIQUELA: Okay. They're
13 saying that three dots does not measure three
14 millimeters, it's just a random -- it's just
15 having three dots. It just shows it's a
16 progression of the opening of the array.
17         THE COURT: All right.
18         MR. CASAMIQUELA: And so this
19 document shows that the three dots does
20 correlate to a measurement around three
21 millimeters. And that's -- they're trying to
22 design around -- our position is that they're
23 trying to design around our patent because
24 they're arguing that the three dots does not

9

1 indicate three millimeters.
2          THE COURT: I see. All right.
3          MR. CASAMIQUELA: Of a width.
4          THE COURT: All right. Anything
5 further before I hear from Minerva?
6          MR. CASAMIQUELA: I don't think
7 so, Your Honor. I think that's all for now.
8          THE COURT: All right. Very good.
9 Counsel for Minerva.
10          MS. KIM: Thank you, Your Honor.
11 Olivia Kim for Defendant Minerva. As an initial
12 matter, the opposing counsel refers to the
13 almost 50 total patents and applications that
14 Minerva cited with regards to their own
15 technology. However, those patents go to the
16 whole product. What is relevant here is the
17 accused features of the accused device, which
18 relates to the invention of the patent in suit.
19          With regard to our defense to
20 willful infringement and copy allegations, they
21 go to what we did with the accused features,
22 whether we copied the accused features of the
23 patents in suit. And we have made out very
24 specifically how we developed those features and

10

1 how Minerva filed patents describing and
2 claiming those accused features. And they were
3 all done in 2008 and 2009.
4          Similarly, with regards to our
5 undue experimentation contentions, one of the
6 evidence that we cite to to assert undue
7 experimentation is that for the -- again, for
8 the accused features what experimentation
9 Minerva did with regards to that. And that goes
10 to the same similar patents that were filed 2008
11 and 2009 time frame. And as you mentioned, Your
12 Honor, the accused features were not made since
13 2011 and the reason for that is Minerva started
14 doing clinical trials back in 2011 with approval
15 from the FDA. After those clinical trials were
16 done and they were successful, that's when
17 Minerva was able to file a pre-market
18 application to get approval from the FDA to sell
19 and make the product that was tested in the
20 clinical trials.
21          Now, they were generation one and
22 generation two, but within generation one and
23 generation two there were no changes made to the
24 accused feature.

11

1          THE COURT: All right.
2          MS. KIM: Therefore, Your Honor,
3 we are requesting that Hologic's request be
4 limited so that it's proportionate to the time
5 expressed by Hologic. And we are asking for two
6 limitations; one is the time period. As we
7 indicated, our contentions with regards to the
8 independent development happened back in 2008
9 and 2009. And indeed our product, the accused
10 features did not change since 2011.
11          Secondly, the relevant custodians.
12 With regards to our contention of independent
13 development of the accused features, there are
14 two relevant custodians to that. Those are the
15 inventors of the Minerva patents that describe
16 or claim the accused features. One is Minerva's
17 founder, Mr. Truckai, and the other one is one
18 of the engineers, Mr. Toth. And so those two
19 are the relevant custodians with regards to
20 Minerva's contention.
21          In addition to that, Minerva was
22 willing to expand the list to include the
23 relevant discovery custodians that were
24 identified during discovery. That includes the

12

1 10 custodians that Minerva was required to
2 identify under the ESI order and to meet
3 additional engineer custodians that Hologic move
4 this Court to add during discovery.
5          THE COURT: Okay. Let me ask you,
6 Mr. Casamiquela pointed out Exhibits 4 and 5 to
7 the Plaintiff's submission, which are the lab
8 notebook pages, I believe of one of the Minerva
9 engineers, Estala Hilario. And these pages from
10 her lab notebooks are dated June and July,
11 respectively, of 2013 and they seem to, as
12 arguably pointed out by Plaintiffs, address some
13 measurements, the reference to dots allegedly
14 referencing a form of measurement that may have
15 relevance to the issues concerning the patents
16 in suit; that is, the accused features of the
17 patents in suit, so why shouldn't the limitation
18 be through June of 2014 as requested by
19 Plaintiffs?
20          MS. KIM: Your honor, this goes to
21 just testing of the accused feature that's
22 already developed and set. And it is just
23 testing the PST feature, which is one of the
24 technology that Minerva developed back in 2008

13

1 and 2009.  And Estela Hilario is here just
2 testing the measurements, the PST feature that's
3 being accused in the case.  The accused device
4 that is being currently sold, the PST is already
5 there.  It has nothing changed since 2011 and
6 Ms. Hilario is just merely testing the
7 measurements, it appears, for the PST, the
8 device -- the feature the device already has.
9         THE COURT:  All right.  Thank you.
10 Mr. Casamiquela.
11         MR. CASAMIQUELA:  Sure.  I mean --
12 it's not merely testing.  It's testing it to see
13 if there's a redesign that could occur or if
14 minor adjustments could be made.  But
15 essentially, that is the key allegation in this
16 case.  The key allegation is that the three dots
17 do not indicate three millimeters.  That is --
18 for one of the patents, that is the key dispute,
19 for infringement and for design around.  The
20 whole copying or design around case is about the
21 fact that they put dots instead of numbers.  On
22 our product we have three millimeters, we have
23 the number three.  They have three dots.  And
24 that's their design around.  That's the whole --
Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

14

1 that's our -- that's our -- that's one of our
2 key positions on why we believe that they're
3 just infringing our patents because they use
4 dots instead of numbers.  And so it's really
5 highly relevant.  And, you know, that's why we
6 even brought -- that's why we brought the motion
7 is because of these two pages and we believe
8 there's a lot more out there.  And so that's --
9 that's why we're here.
10         You know, again, I mean on the
11 time limitation -- so Minerva has these two
12 limitations, time and custodians.  On the time
13 limitation, you know, the key points are, again,
14 they have -- in the rog response they actually
15 assert 25 patents they say covers the accused
16 device.  And they have 14 -- sorry, they have 24
17 applications that cover the accused device.  And
18 30 of those, together, are from 2011 and 2014.
19 And so we believe the time limitation doesn't
20 make any sense.
21         With regard to the custodian
22 limitation, they argue that there are only --
23 well, they argue that there's two inventors or
24 two custodians, but actually if you look at
Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

15

1 those, those 25 patents that were filed, that
2 they're -- and then you look at the 24 patent
3 applications, there are 12, there are 12 named
4 inventors on those, not two, 12, for all of
5 those applications that they -- patents and
6 patent applications that they list in the rog
7 response.  So we got 12 named inventors.
8         And then also on top of that, they
9 argue that the founder, Mr. Truckai, he's the
10 founder of the company, kind of like the lead
11 engineer, he didn't have any notebooks.  But the
12 thing is is it's routine for like the executives
13 and the founders, they don't want to do the
14 notes, they delegate that to others.  And so
15 it's routine that may be the middle -- the
16 engineers, the kind of the associate engineers,
17 they are the ones that do all the note taking,
18 not the head guy.  And so, so he doesn't have
19 lab notebooks, but all the people under him have
20 lab notebooks, so we don't believe limiting it
21 to just a few people makes sense.  So we have
22 the 12 named inventors, then we have people that
23 were delegated under that.
24         And then we don't have any
Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

16

1 argument on burden.  There's no argument that
2 it's hard to collect these lab notebooks.  They
3 don't identify any burden specifically.  And we
4 asked them in the meet and confer, how many
5 notebooks are out there?  They didn't tell us
6 how many there were.  And they didn't tell us in
7 the briefing how many there were.  For all we
8 know there's 30, 40 lab notebooks.  The
9 SmithKline is directly on point.  In the
10 SmithKline case they compelled -- they found
11 that 160 lab notebooks was not burdensome and
12 then they compelled the production of lab
13 notebooks relating to the drug Paroxetine.  And
14 Paroxetine is basically the accused product.
15 It's a generic form of an antidepressant pill.
16 And so the Court said produce the ones that
17 relate to the accused product.  And that's what
18 we're asking.  Produce the ones that relate to
19 the development of the accused product.  And
20 that's what we're asking for.
21         THE COURT:  All right.  Anything
22 further on behalf of Minerva?
23         MS. KIM:  Yes, Your Honor.  Two
24 more points.  The opposing counsel referred to
Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

17

1  the dots in Ms. Hilario's lab notebook and I
2  just want to point out that those dots were
3  there in 2011 when the accused features were
4  set.
5       Secondly, with regard to maybe the
6  assumption that Mr. Truckai would not take his
7  own notes and would have other technicians or
8  engineers take notes for him, there's no
9  evidence of that.  And in fact, you know, if you
10  look at other patents that Minerva has, if any
11  technician or engineer were involved in
12  developing that feature, they would be named as
13  one of the inventors.  Those other patents that
14  opposing counsel is talking about definitely go
15  to other features of the Minerva device, but not
16  the accused feature.  Again, Minerva has
17  specifically identified in its interrogatory
18  responses the independent development of the
19  accused features and its own patents that go to
20  those accused features.  Thank you, Your Honor.
21       THE COURT:  Thank you.  Anything
22  further on behalf of Hologic.
23       MR. CASAMIQUELA:  Just one quick
24  point on that last point.  In the rog response

18

1  they don't -- they just list all their patents
2  and patent applications.  They list 49 patents
3  and patent applications.  They don't specify
4  which of these patents or patent applications go
5  to these accused features.  They just list them
6  all.  And they say these go to the novel Minerva
7  system.  They don't specify these 10 patents go
8  to the accused features and these -- you know,
9  they list 25 patents that relate to the Minerva
10  novel system and they list 24 patent
11  applications that relate to the novel system.
12       THE COURT:  All right.  Having --
13       MS. KIM:  Excuse me, Your Honor.
14  May I?
15       THE COURT:  Yes.  One brief
16  response.  I'm prepared to make a ruling on the
17  record for the parties today.
18       MS. KIM:  Thank you.  Just to make
19  the record clear, we have cited and actually
20  quoted some of our responses specifically
21  identifying the accused features and which
22  Minerva patents go to those accused features
23  and the fact that these Minerva patents actually
24  cite to the patents in suit and the family of

19

1  the patents in suit.  So we made it very clear
2  from early on as to which patents and which
3  technologies independently developed by Minerva
4  go to the accused features.  Thank you.
5       THE COURT:  Thank you.  All right.
6  Having read the submissions of the parties on
7  the Plaintiff's application to compel production
8  of lab notebooks and having heard the arguments
9  today, I'm going to grant the request in part
10  and deny it in part without prejudice.
11       As everyone knows, under the
12  federal rules, specifically Rule 26, my
13  obligation is to consider both relevance and
14  proportionality.  I am inclined on this record,
15  with respect to the relevance portion of it, I
16  don't believe that that is being disputed so
17  much as to what is a proportional response to a
18  request for the lab notebooks.
19       Minerva has asserted that there
20  are at least 22 employees or former employees
21  that have or have had one or more lab notebooks
22  at Minerva and to compel production of all of
23  those lab notebooks would be overly broad and
24  unduly burdensome.  For purposes of my ruling

20

1  and the record that I have before me today, I am
2  accepting that, and therefore in granting
3  Plaintiff's request, I am going to place some
4  limitations on what Minerva needs to produce.
5       Minerva has offered to produce the
6  lab notebooks of the custodians identified
7  pursuant to the ESI order and three additional
8  custodians, the Minerva engineers identified on
9  page 4 of Minerva's submission, document item
10  number 247, the engineers being Dominique
11  Filloux, head of R&D, Estela Hilario, an
12  engineer and Tejas Mazmudar, an engineer and
13  Akas Toth, an engineer and inventor of Minerva's
14  patents identified.  So those are the custodians
15  from whom I will order production of lab
16  notebooks.
17       As to the time limitation, I will
18  grant the time limitation requested by the
19  Plaintiffs; that is, for those custodians,
20  produce all lab notebooks dated prior to June
21  27, 2014.  In reviewing the submissions there
22  are two pages from lab notebooks of engineer
23  Hilario that are dated June and July of 2013
24  respectively.  The defense points out that those

21

1  just simply relate to quote, unquote, testing of
2  the accused features that have already been
3  established and set.  Nonetheless, those
4  features are, according to the Plaintiff,
5  relating to the key allegations of infringement
6  in the case.  And so, I find that it is not
7  disproportional to order production of all lab
8  notebooks dated prior to June 27, 2014, from
9  those custodians.
10        To the extent after this
11  production is made and reviewed by Plaintiffs
12  and perhaps there are further meet and confers
13  if needed between counsel, at which time a
14  resolution cannot be achieved with respect to
15  any additional notebooks from the 22 employees
16  or former employees of Minerva, then the Court
17  will reconsider whether or not to extend the
18  limitations imposed by this order.
19        Because I am ruling on the record,
20  this transcript will serve as my order.
21  Pursuant to Rule 72A of the federal rules of
22  civil procedure, any party may serve and file
23  objections to this transcript order within 14
24  days after being served with a copy and the

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

22

1  district judge will review it and decide any
2  timely objections and will modify or set aside
3  any part of my order that is clearly erroneous
4  or contrary to law.
5        Are there any further matters on
6  behalf of the Plaintiff that you wish to bring
7  to the attention of the court at this time?
8        MR. CASAMIQUELA:  No, Your Honor.
9        THE COURT:  Are there any further
10  matters on behalf of Defendant Minerva?
11        MS. KIM:  No, thank you, Your
12  Honor.
13        THE COURT:  Thank you, counsel.
14  Our teleconference is concluded.
15        (End at 12:50 p.m.)
16
17
18
19
20
21
22
23
24

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

23

1  State of Delaware)
                    )
2  New Castle County)

3
4
5        CERTIFICATE OF REPORTER
6
7        I, Stacy M. Ingram, Certified Court Reporter
8  and Notary Public, do hereby certify that the
9  foregoing record, Pages 1 to 23 inclusive, is a true
10  and accurate transcript of my stenographic notes
11  taken on June 21, 2017, in the above-captioned
12  matter.
13
14        IN WITNESS WHEREOF, I have hereunto set my
15  hand and seal this 21st day of June 2017, at
16  Wilmington.
17
18
19        /s/ Stacy M. Ingram
20        Stacy M. Ingram, CCR
21
22
23
24

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

# EXHIBIT L

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HOLOGIC, INC. and CYTYC SURGICAL PRODUCTS, LLC, | ) ) ) ) | |
| Plaintiffs and Counterdefendants, | ) ) ) | |
| v. | ) ) | C.A. No. 15-1031-JFB-SRF |
| MINERVA SURGICAL, INC., | ) ) | **JURY TRIAL DEMANDED** |
| Defendant and Counterclaimant. | ) ) ) ) | |

**DEFENDANT AND COUNTERCLAIMANT MINERVA SURGICAL, INC.'S
<u>REBUTTAL FACT WITNESS LIST</u>**

*Of Counsel*:

Vera M. Elson
Dale R. Bish
Christopher D. Mays
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA  94304
(650) 493-9300

Edward G. Poplawski
Olivia M. Kim
Erik Carlson
Neil N. Desai
WILSON SONSINI GOODRICH & ROSATI, P.C.
633 West Fifth Street, Suite 1550
Los Angeles, CA  90071
(323) 210-2900

ROSS ARONSTAM & MORITZ LLP
Benjamin J. Schladweiler (#4601)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
bschladweiler@ramllp.com

*Counsel for Defendant and Counterclaimant
Minerva Surgical, Inc.*

Dated:  February 2, 2018

Pursuant to paragraph 2 of the Court's Amended Scheduling Order (D.I. 265), Defendant and Counterclaimant Minerva Surgical, Inc. ("Minerva") provides the following list of rebuttal fact witnesses that it intends to call at trial. Minerva reserves the right to supplement or modify this list if so warranted. Minerva also reserves the right to call any witness on the witness lists of Plaintiffs and Counterdefendants Hologic, Inc. and Cytyc Surgical Products, LLC.

- Avery Burns
- Dr. Peter Casella
- William Lucas Churchill
- Dave Clapper
- Eric Compton
- Dan Eby
- Dr. Edward Evantash
- Dominique Filloux
- Dr. Amy Garcia
- Dr. Douglas Gearity
- Daniel Hayes
- Dominic Hulton
- Mark Hunter
- Dr. William Jamieson
- Dr. Alan Johns
- Russell Layton
- Lance Lozan
- Paul MacNeill

- Burt Magen

- Adam Mascari

- Dr. Craig McKnight

- Michael Meier

- Dr. James Mirabile

- Jeffrey Mountain

- Nicholas Moussa

- Tom O'Neill

- Whitney Parachek

- Thomas Pendlebury

- Shacey Petrovic

- Colin Pollard

- Dr. David Schwartz

- Dr. Eugene Skalnyi

- Brian Smith

- Stephen Smith

- Akos Toth

- Dr. Robert Tucker

- Csaba Truckai

Respectfully submitted,

ROSS ARONSTAM & MORITZ LLP

*Of Counsel*:

/s/ Benjamin J. Schladweiler

Vera M. Elson
Dale R. Bish
Christopher D. Mays
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA  94304
(650) 493-9300
velson@wsgr.com
dbish@wsgr.com
cmays@wsgr.com

Benjamin J. Schladweiler (#4601)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
bschladweiler@ramllp.com

*Counsel for Defendant and Counterclaimant
Minerva Surgical, Inc.*

Edward G. Poplawski
Olivia M. Kim
Erik Carlson
Neil N. Desai
WILSON SONSINI GOODRICH & ROSATI, P.C.
633 West Fifth Street, Suite 1550
Los Angeles, CA  90071
(323) 210-2900
epoplawski@wsgr.com
okim@wsgr.com
ecarlson@wsgr.com
ndesai@wsgr.com

Dated:  February 2, 2018

## CERTIFICATE OF SERVICE

I, Benjamin J. Schladweiler, hereby certify that on February 2, 2018, I caused the foregoing *Defendant and Counterclaimant Minerva Surgical, Inc.'s Rebuttal Fact Witness List* to be served via electronic mail upon the following counsel of record:

Karen L. Pascale
Pilar G. Kraman
James L. Higgins
YOUNG CONAWAY STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
kpascale@ycst.com
pkraman@ycst.com
jhiggins@ycst.com

Amie L. Medley
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
amie.medley@apks.com

*Counsel for Plaintiffs and Counterdefendants Hologic, Inc. and Cytyc Surgical Products, LLC*

Matthew M. Wolf
Edward Han
Marc A. Cohn
William Z. Louden
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001-3743
matthew.wolf@apks.com
ed.han@apks.com
marc.cohn@apks.com
william.louden@apks.com

Ryan J. Casamiquela
ARNOLD & PORTER KAYE SCHOLER LLP
10th Floor, Three Embarcadero Center
San Francisco, CA 94111-4024
ryan.casamiquela@apks.com

Assad Rajani
David A. Caine
Philip W. Marsh
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
assad.rajani@apks.com
david.caine@apks.com
philip.marsh@apks.com

*Counsel for Plaintiffs and Counterdefendants Hologic, Inc. and Cytyc Surgical Products, LLC*

/s/ Benjamin J. Schladweiler
Benjamin J. Schladweiler (#4601)

# **<u>EXHIBIT M</u>**

# EXHIBIT 19

Case 1:15-cv-01631-LPS-JFB-SRF   Document 435-1   Filed 07/02/18   Page 25 of 43 PageID #:
28520
Case 2:09-cv-00528-LPS-SRF   Document 602   Filed 02/27/14   Page 224 of 235 PageID #: 28064

## EXHIBIT 19 TO PRETRIAL ORDER
## GOOGLE'S LIST OF MISCELLANEOUS ISSUES

Google submits the following list of issues it believes should be addressed at the Pretrial
Conference.  Google reserves the right to modify or supplement this list at any time before the
Conference.

1.      By the very nature of this patent infringement suit, PUM has access to some of Google's

most sensitive confidential information.  Due to the strong protective order entered by

this Court, Google has produced hundred of thousands of pages of materials that include

highly sensitive engineering documents without troubling the Court with the concerns the

company would otherwise have.  While Google respects the right of public access to

judicial proceedings, public dissemination of this information would cause considerable

harm to Google's competitive standing; allowing companies to compete against Google

without the years of refinement and significant financial outlay Google has invested in

these trade secrets and other sensitive information.  The strong public interest in

protecting this kind of sensitive commercial information  from disclosure outweighs the

common law presumption of public access to judicial proceedings.  Thus, testimony

related to the confidential operations of Google's products and systems, particularly any

source code, should be shielded from public disclosure. Accordingly, Google asks the

Court to close the courtroom whenever testimony regarding Google's confidential

commercial information is offered at trial, and to seal all documents and portions of

transcripts discussing Google's sensitive commercial information.  Google will work

with PUM and the Court to limit any such closings and ensure the least disruption to the

trial proceedings.

2. Google understands that in denying its motion to dismiss for lack of standing, the Court rejected Google's assertion that title never passed to PUM because PUM did not exist as a legal entity at the time Levino Ltd. assigned the patents-in-suit to PUM. (D.I. 396.) Accordingly, Google understands that this argument has been rejected as a matter of law and that the Court has found no related factual issues remain to be tried before the jury on this issue. However, if this incorrect , Google should be permitted to present evidence and argument on the issue of standing to the jury. Google requests clarification of the Court's finding on this issue.

3. Google's "Smart Ad Selection System" is sometimes referred to within the company by the acronym SmartASS. Google asked witnesses to refer to the system as SmartAds during depositions, but on occasion they or counsel used the term SmartASS. In addition, the term SmartASS appears in documents included on the parties' exhibit lists. Google requests that parties and witnesses refrain from using the term SmartASS in the presence of the jury. Google also requests that the term SmartASS be replaced with SmartAds in documents shown to the jury and in deposition designations played to the jury. PUM has indicated that it does not oppose Google's proposal herein.

4. Google believes that the meaning of the word "conceived" in Yochai Konig's employment agreement with SRI is an issue of law to be decided by the Court and that there is no conflicting extrinsic evidence such that this issue could be decided by the jury. However, Google understands that in denying Google's motion for summary judgment on its counterclaim of breach of contract and Google's motion for reconsideration, the Court rejected Google's position and will let the jury decide the meaning of the word

"conceived."  (*See* D.I. 521; D.I. 537.)  Google requests clarification if this understanding is incorrect.

Google responds below to the issues PUM has indicated should be addressed at the Pretrial Conference.

1.      In its portions of the Pretrial Order (*see* Exhibit 18), PUM requests that Google and its experts be prohibited from rearguing claim construction positions.  This, however, should apply to both parties.  Both parties and their experts should be prohibited from rearguing claim construction positions rejected by the Court in its *Markman* opinion.  The parties should apply the Court's claim constructions.

2.      PUM includes in Exhibit 2 allegations regarding indirect infringement.  As detailed in Google's Reply in Support of Google's Motion *in Limine* To Preclude Evidence or Arguments on Copying or Pre-Suit Knowledge, PUM did not disclose in discovery (including interrogatory responses and its infringement expert's report on infringement) that it contends Google indirectly infringes, or any facts to support such a claim.  Thus, there are no legal and factual issues to be addressed at trial on indirect infringement to the jury on this issue and PUM, PUM should not be allowed to do so.  As also explained in Google's Reply to MIL No. 1, PUM should not be allowed to use a claim of indirect infringement never disclosed in discovery as a way to introduce the pre-suit letters that are the subject of MIL No. 1.

3.      PUM requests that Google be precluded from relying on PUM's infringement expert, Dr. Pazzani's articles as obviousness references.  (*See* Exhibit 18.)  Initially, this request is an improper motion *in limine* that should be disregarded by the Court.

In any event, as PUM admits, Google identified Dr. Pazzani's articles as prior art

in an interrogatory response served on June 9, 2011.  And Google questioned Dr. Pazzani about those articles during his deposition.  Thus, PUM has long been on notice that Google considered his articles to be prior art.  That Google's invalidity expert did not rely on them does not mean they are inadmissible.

Indeed, PUM does not cite any case which indicates that Google can be precluded from providing evidence of the state of the art separate and apart from what an expert relies on.  Nor could it.  Obviousness is a question of law, and "precedent does not require 'expert' opinions on matters of law."  *Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1336, 1341 (Fed. Cir. 2013); *see also Friskit, Inc. v. RealNetworks, Inc.*, 499 F. Supp. 2d 1145 (N.D. Cal. 2007), *aff'd per curiam*, 306 Fed. Appx. 610 (Fed. Cir. 2009) (granting summary judgment of obviousness without relying on expert testimony).  PUM also cannot demonstrate any prejudice here.  The case cited by PUM, *Pfizer, Inc. v. Ranbaxy Labs., Ltd.*, 2005 WL 2296613 (D. Del. Sept. 20, 2005), does not support PUM's position.  That case holds that an opposing party's expert's deposition testimony does not fall within the hearsay exception for statements by a person who has been authorized by a party to "make a statement concerning the subject," under F.R.E. 801(d)(2)(C).  *Id.*  Dr. Pazzani is listed as one of PUM's live witnesses, so Google should be able to introduce his two prior art articles through his live testimony.

4.      PUM also asks that Google be precluded Matthew Montebello from testifying at trial.  Again, this request is an improper motion *in limine* that should be disregarded by the Court.

Google disclosed Mr. Montebello in its Initial Disclosures on May 4, 2011, his article was disclosed as prior art in an interrogatory response served on May 12, 2011,

and Google's invalidity expert relied on his article as anticipatory prior art.  And while PUM suggests that Google should have disclosed Mr. Montebello earlier as a "trial witness," Google disclosed him as a trial witness the day such disclosures were due, January 31, 2014.  Here too, there is no prejudice.  PUM made no effort to take any discovery as to any prior witness throughout the case, and never even asked Google which prior art witnesses it might rely on at trial during discovery.

Nevertheless, and notwithstanding the fact that it is well after the close of fact discovery, Google told PUM it would not object to Mr. Montebello (who resides in Malta and is not in Google's control) being deposed in the U.S. prior to trial.  Google proposed that Mr. Montebello travel to the U.S. early for trial and be deposed prior to the start of trial when counsel will likely all be in Wilmington, which Mr. Montebello is willing to do.  PUM has indicated it intends to proceed with this deposition.

5.      PUM indicated in Exhibit 18 that it wishes to discuss the number of Google witnesses included on Google's witness list.  As Google has explained to PUM and the Court (Dkt. No. 574), the number of potential live witnesses on Google's witness list is a direct result of PUM's own trial witness list and the unreasonable breadth of PUM's infringement case.  PUM initially designated deposition testimony from 15 Google witnesses (current and former Google employees) and 24 witnesses total.  It is unlikely that PUM intends to play all of the deposition testimony it designated.  PUM takes issue with the fact that Google initially listed 13 of those Google witnesses as potential live witnesses.  In other words, PUM apparently believes that it will need to rely on these witnesses' testimony to prove its infringement claims, but is seeking to preclude Google from having the ability to rely on those same witnesses' testimony to rebut PUM's claims.  This is patently

unfair.   In the course of preparing the Joint Pretrial Order, PUM has dropped two

accused products, which resulted in PUM removing one Google witness from PUM's

witness list.  Google has removed the same witness, Andre Rohe, from its own witness

list based on PUM's representation that it is dropping Google News from its list of

accused products.

6.      In Exhibit 18, PUM proposes that PUM be permitted to examine Google's live witnesses

during Google's case and that PUM be permitted to exceed the scope of Google's direct

examination.  PUM further proposes that its case be left open pending completion of this

testimony.  Google does not agree to this proposal.

PUM has taken 19 depositions in this case.  It has designated nearly 34 hours of

deposition testimony.  Rather than narrow its case, PUM suggests it wants to wait until

Google puts on its case and try its case through the witnesses Google calls in its case.

PUM is the plaintiff asserting that Google infringes its patents.  The case that Google puts

on to rebut PUM's case-in-chief on infringement, including which witnesses Google will

call live, necessarily depends on the case-in-chief that PUM presents, including which

witnesses or deposition testimony PUM presents, and which theories PUM presents.

What PUM proposes will effectively  allow PUM to further delay settling and narrowing

PUM's actual infringement case.  It would also unfairly force Google to put on a defense

rebutting an infringement case that has not even been fully presented or that may change

or evolve even after PUM's case in chief is done.  PUM should to provide the evidence it

believes it needs in its case-in-chief using the depositions it has taken of Google's

witnesses.

Relatedly, PUM identifies Yochai Konig as a witness that it "may call" live.  Rather than put on its affirmative case during PUM's case with Mr. Konig's testimony, Google intends to call Mr. Konig live during its case, but seeks guidance from the Court if its preference is for Mr. Konig to take the stand only once.

7.    PUM requests that Google be precluded from referring to and presenting evidence of recent changes in its technology, including changes to the use of Google Search and ███████ (*See* Exhibit 18.)  This request is yet another improper motion *in limine* that should be disregarded by the Court.  However, to the extent that the Court considers PUM's request, Google does not believe that it should be so precluded.  Google could not disclose these changes during fact discovery because they had not yet occurred or been planned.  For example, In August 2012, Google informed PUM that ████████████ that PUM accuses of infringing the patents-in-suit in connection with Google Search would be phased out.  Google offered to provide PUM discovery on this change, but PUM chose not to pursue it.   On January 16, 2014, Google produced documents from October 2013 – January 2014 concerning the planned elimination of the ██████ functionality before trial.

There is no reason why Google should be precluded from informing the jury that Google does not use some of the accused functionality for some of the accused products anymore, or is planning to discontinue using those products, as PUM will presumably argue that its patents and their alleged use in Google's products are of great importance.  Also, as purported evidence of secondary considerations of non-obviousness, PUM's invalidity expert points to purposed commercial success from Google's accused products.  If PUM is permitted to introduce such evidence, and it should not as there is no nexus to

the accused functionality, Google should be permitted to refute it by showing that the accused functionalities did not even contribute to those revenues.  Similarly, PUM's invalidity expert opined that Google's "continued adoption of the patented technology, for example, in ███████" is evidence of the patents' non-obviousness.  Again, Google should be permitted to refute this argument by explaining that it is eliminating that functionality.

8.    PUM notes in Exhibit 18 that Dr. Jordan served a supplemental report on February 14, 2014.  This supplemental report is very limited; it only explains what has occurred in the *inter partes* reexaminations of the patents-in-suit since his last report was served.  That is, the Examiner has issued Final Office Actions rejecting all asserted claims of both patents-in-suit, and PUM has appealed those decisions to the PTAB.  To the extent that evidence or argument regarding the reexaminations is permitted (as it should be), Dr. Jordan should be able to provide the very minimal additional information referenced in his supplemental report so that the jury has current information.

9.    In Exhibit 18, PUM suggests a hearing set following the conclusion of the jury trial at which argument can be presented.  Google agrees with this approach, provided that such hearing be scheduled at a mutually convenient time for the parties and the Court.

10.    In Exhibit 18, PUM indicates that it wishes to discuss Google's listing of Reuben Benquessos (Banks) and Levy Benaim, on its Fifth Supplemental Initial Disclosures.  Google has never stated that it listed these witnesses "solely for purposes of harassment" as PUM states.  Rather, Google has repeatedly explained to PUM that it is presently not planning to call either witness, but reserves its right to do so based on PUM's recent

representation of their importance to PUM and the potential that either is implicated in testimony and theories presented by PUM at trial.   Both of these witnesses are individuals that PUM represented would be present for trial, and that the trial needed to be scheduled such that they could be available to attend.