IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HOLOGIC, INC., and CYTYC SURGICAL
PRODUCTS, LLC,

                         Plaintiffs,

           v.

MINERVA SURGICAL, INC.,

                         Defendant.

**1:15CV1031**

**INITIAL JURY INSTRUCTIONS**

## INSTRUCTION NO. 1

## DUTY

It will be your duty to decide from the evidence whether the plaintiff is entitled to a verdict against the defendant.  From the evidence, you will decide what the facts are. You are entitled to consider the evidence in the light of your own observations and experiences in life.  You may use reason and common sense to draw deductions from facts established by the evidence. You will then apply those facts to the law which I give you in these and the other instructions.  In that way, you will reach your verdict.  You are the sole judges of the facts; but you must follow the law as stated in my instructions, whether you agree or disagree with the law stated in the instructions.

Do not allow sympathy or prejudice to influence you. The law requires that your verdict be unaffected by anything except the evidence, your common sense, and the law stated in these and other instructions.

Anything that I may say or do during the trial must not be taken by you as an indication of what I think of the evidence or what I think your verdict should be.

# INSTRUCTION NO. 2

## EVIDENCE

The word "evidence" includes the testimony of witnesses; documents and other things received as exhibits; any facts that have been stipulated, that is, formally agreed to by the parties; and any facts that have been judicially noticed, that is, facts which I say you must accept as true.

Certain things are not evidence. I will list those things for you now:

1. Statements, arguments, questions and comments by lawyers are not evidence.

2. Exhibits that are identified by a party but not offered or received in evidence are not evidence.

3. Objections are not evidence. Lawyers have a right and sometimes an obligation to object when they believe that the evidence being offered is improper. You should not be influenced by the objection. If I sustain an objection to a question or an exhibit, you must ignore the question or the exhibit and must not try to guess what the information might have been.

4. Testimony and exhibits that I strike from the record or tell you to disregard are not evidence and must not be considered.

5. Anything you see or hear about this case outside this courtroom is not evidence, unless I specifically tell you otherwise during the trial.

Furthermore, a particular item of evidence is sometimes received for a limited purpose only. That is, it can be used by you only for one particular purpose, and not for any other purpose. I will tell you when that occurs, and instruct you on the purposes for which the item can and cannot be used. You should also pay particularly close attention

to such an instruction, because it may not be available to you in writing later in the jury room.

Finally, some of you may have heard the phrases or terms "direct evidence" and "circumstantial evidence."  Direct evidence is direct proof of a fact, such as testimony by an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.  You are instructed that you should not be concerned with those terms, since the law makes no distinction between the weight to be given to direct and circumstantial evidence.

**INSTRUCTION NO. 3**

**BENCH CONFERENCES AND RECESSES**


During the trial it may become necessary for me to talk with the lawyers outside your hearing, either by having a bench conference while you are present in the courtroom, or by calling a recess. Please understand that while you are waiting, the court and counsel are working.  The purpose of these conferences is to decide how certain evidence is to be treated under the rules of evidence which govern the trial, and to avoid confusion and error.  We will, of course, do what we can to keep the number and length of these conferences to a minimum.

**INSTRUCTION NO. 4**

**JURY QUESTIONS**

While evidence is being presented, you are not allowed to raise your hands to ask questions about that evidence.  However, if you do have questions about something you hear during the examination of a witness, you may write your questions down on a piece of paper.  When the attorneys have finished examining that witness, you may submit your written question or questions.  I will review each question with the attorneys.  You may not receive an answer to your question because I may decide that the question is not proper under the rules of evidence.  The attorneys may choose to answer your questions by asking more questions of the witness.  But even if the question is proper, you may not get an immediate answer to your question.  For instance, a witness or an exhibit that you will see later in the trial may answer your question.

## INSTRUCTION NO. 5

## NOTE-TAKING

If you wish, you may take notes to help you remember what witnesses said.  Notes may be helpful to you because at the end of the trial, you must make your decision based on what you recall of the evidence.  You will not have a written transcript to consult, and it may not be practical for the court reporter to read back lengthy testimony.  Therefore, you should pay close attention to the testimony as it is given.

If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide this case.  Do not let note-taking distract you to the point that you miss hearing other testimony from the witness.

During the trial, documents or other physical items may be received into evidence.  At the present, however, you will not be supplied with a list of exhibits which are received in evidence.  Therefore, you may wish to make notes about the exhibits, especially their description and number, so that you can refer to those exhibits while you are deliberating.

When we take our recess each day for the lunchtime break and when we take our recess each night, please take your notes to the jury room and leave your notes there. The courtroom deputy will take custody of your notes and secure them.

No one will read your notes but you.  Your notes will be destroyed after the trial is over.

**INSTRUCTION NO. 6**

**PREPONDERANCE OF EVIDENCE**


Your verdict depends on whether you find certain facts have been proved by a preponderance of evidence.   In order to find that a fact has been proved by a preponderance of evidence you must find that it is more likely true than not true.   It is determined by considering all of the evidence and deciding which evidence is more believable.

You have probably heard of the phrase "proof beyond a reasonable doubt."  That is a stricter standard which applies in criminal cases.  It does not apply in civil cases such as this.  You should, therefore, put it out of your minds.

# INSTRUCTION NO. 7

## WITNESSES

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe.  You may believe all of what a witness said, or only part of it, or none of it.

In deciding what testimony to believe, consider the witness's intelligence, the opportunity the witness had to have seen or heard the things testified about, a witness's memory, any motives that witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with any evidence that you believe.

In deciding whether or not to believe a witness, keep in mind that people sometimes hear or see things differently and sometimes forget things.  You need to consider therefore whether a contradiction is an innocent misrecollection or lapse of memory or an intentional falsehood, and that may depend on whether it has to do with an important fact or only a small detail.

**INSTRUCTION NO. 8**

**CONDUCT OF THE JURY**


To insure fairness, you as jurors must obey the following rules:

First, do not talk among yourselves about this case, or about anyone involved with this case, until the end of the case when you go to the jury room to decide on your verdict.

Second, do not talk with anyone else about this case, or about anyone involved with it, until the trial has ended and you have been discharged as jurors.

Third, when you are outside this courtroom, do not let anyone tell you anything about this case or anyone involved in it until the trial has ended and I have accepted your verdict.  If someone should try to talk to you about this case during the trial, please report it to me or to the deputy clerk.

Fourth, during the trial you should not talk with or speak to any of the parties, lawyers, or witnesses involved in this case—you should not even pass the time of day with any of them.  If a person from one side of the lawsuit sees you talking to a person from the other side—even if it is simply to pass the time of day—it might arouse an unwarranted suspicion about your fairness.  If a lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or encounter each other elsewhere while this trial is taking place, do not think he or she is being rude.  Those persons are not supposed to talk or visit with you, either.

Fifth, you must decide this case on the basis of evidence presented in the courtroom.  Therefore, do not read any news stories or articles about the case, or about anyone involved with this case, or listen to any radio or television reports about the case

or about anyone involved with it. In fact, until the trial is over you should probably avoid reading any newspapers or news journals, and avoid listening to any TV or radio newscasts. There might not be any news reports of this case, but, if there are, you might find yourself inadvertently reading or listening to something before you realize what you are doing.

Sixth, do not do any research—on the Internet, in libraries, in the newspapers, or in any other way—or make any investigation about this case on your own.  Do not use or refer to a dictionary or any law books concerning any aspect of this case, including any evidence introduced.  Do not visit the scene of any incident mentioned in this case and do not use Internet programs or other devices to electronically search for or view any place discussed in the testimony.  Also, do not research any information about this case, the law, or the people involved, including the parties, the witnesses, the lawyers, or the judge.

Seventh, do not form an opinion about any fact or issue in the case until you have received all of the evidence, have heard arguments of counsel, have been instructed as to the law of the case, and have retired to the jury room.  Consequently, do not make up your mind during the trial about what the verdict should be.  Keep an open mind until after you have gone to the jury room to decide the case and have discussed the evidence with the other jurors.

## INSTRUCTION NO. 9

## OUTSIDE COMMUNICATIONS AND RESEARCH

You, as jurors, must decide this case based solely on the evidence presented here within the four walls of this courtroom because the parties must have an opportunity to respond to any information you consider in deciding this case.  This means that during the trial you must not conduct any independent research about this case, the matters in the case, and the individuals or entities involved in the case.  In other words, you should not consult dictionaries or reference materials, search the Internet, websites, blogs, chat rooms, social networking websites including Facebook, My Space, LinkedIn or YouTube, or use your cell phones, iPhones, text messaging, Twitter or any other electronic tools or devices to obtain information about this case or to help you decide the case.

Until you retire to deliberate, you may not discuss this case with anyone, even your fellow jurors.  After you retire to deliberate, you may begin discussing the case with your fellow jurors, but you cannot discuss the case with anyone else until you have returned a verdict and the case is at an end.  I hope that for all of you this case is interesting and noteworthy.  However, until you have returned a verdict and the case is at an end, you must not talk to anyone or communicate with anyone about the case by any means, electronic or otherwise.  This includes communications with your family and friends.  Such communication would compromise your fairness as jurors and may require your removal from the case and a retrial of this matter at considerable expense to the parties.

**INSTRUCTION NO. 10**

**OUTLINE OF TRIAL**

The trial will proceed in the following manner:

First, the attorney for the plaintiff may make an opening statement. Next, the attorney for the defendant may make an opening statement.  An opening statement is not evidence but is an outline of what the party intends to prove, a summary of what the attorney expects the evidence to be.

The plaintiff's attorney will then present evidence through a direct examination of a witness.  The defendant's attorney may then cross-examine that witness.  After the cross-examination, the plaintiff's attorney may ask additional questions on re-direct.  The defendant's attorney may also ask questions on re-cross.  After all of the plaintiff's witnesses have been presented, the plaintiff will rest.  The defendant's attorney will then present the defendant's case.  The defendant may present evidence through direct examination of witnesses and plaintiff's attorney may cross-examine those witnesses. Re-direct and re-cross examinations may also take place.

Both parties also may present rebuttal witnesses and evidence.

After the presentation of evidence is completed, the attorneys will make their closing arguments to summarize and interpret the evidence for you.  Just as with opening statements, these closing arguments are not evidence.  I will then instruct you further on the law.  After that, you will retire to deliberate on your verdict.

**INSTRUCTION NO. 11**

**ADMITTED FACTS**

The parties have stipulated that certain facts are true, and those admitted facts may be read to you during trial.  You must treat any admitted facts as having been proved for the purposes of this case.

## INSTRUCTION NO. 12

## STATEMENT OF THE CASE

The parties in this case are Hologic, Inc. and Cytyc Surgical Products, LLC, and Minerva Surgical, Inc.  The case involves United States Patent No. 6,872,183, and United States Patent No. 9,095,348, obtained by Mr. Csaba Truckai, and transferred by Mr. Truckai to Hologic and Cytyc (collectively, "Hologic").  For your convenience, the parties and I will often refer to these patent numbers by the last three numbers of the patent number, namely, as the "'183 and '348 patents."

Each patent includes numbered claims that define the legal scope of the patented invention.  Hologic filed suit in this court seeking money damages from Minerva for allegedly infringing the '183 and '348 patents by making a product that infringes claims 7, 9, 11, 13 and 14 of the '183 Patent and claim 1 of the '348 Patent.  Hologic also alleged Minerva actively induced infringement of these claims of the patents by others, and/or contributed to the infringement of the asserted claims of the patents by others.  Hologic also alleged that Minerva's infringement of the '348 patent has been and continues to be willful.

Minerva denied that it infringed—directly or indirectly (under inducement or contributory infringement)—any of the asserted claims of the patents.  Minerva also denies that any alleged infringement has been willful.

It has already been determined that Minerva infringed the asserted claims of the patents involved in this action.  With respect to the patent infringement claim you will be asked to determine the damages that Hologic is entitled to recover and to determine whether Minerva's infringement was willful.  I will give more detailed instructions

regarding damages shortly.  Note, however, that is Hologic is entitled to recover no less than a reasonable royalty for each infringing sale.

In this case, Hologic seeks total damages of $17,824,534 on infringing sales of the Minerva EAS from August 2015 through March 31, 2018, comprising $16,234,761 in lost profits, $638,194 in reasonable royalty damages on sales not subject to lost profits. Alternatively, if the jury determines that it is only entitled to reasonable royalty damages, Hologic seeks a 10% royalty on infringing sales from August 2015 through March 31, 2018, yielding damages of $2,973,265.  Minerva denies the particular damages alleged by Hologic.

Hologic also alleges Minerva has engaged in (1) unfair competition under the Lanham Act, 15 U.S.C. § 1125, by using Hologic's NovaSure trademark to confuse customers as to the source of Minerva's EAS; (2) deceptive trade practices under 6 Del. C. § 2532; (3) unfair competition under Delaware common law; and (4) tortious interference with Hologic's business relationships under Delaware common law.  Minerva denies those claims.

Minerva also asserts counterclaims against Hologic.   Minerva contends that Hologic has engaged in (1) unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) & (c) by false advertising; (2) deceptive trade practices under 6 Del. C. § 2532; (3) unfair competition under Delaware common law; (4) interference with contract/business advantage; (5) breach of contract; and (6) trade libel.  Hologic denies those claims.

**INSTRUCTION NO. 13**

**PATENT INFRINGEMENT CLAIM**

**DAMAGES—LOST PROFITS—AMOUNT OF PROFIT**

Hologic may calculate its lost profits on lost sales by computing the lost revenue for sales it claims it would have made but for the infringement and subtracting from that figure the amount of additional costs or expenses it would have incurred in making those lost sales, such as cost of goods, sales costs, packaging costs, and shipping costs. Certain fixed costs that do not vary with increases in production or scale, such as taxes, insurance, rent, and administrative overhead, should not be subtracted from Hologic's lost revenue.

**INSTRUCTION NO. 14**

**PATENT INFRINGEMENT CLAIM**

**DAMAGES LOST PROFITS—DEMAND**

Demand for the patented product can be proven by significant sales of Hologic's patented product or significant sales of an infringing product containing the patented features.

**INSTRUCTION NO. 15**

**PATENT INFRINGEMENT CLAIM**

**DAMAGES—LOST-PROFITS—ACCEPTABILITY OF NON-INFRINGING**

**SUBSTITUTES**

To be an "acceptable, non-infringing substitute," a product must have the advantages of the patented invention that were important to people who purchased a Minerva product.  If purchasers of Minerva's product were motivated to buy that product because of features available only from that product and Hologic's patented product, then some other, alternative product or procedure is not an acceptable substitute, even if it otherwise competed with Hologic's and Minerva's products.  On the other hand, if the realities of the marketplace are that competitors other than Hologic would likely have captured the sales made by Minerva, despite a difference in the products or procedure, then Hologic is not entitled to lost profits on those sales.

**INSTRUCTION NO. 16**

**PATENT INFRINGEMENT CLAIM**

**AVAILABILITY OF NON-INFRINGING SUBSTITUTES**

An alternative product may be considered "available" as a potential non-infringing substitute even if the product or procedure was not actually on sale during the infringement period.  Factors suggesting the alternative was available include whether the material, experience, and know-how for the alleged substitute were readily available at the time of infringement.  Factors suggesting the alternative was not available include whether the material was of such high cost as to render the alternative unavailable and whether an alleged infringer had to design or invent around the patented technology to develop an alleged substitute.

**INSTRUCTION NO. 17**

**PATENT INFRINGEMENT CLAIM**

**LOST PROFITS—CAPACITY**

A patent holder is only entitled to lost profits for sales it could have actually made. In other words, Hologic must show that it had the manufacturing and marketing capability to make the sales it alleges it lost.  This means Hologic must prove it is more probable than not that it could have made and sold, or could have had someone else make or sell for it, the additional products it could have sold but for the infringement.

**INSTRUCTION NO. 18**

**PATENT INFRINGEMENT CLAIM**

**DAMAGES—MARKET SHARE**

If Hologic establishes it would have made some, but not all, of Minerva's sales but for the infringement, the amount of sales that Hologic lost may be shown by proving its share of the relevant market, excluding infringing products.  Hologic may be awarded a share of profits equal to its market share even if there were non-infringing substitutes available.  In determining a patent holder's market share, the market must be established first, which requires determining which products are in that market.  Products are considered in the same market if they are considered "sufficiently similar" to compete against each other.  Two products are sufficiently similar if one does not have a significantly higher price than, or possess characteristics significantly different from, the other.

**INSTRUCTION NO. 19**

**REASONABLE ROYALTY**

Hologic is entitled to at least a reasonable royalty to compensate it for that infringement.  If you find that Hologic has not proved its claim for lost profits, or has proved its claim for lost profits for only a portion of the infringing sales, then you must award Hologic a reasonable royalty for all infringing sales for which it has not been awarded lost profits damages.

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of royalty payment that a patent holder and infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began.  In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.

In determining this, you must assume that both parties believed the patent was valid and infringed and that both parties were willing to enter into an agreement.  The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred. Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.  Although evidence of the actual profits Minerva made may be used to determine the anticipated profits at the

time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits Minerva made.

**INSTRUCTION NO. 20**

**REASONABLE ROYALTY - FACTORS**

In determining the reasonable royalty, you should assume that both Hologic and Minerva knew all pertinent information at the time of the hypothetical negotiations.  Some of the kinds of factors that you may consider in making your determination are:

1.      The value that the claimed invention contributes to the accused product.

2.      The value that factors other than the claimed invention contribute to Minerva's EAS.

The following factors also can be considered to inform the hypothetical negotiations:

1.       The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty;

2.      The rates paid by the licensee for the use of other patents comparable to the patents-in-suit;

3.      The nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold;

4.      The licensor's established policy and marketing program to maintain his or her patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly;

5.      The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter;

6.      The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his nonpatented items, and the extent of such derivative or convoyed sales;

7.      The duration of the patents-in-suit and the term of the license;

8.      The established profitability of the product made under the patents, its commercial success, and its current popularity;

9.      The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

10.     The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

11.     The extent to which Minerva has made use of the invention and any evidence probative of the value of that use;

12.     The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions;

13.     The portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by Minerva;

14.     The opinion and testimony of qualified experts; and

15.     The amount that a licensor (such as the patentee) and a licensee (such as Minerva) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a

prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors.  You may also consider any other factors which in your mind would have increased or decreased the royalty Minerva would have been willing to pay and Hologic would have been willing to accept, acting as normally prudent business people.

**INSTRUCTION NO. 21**

**PATENT INFRINGEMENT CLAIM**

**DAMAGES APPORTIONMENT**

Where there are multiple components in the accused product, patent damages—in the form of lost profits or reasonable royalty—must only reflect the value attributable to the infringing features of the accused product, here Minerva's EAS.  In other words, non-infringing features of Minerva's EAS should not be included in the damages calculation and must be separated out.  In addition, the patent damages—in the form of lost profits or reasonable royalty—must also reflect only the accused features' improvement, and not the conventional components of the multicomponent product.

**INSTRUCTION NO. 22**

**PATENT INFRINGEMENT CLAIM**

**DATE OF COMMENCEMENT OF DAMAGES**

Damages for infringement of the patents-in-suit should be calculated beginning on August 2015, when Minerva first sold the accused Minerva EAS.

The hypothetical negotiation would also occur by August 2015, when Minerva began selling the accused Minerva EAS.

**INSTRUCTION NO. 23**

**PATENT INFRINGEMENT CLAIM**

**WILLFUL INFRINGEMENT**

In this case, Hologic argues that Minerva infringed willfully the '348 patent.  You must determine if Minerva's infringement was willful.  Willfulness requires you to determine by a preponderance of evidence whether the infringement by Minerva was especially worthy of punishment.  You may not determine that the infringement was willful just because Minerva knew of the '348 patent and infringed it.  Instead, willful infringement is reserved for egregious cases typified by willful—intentional, reckless or knowing—misconduct.

To determine whether Minerva acted willfully, consider all facts.  These may include, but are not limited, to:

1.      Whether or not Minerva acted consistently with the standards of behavior for its industry;

2.      Whether or not Minerva intentionally copied a product of Hologic that is covered by the '348 patent;

3.      Whether or not Minerva reasonably believed it did not infringe or that the patents were invalid;

4.      Whether or not Minerva made a good-faith effort to avoid infringing the '348 patent, for example, whether Minerva attempted to design around the '348 patent; and

5.      Whether or not Minerva tried to cover up its infringement.

## INSTRUCTION NO. 24

## DECEPTIVE TRADE PRACTICES

## DELAWARE UNIFORM DECEPTIVE TRADE PRACTICES ACT

Each party contends that the other has engaged in deceptive trade practices under the Delaware Uniform Deceptive Trade Practices Act.  To recover on a claim for a violation of the Delaware Deceptive Trade Practices Act, the party asserting the claim must prove by a preponderance of the evidence that the accused party, in the course of its business, either:

1.      Represented that its goods have characteristics, uses, or benefits that they do not have; or

2.      Disparaged the goods, services or business of the accused party by false or misleading representation of fact; or

3.      Advertised its goods with an intent not to sell them as advertised; or

4.      Engaged in other conduct that creates likelihood of confusion or misunderstanding.

If you find the party asserting the claim has proved, by a preponderance of the evidence, one or more of the above listed elements, your verdict will be for that party.  If you find the party asserting the claim has not proved one or more of the above listed elements your verdict will against that party on this claim.

**INSTRUCTION NO. 25**

**DELAWARE DECEPTIVE TRADE PRACTICES ACT EXPLAINED**

In order to prevail on a claim under the Delaware Deceptive Trade Practices Act, a party need not prove competition between the parties or actual confusion or misunderstanding.  The Delaware Deceptive Trade Practices Act is directed at patterns of deceptive conduct, not isolated statements or isolated incidents.  The party asserting the claim must prove by a preponderance of the evidence there is a reasonable probability of deception as opposed to a speculative or possibility of confusion.

**INSTRUCTION NO. 26**

**UNFAIR COMPETITION UNDER DELAWARE COMMON LAW**

Each party also contends that the other has engaged in unfair competition under the common law of Delaware.  To recover on a claim of unfair competition under Delaware common law, the party asserting the claim must prove by a preponderance of the evidence:

1.      The party asserting the claim had a reasonable expectancy of entering a valid business relationship with its customers in the form of product sales;

2.      The accused party wrongfully interfered with that relationship;

3.      The accused party's wrongful interference defeated the party asserting the claim's legitimate expectancy of entering a valid business relationship; and

4.      The party asserting the claim was injured as a result of the accused party's unfair competition.

If you find the party asserting the claim has proved, by a preponderance of the evidence, all of the above listed elements, your verdict will be for that party.  If you find one or more of the elements has not been proved, your verdict will against be against that party on this claim.

**INSTRUCTION NO. 27**

**COMMON LAW UNFAIR COMPETITION – EXPLAINED**

Some amount of interference is justified and encouraged in a free market system and companies have a right to compete in the market.  The essential element separating unfair competition from legitimate market participation is an unfair action on the part of an accused party that prevents the party asserting the claim from legitimately earning revenue.  Types of interference that are wrongful and which may therefore constitute unfair competition include, for example, using deceptive representations in connection with products or services; representing that products or services have characteristics or benefits that they do not have; or disparaging the products of others by false or misleading representations of fact.

**INSTRUCTION NO. 28**

**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES**

**ELEMENTS**

Each party also contends that the other tortiously interfered with its business expectancies.  To recover on a claim of tortious interference with business expectancies, the party asserting the claim must prove by a preponderance of the evidence the following elements:

1.      The existence of a valid business relationship or expectancy on the part of the party asserting the claim;

2.      Knowledge of the relationship or expectancy on the part of the accused party;

3.      Intentional interference by the accused party which induced or caused a termination of the relationship or expectancy; and

4.      Resulting damages to the party asserting the claim, whose relationship or expectancy has been disrupted.

If you find the party asserting the claim has proved, by a preponderance of the evidence, all of the above listed elements, your verdict will be for that party.  If you find one or more of the elements has not been proved, your verdict will against be against that party on this claim.

**INSTRUCTION NO. 29**

**TORTIOUS INTERFERENCE EXPLAINED**

A company has the privilege to interfere in some ways with business opportunities. The key is whether the interference is both intentional and improper.

There are several factors you can use to help you determine whether acts of interference are improper.  They include: (a) the nature of the party's conduct; (b) the party's motive; (c) the interests of the party asserting the claim; (d) the interests sought to be advanced by the accused party; (e) the societal interests in protecting the freedom of action of the accused party and the contractual interests of the party asserting the claim; (f) the proximity or remoteness of the party asserting the claim conduct to the interference; (g) the relations between the parties, and (h) whether the party's statement was true.

**INSTRUCTION NO. 30**

**LANHAM ACT**

**TRADEMARK INFRINGEMENT—NATURE OF CLAIM**

A trademark is a word, symbol, or combination of words or symbols used by a person to identify his product, to distinguish his product from those manufactured or sold by others, and to indicate the source of his product.

The purpose of trademark law is to prevent confusion among consumers about the source of products and to permit trademark owners to show ownership of their products and control their product's reputation.

Hologic claims that Minerva infringed its United States trademark registration No. 2513050, which was registered November 27, 2001 for NovaSure ("the NovaSure mark") by using Hologic's NovaSure trademark to confuse customers as to the source of Minerva's EAS.  Minerva denies using the NovaSure mark, and contends that its use, if any, was to describe the differences between the devices, the relationship of the parties, and/or the professional accomplishments of its founders and management team.

**INSTRUCTION NO. 31**

**TRADEMARK INFRINGMENT**

**ELEMENTS**

Hologic claims Minerva infringed Hologic's trademark.  In order to recover for trademark infringement under the Lanham Act, Hologic must prove the following elements by a preponderance of evidence:

1.      Hologic owns NovaSure as a trademark;

2.      NovaSure is a valid trademark;

3.      Minerva used the NovaSure mark in interstate commerce;

4.      Minerva used the NovaSure mark without the consent of Hologic in a manner that is likely to cause confusion as to the source of the Minerva EAS; and Minerva's use of the NovaSure mark caused an injury to Hologic's commercial business interest in the form of lost sales or harm to its business reputation.

If you find that each of these elements has been proved by a preponderance of the evidence, then you must find in favor of Hologic.  However, if any of these elements has not been proved by a preponderance of the evidence, then you must find for Minerva on this claim.

**INSTRUCTION NO. 32**

**TRADEMARK INFRINGEMENT**

**LIKELIHOOD OF CONFUSION—FACTORS**

One of the things that Hologic must prove is that Minerva used Hologic's trademark, NovaSure, in a manner likely to cause confusion as to the source or origin of Minerva's EAS product.  Hologic must prove a likelihood of confusion among a significant number of people who buy or use, or consider buying or using, the product or similar products.  In deciding this, you should consider the following:

1.      Whether the overall impression created by Minerva's use is similar to that created by Hologic's trademark in appearance;

2.      Whether Minerva and Hologic use their trademarks on the same or related products;

3.      Whether Minerva's and Hologic's products are likely to be sold in the same or similar stores or outlets, or advertised in similar media;

4.      The degree of care that purchasers or potential purchasers are likely to exercise in buying or considering whether to buy the product.  This may depend on the level of sophistication of potential buyers of the product and/or the cost of the product;

5.      The degree to which purchasers or potential purchasers recognize Hologic's trademark as an indication of the origin of Hologic's product.

6.      Whether Minerva's use of the trademark has led to instances of actual confusion among purchasers or potential purchasers about the source of Minerva's product.  However, actual confusion is not required for finding a likelihood of confusion;

7.      Whether Minerva intended to pass off his product as that of Plaintiff, or intended
to confuse consumers.

The weight to be given to each of these factors is up to you to determine.  No
particular factor or number of factors is required to prove likelihood of confusion.

**INSTRUCTION NO. 33**

**LANHAM ACT**

**FALSE ADVERTISING—ELEMENTS OF CLAIM**

Minerva claims that Hologic has engaged in false advertising.  To succeed on this claim, Minerva must prove all of the following elements by a preponderance of the evidence:

1.      Hologic made a false or misleading factual representation of the nature, characteristics, or qualities of its own products or Minerva's products;

2.      The statement actually deceived or had the tendency to deceive a substantial segment of the intended audience;

3.      The deception was likely to influence the purchasing decisions of consumers; Hologic's false or misleading statement of fact was material to the purchasing decision of customers in that it was likely to influence purchasing decisions;

4.      Hologic's advertised goods and services travel in and/or affect interstate commerce; and

5.      Minerva has been or was likely to be injured as a result of Hologic's false or misleading statement of fact.  Injury includes direct diversion of sales from Minerva to Hologic or a loss of goodwill associated with Minerva's products.

If you find that all of these elements have been proved by a preponderance of the evidence, your verdict should be for Minerva on this claim.  On the other hand, if any of these elements has not been proved by a preponderance of the evidence, your verdict should be for Hologic on this claim.

**INSTRUCTION NO. 34**

**TRADE LIBEL CLAIM**

Minerva contends that Hologic engaged in trade libel.  To recover on its claim of trade libel, Minerva must prove the following elements by a preponderance of evidence:

1.      Hologic made a false statement;

2.      Hologic either intended the false statement to cause economic loss or reasonably should have recognized that it would result in economic loss;

3.      Minerva suffered an economic loss; and

4.      Hologic either knew that the statement was false or acted in reckless disregard for its truth or falsity.

If you find that each of these elements has been proved by a preponderance of the evidence, then you must find in favor of Minerva.  However, if any of these elements has not been proved by a preponderance of the evidence, then you must find for Hologic on this claim.

**INSTRUCTION NO. 35**

**BREACH OF CONTRACT CLAIM**

Minerva contends that Hologic breached the parties' January 6, 2010, Non-Disclosure Agreement.  To recover on its claim for breach of contract, Minerva must prove by a preponderance of the evidence that:

1.       The parties entered a contract;

2.       Hologic breached an obligation set forth in that contract; and

3.       The breach resulted in damage to Minerva.

If you find that each of these elements has been proved by a preponderance of the evidence, then you must find in favor of Minerva on this claim.  If any of these elements has not been proved by a preponderance of the evidence, then you must find for Hologic on this claim.

**INSTRUCTION NO. 36**

**DAMAGES – STATE LAW CLAIMS**

If you find in favor of either party on its statutory or common law deceptive trade practices claims, tortious interference claims, Lanham Act trademark infringement/false advertising claims, trade libel claim or breach of contract claim, you will be asked to determine the amount of damages that will fairly compensate the party asserting the claim.  I will instruct you further as to the measure of damages for these claims at the end of the trial.

**INSTRUCTION NO. 37**
**EXPERT WITNESSES**

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field, who we call an expert witness, is permitted to state his or her opinion on those technical matters.  You will hear testimony in this case from expert witnesses.

Expert testimony should receive whatever weight and credit you think appropriate given all the other evidence in the case.  You are free to accept or reject the testimony of experts just as with any other witness.  In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I've previously mentioned for weighing testimony of all witnesses.  If you decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you conclude that the reasons given in support of the opinion are not sound, or if you feel that the opinion is outweighed by other evidence, you may disregard the opinion in whole or in part.

**INSTRUCTION NO. 38**
**DEPOSITION TESTIMONY**

You may hear witnesses testify through deposition testimony.  A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath and swears to tell the truth, and lawyers for each party may ask questions.  A court reporter is present and records the questions and answers.

Deposition testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness had been present to testify.

In this trial, you may also hear from certain "Rule 30(b)(6)" corporate witnesses for the parties via deposition.   A Rule 30(b)(6) corporate witness is a person that a corporation has chosen to designate to speak on behalf of itself.  This type of witness must be knowledgeable to speak on the specific identified topics and is required to give complete and knowledgeable answers on the corporation's behalf.  The testimony of a Rule 30(b)(6) witness at his or her deposition is binding on the corporate party on those topics and, at trial, the party cannot contradict this earlier deposition testimony.  Before any Rule 30(b)(6) corporate witnesses testify, you will be told that the witness is a Rule 30(b)(6) witness.